**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

KUMHO P&B CHEMICALS INC.

      Plaintiff,

   v.

UNITED STATES,

      Defendant.

Court No. 25-00143

**COMPLAINT**

1.     Plaintiff Kumho P&B Chemicals Inc. ("Plaintiff" or "KPB") by and through its counsel hereby alleges and states as follows:

**JURISDICTION**

2.     Plaintiff brings this action pursuant to 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II) and (a)(2)(B)(i) to contest certain aspects of the final determination of the countervailing duty ("CVD") investigation on certain epoxy resins from the Republic of Korea, case no. C-580-920, issued by the International Trade Administration of the United States Department of Commerce ("Commerce"). *Certain Epoxy Resins From the Republic of Korea: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination,* 90 Fed. Reg. 14,605 (Dep't Commerce April 3, 2025) ("*Final Determination*") and accompanying Issues and Decision Memorandum ("*Final IDM*").

3.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) because this action is commenced pursuant to 19 U.S.C. § 1516a.

**PARTIES AND STANDING**

4.      Plaintiff is a manufacturer and exporter to the United States of epoxy resins from the Republic of Korea and therefore is an interested party within the meaning of sections 771(9)(A) and 516A(f)(3) of the Act, 19 U.S.C. §§ 1677(9)(A) and 1516a(f)(3).  Plaintiff was also a party to the administrative proceeding that led to the determination that is being challenged herein, as Plaintiff was selected by Commerce as a mandatory respondent, responded to all of Commerce's questionnaires, and submitted a case brief to Commerce.  Accordingly, Plaintiff has standing pursuant to 28 U.S.C. § 2631(c) to commence this action.

**TIMELINESS OF THE ACTION**

5.      On May 27, 2025, Commerce published the CVD order in the *Federal Register*. *Certain Epoxy Resins from Taiwan: Amended Final Countervailing Duty Determination; Certain Epoxy Resins from the Republic of Korea and Taiwan; Countervailing Duty Orders*, 90 Fed. Reg. 22,235 (Dep't Commerce May 27, 2025).  Plaintiff timely filed a Summons on June 26, 2025, and this Complaint is filed within thirty days of the filing of the Summons, pursuant to 19 U.S.C. § 1516a(a)(2)(A), 28 U.S.C. § 2636(c), and USCIT Rules 3(a)(2) and 6(a).

**STATEMENT OF FACTS**

6.      On April 29, 2024, Commerce published its initiation notice for the CVD investigation on epoxy resins from various countries, including the Republic of Korea.  *See Certain Epoxy Resins From the People's Republic of China, India, the Republic of Korea, and Taiwan: Initiation of Countervailing Duty Investigations*, 89 Fed. Reg. 33,319 (Dep't Commerce Apr. 29, 2024).  On May 9, 2024, Commerce selected KPB as one of two mandatory respondents to be individually investigated.  *See* Memorandum from Thomas Martin, International Trade Compliance Analyst, Office IV, AD/CVD Operations, "Countervailing Duty Investigation of

Epoxy Resins from the Republic of Korea: Respondent Selection" (May 9, 2024). Commerce issued the initial questionnaire the next day on May 10, 2024. Letter from Robert Bolling, Program Manager, Office IV, AD/CVD Operations, "Investigation of Certain Epoxy Resins from Korea: Countervailing Duty Questionnaire" (May 10, 2024) ("Initial Questionnaire"). On July 3, 2024, KPB filed its Initial Questionnaire response. *See* Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, "Certain Epoxy Resins from Korea, Case No. C-580-920: KPB's Initial Questionnaire Response" (July 3, 2024) ("KPB's IQR"). The Government of Korea ("GOK") also filed its response to the Initial Questionnaire on July 3, 2024. *See* Letter from Lee & Ko LLC to Sec'y Commerce, "Certain Epoxy Resins from Korea: GOK's Initial Questionnaire Response" (July 3, 2024) ("GOK IQR").

7.      One of the programs being reviewed by Commerce was the alleged provision of electricity for less than adequate remuneration ("LTAR"). *See* Initial Questionnaire at 29-34. Although Commerce's analysis is complex and focuses upon whether the Korea Electric Power Corporation's ("KEPCO") electricity prices are "consistent with market principles," the primary focus of the analysis is whether KEPCO fully recovers its cost and profit. *See, e.g.,* Final IDM at Comment 1. Commerce thus required the GOK to submit KEPCO's cost data for the calendar year 2023 investigation period. *See* Initial Questionnaire at 32.

8.      In its Initial Questionnaire, the GOK was unable to provide the KEPCO data for calendar year 2023 because at the time that it submitted its response that data was not finalized. *See* GOK IQR at 78. The GOK subsequently submitted the KEPCO 2023 cost data in response to a supplemental questionnaire. *See* Letter from Lee & Ko LLC to Sec'y Commerce, "Certain Epoxy Resins from the Republic of Korea: GOK's Supplemental Questionnaire Response" (Aug. 30, 2024) ("August 30 GOK Response") at Exhibit E-23. In response to another supplemental

questionnaire the GOK submitted the KEPCO 2023 cost data in an Excel file with certain formulas made visible for Commerce.  *See* Letter from Lee & Ko LLC to Sec'y Commerce, "Certain Epoxy Resins from the Republic of Korea: GOK's Supplemental Questionnaire Response" (Sept. 19, 2024) at Exhibit E-23.1.  There were no changes to the actual cost data that had previously been submitted in the August 30 GOK Response.  *See id.* at 1.

9.     In its Initial Questionnaire response, the GOK also provided confidential data on the amount of electricity provided to the ten largest electricity consuming industries in calendar year 2023.  *See* GOK IQR at 79-80.  The data was based on the largest categories of the Korean Standard Industrial Classification and was provided (i) based on the percentage of electricity consumed in the relevant industry to the total amount of *all* electricity, and also (ii) as a percentage of the total amount of *industrial* electricity.  *See id.*  This data was requested by Commerce for purposes of its analysis of whether the electricity for LTAR program provided a specific subsidy as required to find a countervailable subsidy.  *See* 19 U.S.C. § 1677(5A).  The GOK later provided updated electricity consumption data in response to a supplemental questionnaire issued by Commerce.  *See* Letter from Lee & Ko to Sec'y Commerce, "Certain Epoxy Resins from the Republic of Korea: GOK's First Supplemental Questionnaire Response" (Aug. 2, 2024) ("GOK 1SQR") at 13-14.  This supplemental questionnaire requested usage data for ten manufacturing industry sectors, including the "manufacture of chemicals and chemical products; except pharmaceuticals and medicinal chemicals" industry.  *Id.*[1]

---

[1] To be clear, the amount of electricity provided to the relevant industry was divided (i) by the total amount of electricity consumed and also (ii) by the total amount of electricity consumed by the industrial sector.  The use of the different denominators yielded different percentages for the relevant industries.  *See* GOK 1SQR at 13-14.

10.     On September 13, 2024, Commerce published its *Preliminary Determination* in the Federal Register.  *See Certain Epoxy Resins From the Republic of Korea:  Preliminary Negative Countervailing Duty Determination, Preliminary Negative Critical Circumstances Determination and Alignment of Final Determination with Final Antidumping Duty Determination,* 89 Fed. Reg. 74,912 (Dep't Commerce Sept. 13, 2024) ("*Preliminary Determination*"), and accompanying Preliminary Decision Memorandum ("PDM").  In the *Preliminary Determination*, Commerce determined that the provision of electricity by the GOK was *de facto* specific pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(III) because the chemical industry allegedly "received a disproportionately large amount of the subsidy." *Id.* at 24.  In making its *de facto* specificity determination, Commerce relied upon the electricity consumption data that had been submitted by the GOK.  *See id.* (citing GOK 1SQR at 13-14).

11.     From January 6, 2025, through January 8, 2025, Commerce conducted verification of the GOK, which included verification of the electricity for LTAR program.  *See* Memorandum from Benjamin Blythe, Thomas Martin & Joshua Jacobsen, International Trade Analysts, AD/CVD Operations, Office IV, "Countervailing Duty Investigation of Certain Epoxy Resins from the Republic of Korea: Verification of the Questionnaire Responses of the Government of the Republic of Korea" (Feb. 7, 2025).  As part of the GOK verification, Commerce verified the electricity for LTAR program.  *See id.* at 2-10.

12.     The parties then submitted case briefs on February 24, 2025, including the GOK and KPB.  *See* Letter from Lee & Ko to Sec'y Commerce, "Certain Epoxy Resins from the Republic of Korea: GOK's Case Brief" (Mar. 17, 2025) ("GOK's Case Brief"); Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, "KPB's Case Brief" (Feb. 24, 2025) ("KPB's Case Brief").  In its case brief, KPB argued that Commerce's determination that the

provision of electricity for LTAR program was *de facto* specific was unlawful. *See* KPB's Case Brief at 4-10. The GOK also argued that the specificity determination was unlawful. *See* GOK Case Brief at 13-20.

13.     Commerce published its *Final Determination* in the Federal Register on April 3, 2025. In the *Final Determination,* Commerce continued to determine that the provision of electricity in Korea was *de facto* specific pursuant to section 771(5A)(D)(iii)(III) of the Act. Final IDM at 22-28. To support its *de facto* specificity determination, Commerce relied on the usage data provided by the GOK for the chemical industry and the top ten largest electricity consuming industries that reflected their consumption as a proportion of the total amount of electricity consumed in Korea and within the industrial classification. *See id*. at 23, 27-28. The GOK data was proprietary, but Commerce found that it demonstrated that "the chemical industry consumed a significant portion of the total industrial class electricity consumed during the POI; therefore, we conclude that the chemical industry also received a disproportionately large amount of the subsidy within the meaning of section 771(5A)(D)(iii)(I) of the Act." *Id.* at 28.

14.     This appeal followed.

## STATEMENT OF CLAIMS

15.     This Court shall hold unlawful any determination, finding, or conclusion found to be unsupported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1).

16.     Commerce's *Final Determination* is unsupported by substantial evidence and is otherwise not in accordance with law in the following respects:

## Count One

17.     Paragraphs 1 through 16 are incorporated by reference as if fully set forth herein.

18.     Commerce's determination that the provision of electricity for LTAR was *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(III) is unsupported by substantial evidence and is otherwise not in accordance with law.

## PRAYER FOR RELIEF

19.     WHEREFORE, Plaintiff KPB respectfully requests that this Court:

  a.  Hold Commerce's *Final Determination* unsupported by substantial record evidence and otherwise not in accordance with law;

  b.  Remand the *Final Determination* to Commerce for a redetermination consistent with the judgment and findings of this Court; and

  c.  Provide such other relief as this court deems appropriate.

Respectfully submitted,

**MORRIS MANNING & MARTIN LLP**
1333 New Hampshire Avenue, NW, Suite 800
Washington, D.C. 20036
(202) 216-4116

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

*Counsel to Kumho P&B Chemicals Inc.*

Dated: July 25, 2025