**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| KUMHO P&B CHEMICALS INC. | |
| Plaintiff, | |
| and, | |
| KUKDO CHEMICAL CO., LTD., and U.S. EPOXY RESIN PRODUCERS AD HOC COALITION | |
| Consolidated Plaintiffs, | |
| v. | **NON-CONFIDENIAL VERSION** |
| UNITED STATES, | Proprietary Information Removed from Pages 4 and 10 |
| Defendant, | |
| and, | |
| U.S. EPOXY RESIN PRODUCERS AD HOC COALITION | Consol. Ct. No. 25-cv-00143-GSK |
| Defendant Intervenor, | |
| and, | |
| KUMHO P&B CHEMICALS INC., and KUKDO CHEMICAL CO., LTD., | |
| Consolidated Defendant-Intervenors. | |

<u>**PLAINTIFF KUMHO P&B CHEMICALS INC.'S**</u>
<u>**MOTION FOR JUDGMENT ON THE AGENCY RECORD**</u>

Pursuant to Rule 56.2 of the Rules of this Court, Plaintiff Kumho P&B Chemicals Inc.

("KPB" or "Plaintiff") hereby moves for judgment on the agency record in this action.  KPB

challenges the *Final Determination* issued by the U.S. Department of Commerce ("Commerce")

in *Certain Epoxy Resins From the Republic of Korea:  Final Affirmative Countervailing Duty*

*Determination and Final Negative Critical Circumstances Determination,* 90 Fed. Reg. 14,605

(Dep't Commerce April 3, 2025) ("*Final Determination*") in the following respect: Commerce's

determination that the provision of electricity for LTAR was *de facto* specific under 19 U.S.C.

§ 1677(5A)(D)(iii)(III) is unsupported by substantial evidence and is otherwise not in accordance with law.  A proposed order is also attached.

WHEREFORE, Plaintiff respectfully requests that this Court grant this motion and (1) hold Commerce's Final Determination unsupported by substantial record evidence and otherwise not in accordance with law; (2) remand the *Final Determination* to Commerce for a redetermination consistent with the judgment and findings of this Court; and (3) grant such other relief as the Court shall deem just and proper.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Nicholas C. Duffey

**MORRIS, MANNING & MARTIN LLP**
1333 New Hampshire Avenue NW, Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Kumho P&B Chemicals Inc.*

Dated:  December 2, 2025

2

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| KUMHO P&B CHEMICALS INC.<br><br>      Plaintiff,<br><br>   and,<br><br>KUKDO CHEMICAL CO., LTD., and U.S. EPOXY RESIN PRODUCERS AD HOC COALITION<br><br>      Consolidated Plaintiffs,<br><br>   v.<br><br>UNITED STATES,<br><br>      Defendant,<br><br>   and,<br><br>U.S. EPOXY RESIN PRODUCERS AD HOC COALITION<br><br>      Defendant Intervenor,<br><br>   and,<br><br>KUMHO P&B CHEMICALS INC., and KUKDO CHEMICAL CO., LTD.,<br><br>      Consolidated Defendant-Intervenors. | Consol. Ct. No. 25-cv-00143-GSK |

**ORDER**

  Upon consideration of Plaintiff Kumho P&B Chemicals Inc.'s Rule 56.2 Motion for Judgment on the Agency Record, and all other pertinent papers, it is hereby:

  **ORDERED** that Plaintiff's motion is granted; and it is further

  **ORDERED** that the *Final Determination* issued by the U.S. Department of Commerce ("Commerce") in *Certain Epoxy Resins From the Republic of Korea:  Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 90 Fed. Reg. 14,605 (Dep't Commerce April 3, 2025) ("*Final Determination*") is unsupported by substantial evidence and otherwise not in accordance with law; and it is further

**ORDERED** that the Final Determination is hereby remanded to Commerce for reconsideration in accordance with the Court's opinion in this matter.

**SO ORDERED.**

Dated: _____          _____
          New York, New York                    Gary S. Katzmann, Judge

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| KUMHO P&B CHEMICALS INC.<br><br>                Plaintiff,<br><br>     and,<br><br>KUKDO CHEMICAL CO., LTD., and U.S. EPOXY RESIN PRODUCERS AD HOC COALITION<br><br>              Consolidated Plaintiffs,<br><br>  v.<br><br>UNITED STATES,<br><br>              Defendant,<br><br>     and,<br><br>U.S. EPOXY RESIN PRODUCERS AD HOC COALITION<br><br>              Defendant Intervenor,<br><br>     and,<br><br>KUMHO P&B CHEMICALS INC., and KUKDO CHEMICAL CO., LTD.,<br><br>              Consolidated Defendant-Intervenors. | **NON-CONFIDENIAL VERSION**<br>Proprietary Information Removed from Pages 4 and 10<br><br><br>Consol. Ct. No. 25-cv-00143-GSK |

**PLAINTIFF KUMHO P&B CHEMICALS INC.'S BRIEF IN SUPPORT OF**
**ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Nicholas C. Duffey

**MORRIS, MANNING & MARTIN, LLP**
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Plaintiff Kumho P&B Chemicals Inc.*

December 2, 2025

## <u>TABLE OF CONTENTS</u>

I.   Statement Pursuant to Rule 56.2 ................................................................................. 2

II.  Issues of Law Presented and Reasons For Contesting The Administrative Determination ... 2

III. Statement of Facts ..................................................................................................... 2

IV.  Summary of Argument ............................................................................................... 6

V.   Standard of Review .................................................................................................... 7

VI.  Argument .................................................................................................................. 8

   A.   Commerce's Determination That KEPCO's Provision of Electricity for LTAR Is *De Facto* Specific Is Unsupported by Substantial Evidence And Is Otherwise Contrary to Law. ........................................................................................................................ 8

     1.   Commerce's *De Facto* Specificity Analysis Fails to Show That the Chemical Industry Grouping Received A Disproportionately Large Amount of the Electricity for LTAR Subsidy. ...................................................................................................... 8

     2.   Commerce's Attempts to Justify Its Disproportionality Determination Are Not Persuasive. ................................................................................................................ 16

VII. CONCLUSION ........................................................................................................ 20

Case 1:25-cv-00143-GSK   Document 29   Filed 12/02/25   Page 7 of 38


## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AK Steel Corp. v. United States*,
    192 F.3d 1367 (Fed. Cir. 1999)...........................................................................12, 13, 14, 15

*Bethlehem Steel Corp. v. United States*,
    140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) ........................................................13, 14, 18, 19

*Carlisle Rubber & Tire Co. v. United States*,
    564 F. Supp. 834 (Ct. Int'l Trade 1983) ......................................................................9, 15, 16

*Gov't of Quebec v. United States*,
    105 F.4th 1359 (Fed. Cir. 2024) ..................................................................................9, 13, 16

*Hyundai Steel v. United States*,
    745 F. Supp. 3d 1345 (Ct. Int'l Trade 2024) ................................................................ *passim*

*Hyundai Steel v. United States*,
    No. 23-00211-CRK, 2025 WL 2400442 (Ct. Int'l Trade Aug. 12, 2025) ...................... *passim*

*Mosaic Co. v. United States*,
    744 F. Supp. 3d 1367 (Ct. Int'l Trade 2025) ....................................................................9, 15

*POSCO v. United States*,
    No. 24-cv-00006-JSR, 2025 WL 2269772 (Ct. Int'l Trade Aug. 8, 2025)..................... *passim*

*Royal Thai Gov't v. United States*,
    436 F.3d 1330 (Fed. Cir. 2006)............................................................................................12

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)...........................................................................................................7

19 U.S.C. § 1677(5)(B).....................................................................................................................8

19 U.S.C. § 1677(5A) ............................................................................................................. *passim*

**Other Authorities**

*Certain Epoxy Resins From the People's Republic of China, India, the Republic
of Korea, and Taiwan: Initiation of Countervailing Duty Investigations*, 89
    Fed. Reg. 33,319 (Dep't Commerce Apr. 29, 2024).................................................................2

*Certain Epoxy Resins From the Republic of Korea: Final Affirmative*
   *Countervailing Duty Determination and Final Negative Critical*
   *Circumstances Determination,* 90 Fed. Reg. 14,605
   (Dep't Commerce April 3, 2025) ...................................................................... *passim*

*Certain Epoxy Resins From the Republic of Korea: Preliminary Negative*
   *Countervailing Duty Determination, Preliminary Negative Critical*
   *Circumstances Determination and Alignment of Final Determination with*
   *Final Antidumping Duty Determination,* 89 Fed. Reg. 74,912
   (Dep't Commerce Sept. 13, 2024) ............................................................... 4, 5, 18

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep.
   No. 103-316, reprinted in 1994 U.S.C.C.A.N. 4040 ............................... 9, 15, 16, 17

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| KUMHO P&B CHEMICALS INC. <br><br> Plaintiff, <br><br> and, <br><br> KUKDO CHEMICAL CO., LTD., and U.S. EPOXY RESIN PRODUCERS AD HOC COALITION <br><br> Consolidated Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and, <br><br> U.S. EPOXY RESIN PRODUCERS AD HOC COALITION <br><br> Defendant Intervenor, <br><br> and, <br><br> KUMHO P&B CHEMICALS INC., and KUKDO CHEMICAL CO., LTD., <br><br> Consolidated Defendant-Intervenors. | **NON-CONFIDENIAL VERSION** <br> Proprietary Information Removed from Pages 4 and 10 <br><br><br> Consol. Ct. No. 25-cv-00143-GSK |

**PLAINTIFF KUMHO P&B CHEMICALS INC.'S RULE 56.2 BRIEF IN**
**SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD**

In accordance with U.S. Court of International Trade ("USCIT") Rule 56.2, and the

October 3, 2025, scheduling order, Plaintiff Kumho P&B Chemicals Inc. ("KPB" or "Plaintiff")

files this brief in support of its Rule 56.2 motion for judgment upon the agency record.

Scheduling Order, ECF No. 27.  As discussed further below, the U.S. Department of

Commerce's ("Commerce") *Final Determination* is unsupported by substantial evidence and is

otherwise not in accordance with law.

I.    **STATEMENT PURSUANT TO RULE 56.2**

The administrative determination under review is *Certain Epoxy Resins From the*
*Republic of Korea: Final Affirmative Countervailing Duty Determination and Final Negative*
*Critical Circumstances Determination,* 90 Fed. Reg. 14,605 (Dep't Commerce April 3, 2025)
("*Final Determination*"), PR 540,[1] and accompanying Issues and Decision Memorandum ("*Final*
*IDM*"), PR 531.

II.    **ISSUES OF LAW PRESENTED AND REASONS FOR CONTESTING THE**
    **ADMINISTRATIVE DETERMINATION**

Whether Commerce's determination that the provision of electricity for less than
adequate remuneration ("LTAR") program was *de facto* specific pursuant to 19 U.S.C. §
1677(5A)(D)(iii)(III), is unsupported by substantial evidence and not in accordance with law.

III.    **STATEMENT OF FACTS**

On April 29, 2024, Commerce published its initiation notice for the countervailing duty
("CVD") investigation on epoxy resins from various countries, including the Republic of Korea.
*See Certain Epoxy Resins From the People's Republic of China, India, the Republic of Korea,*
*and Taiwan: Initiation of Countervailing Duty Investigations*, 89 Fed. Reg. 33,319 (Dep't
Commerce Apr. 29, 2024), PR 58. On May 9, 2024, Commerce selected KPB as one of two
mandatory respondents to be individually investigated. *See* Memorandum from Thomas Martin,
International Trade Compliance Analyst, Office IV, AD/CVD Operations, "Countervailing Duty
Investigation of Epoxy Resins from the Republic of Korea: Respondent Selection" (May 9,
2024), CR 42, PR 66. Commerce issued the initial questionnaire the next day on May 10, 2024.
Letter from Robert Bolling, Program Manager, Office IV, AD/CVD Operations, "Investigation

---

[1] The administrative record is contained in a confidential record ("CR") and a public record
("PR"). Administrative Record Index, ECF No. 25-1.

of Certain Epoxy Resins from Korea:  Countervailing Duty Questionnaire" (May 10, 2024)

("Initial Questionnaire"), PR 64.  On July 3, 2024, KPB filed its Initial Questionnaire response.

*See* Letter from Morris, Manning & Martin, LLP to Sec'y of Commerce, "Certain Epoxy Resins

from Korea, Case No. C-580-920: KPB's Initial Questionnaire Response" (July 3, 2024)

("KPB's IQR"), CR 161-234, PR 159-179.  The Government of Korea ("GOK") also filed its

response to the Initial Questionnaire on July 3, 2024.  *See* Letter from Lee & Ko LLC to Sec'y of

Commerce, "Certain Epoxy Resins from Korea: GOK's Initial Questionnaire Response" (July 3,

2024) ("GOK IQR"), CR 92-145, PR 117-158.

One of the programs being investigated by Commerce was the provision of electricity for

LTAR.  *See* Initial Questionnaire at 29-34.  In its Initial Questionnaire response, the GOK

provided confidential data on the amount of electricity provided to the ten largest electricity

consuming industries in calendar year 2023.  *See* GOK IQR at 79-80.  The data was based on the

largest categories of the Korean Standard Industrial Classification ("KSIC") at the three-digit

level and was provided (i) based on the percentage of electricity consumed in the relevant

industry to the total amount of *all* electricity, and (ii) as a percentage of the total amount of

*industrial* electricity.  *See id.*  This data was requested by Commerce for purposes of its analysis

of whether the electricity for LTAR program was "specific" as required to find a countervailable

subsidy.  *See* 19 U.S.C. § 1677(5A).  Commerce subsequently requested, and the GOK provided,

a revised presentation of the electricity consumption data that was also based on the KSIC codes,

but at the two-digit level.  *See* Letter from Lee & Ko LLC to Sec'y of Commerce, "Certain

Epoxy Resins from the Republic of Korea: GOK's First Supplemental Questionnaire Response"

(Aug. 2, 2024) ("GOK 1SQR") at 13-14, CR 325-333, PR 250-258.  This supplemental

questionnaire requested usage data for ten manufacturing industry sectors, including the

3

NON-CONFIDENTIAL

"manufacture of chemicals and chemical products; except pharmaceuticals and medicinal chemicals" industry. *Id.* This data showed that the chemical group consumed [        ] percent of total electricity, and [        ] percent of industrial class electricity.[2] *See id.* at 13.

On September 13, 2024, Commerce published its *Preliminary Determination* in the Federal Register. *See Certain Epoxy Resins From the Republic of Korea: Preliminary Negative Countervailing Duty Determination, Preliminary Negative Critical Circumstances Determination and Alignment of Final Determination with Final Antidumping Duty Determination,* 89 Fed. Reg. 74,912 (Dep't Commerce Sept. 13, 2024) ("*Preliminary Determination*"), PR 358, and accompanying Preliminary Decision Memorandum ("PDM"), PR 351. In the *Preliminary Determination*, Commerce determined that the provision of electricity by the GOK was *de facto* specific pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(III) because the chemical industry allegedly "received a disproportionately large amount of the subsidy." *Id.* at 24. In its *de facto* specificity determination, Commerce relied upon the revised electricity consumption data that had been submitted by the GOK in its first supplemental questionnaire response. *See id.* (citing GOK 1SQR at 13-14). As previously mentioned, this data showed that the industrial category that KPB fell within – the "Manufacture of chemicals and chemical products; except pharmaceuticals and medicinal chemicals" – consumed [        ] percent of industrial electricity and [        ] percent of total electricity. GOK 1SQR at 13.

From January 6, 2025, through January 8, 2025, Commerce conducted verification of the GOK, which included verification of the electricity for LTAR program. *See* Memorandum from Benjamin Blythe, Thomas Martin & Joshua Jacobsen, International Trade Analysts, AD/CVD

---

[2] To be clear, the amount of electricity provided to the relevant industry was divided by (i) the total amount of electricity consumed and (ii) by the total amount of electricity consumed by the industrial sector. The use of the different denominators yielded different percentages for the relevant industries. *See* GOK 1SQR at 13-14.

Operations, Office IV, "Countervailing Duty Investigation of Certain Epoxy Resins from the Republic of Korea: Verification of the Questionnaire Responses of the Government of the Republic of Korea" (Feb. 7, 2025), CR 662, PR 467.  As part of the GOK verification, Commerce verified the electricity for LTAR program.  *See id.* at 2-10.  The usage data that Commerce verified for specificity purposes was the KSIC data from the Initial Questionnaire, and not the data from first supplemental questionnaire.  *See id.* at 9 ("We noted no discrepancies with the amounts reported on page 80 of the GOK's IQR."); *see* Letter from Lee & Ko LLC to Sec'y of Commerce, "Certain Epoxy Resins from the Republic of Korea: GOK's Verification Exhibits (Jan. 8, 2025) ("GOK Verification Exhibits"), CR 611-614, PR 455, Exhibit 2 at 12.

The parties submitted case briefs on February 24, 2025, including the GOK and KPB. *See* Letter from Lee & Ko LLC to Sec'y of Commerce, "Case Brief of the Government of the Republic of Korea" (Feb. 24, 2025) ("GOK's Case Brief"), CR 689, PR 516; Letter from Morris, Manning & Martin, LLP to Sec'y of Commerce, "Certain Epoxy Resins from Korea, Case No. C-580-920: KPB's Case Brief" (Feb. 24, 2025) ("KPB's Case Brief"), CR 675, PR 484.  In its case brief KPB argued that Commerce's determination that the provision of electricity for LTAR program was *de facto* specific was unlawful.  *See* KPB's Case Brief at 4-10.  The GOK also argued that the specificity determination was unlawful.  *See* GOK Case Brief at 13-20.

Commerce published its *Final Determination* in the Federal Register on April 3, 2025.  In the *Final Determination,* Commerce continued to determine that the provision of electricity in Korea was *de facto* specific pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(III).  Final IDM at 22-28. To support its *de facto* specificity determination, Commerce relied on the same usage data provided by the GOK that had been used in the *Preliminary Determination*, which listed the electricity consumption for the chemical industry and 9 other manufacturing industry sectors.

*See id.* at 23, 27-28.  Commerce found that this confidential data demonstrated that "the chemical industry consumed a significant portion of the total industrial class electricity consumed during the POI; therefore, we conclude that the chemical industry also received a disproportionately large amount of the subsidy within the meaning of section 771(5A)(D)(iii)(I) of the Act."  *Id.* at 28.  Commerce also found that "the chemical industry, as a group of industries, is a disproportionate user of electricity because the chemical industry consumed a larger percentage of electricity during the POI than many other manufacturing industries."  *Id.* at 24.

This appeal followed.

## IV.   SUMMARY OF ARGUMENT

Commerce's determination that the GOK's provision of electricity for LTAR was *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(III) is unsupported by substantial evidence and is otherwise not in accordance with law.  A subsidy is *de facto* specific under section 1677(5A)(D)(iii)(III) if the evidence shows that "an enterprise or industry receives a disproportionately large amount of the subsidy."  In the *Final Determination*, Commerce examined the total industrial electricity consumption by the chemical industry and concluded that, because the chemical industry consumed a larger percentage of electricity than many other manufacturing industries, it received a disproportionate amount of the subsidy for *de facto* specificity purposes.  This analysis fails to give meaning to the statutory term "disproportionate" by explaining how the chemical industry grouping's consumption of industrial electricity was disproportionate as that term is defined.  *See Hyundai Steel v. United States*, 745 F. Supp. 3d 1345, 1351 (Ct. Int'l Trade 2024) ("*Hyundai Steel I*") ("The term disproportionate refers to 'having or showing a difference that is not fair, reasonable, or expected . . . .'").

6

The comparison that Commerce made between the chemical industry and other manufacturing industries does not show disproportionality.  As this court has found in several recent cases addressing the same electricity for LTAR program in Korea, Commerce must give meaning to the statutory term "disproportionate" and cannot simply apply a "more equates with disproportionate" analysis.  *See Hyundai Steel I,* 745 F. Supp. 3d at 1351-53; *Hyundai Steel v. United States*, No. 23-00211-CRK, 2025 WL 2400442 (Ct. Int'l Trade Aug. 12, 2025) ("*Hyundai Steel II*") at *4-6; *POSCO v. United States*, No. 24-cv-00006-JSR, 2025 WL 2269772 (Ct. Int'l Trade Aug. 8, 2025) ("*POSCO*") at *3-4.  Disproportionality "requires a comparison of the amount of subsidy to an attribute of the industry, not a comparison of the amount of a subsidy given to different industries."  *Hyundai Steel II*, 2025 WL 2400442 at *5 (internal citations omitted).  Commerce's comparison of the amount of electricity consumed by the chemical industry to other industries fails to give meaning to the term disproportionate and is exactly the type of analysis that has been found to be unsupported by substantial evidence in recent cases.  This Court should reach the same conclusion here and find Commerce's *de facto* specificity determination to be unsupported by substantial evidence and not in accordance with law.

## V.    <u>STANDARD OF REVIEW</u>

In reviewing a challenge to Commerce's determination in a CVD investigation, the Court "shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with the law."  19 U.S.C. § 1516a(b)(1)(B)(i).

VI.    **ARGUMENT**

    A.    **Commerce's Determination That KEPCO's Provision of Electricity for LTAR Is *De Facto* Specific Is Unsupported by Substantial Evidence And Is Otherwise Contrary to Law.**

A countervailable subsidy exists if Commerce determines that a government authority has provided (i) a financial contribution, (ii) that confers a benefit, and is (iii) specific. 19 U.S.C. § 1677(5)(B) & (5A). This appeal challenges Commerce's determination that the GOK's provision of electricity for LTAR was *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(III) because the chemical industry consumed more electricity than "many other manufacturing industries" and thus received a disproportionate amount of the subsidy. *See* Final IDM at 24. As discussed below, this analysis and conclusion fail to give meaning to the statutory term "disproportionate" and is otherwise unsupported by substantial evidence.

    1.    **Commerce's *De Facto* Specificity Analysis Fails to Show That the Chemical Industry Grouping Received A Disproportionately Large Amount of the Electricity for LTAR Subsidy.**

A subsidy can be found to be specific on a *de jure* or *de facto* basis. *See* 19 U.S.C. §§ 1677(5A)(D)(i) (*de jure*) & (5A)(D)((iii)(I)-(IV) (*de facto*). This case involves a *de facto* specificity determination. Final IDM at 28. The statute provides that a domestic subsidy is *de facto* specific if:

    (I) The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.
    (II) An enterprise or industry is a predominant user of the subsidy.
    *(III) An enterprise or industry receives a disproportionately large amount of the subsidy.*
    (IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

19 U.S.C. § 1677(5A)(D)(iii)(I)-(IV) (emphasis added). The statute also provides that "any reference to an enterprise or industry is a reference to a foreign enterprise or foreign industry and

includes a group of such enterprises or industries." 19 U.S.C. § 1677(5A)(D).  In evaluating

whether a subsidy is *de facto* specific Commerce must also consider the extent of diversification

of economic activities in the country providing the subsidy.  *See* 19 U.S.C. § 1677(5A)(D)(iii).

The Uruguay Round Agreements Act Statement of Administrative Action ("SAA")

distinguishes between subsidies that are "provided to or used by discrete segments of the

economy" versus those that spread a benefit throughout the economy via widespread availability

and use.  H.R. Rep. No. 103-316 at 930 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4242.

Countervailing duties do not cover generally available subsidies because "all governments,

including the United States, intervene in their economies to one extent or another, and to regard

all such interventions as countervailable subsidies would product absurd results."  *Mosaic Co. v.*

*United States*, 744 F. Supp. 3d 1367, 1379 (Ct. Int'l Trade 2025) ("*Mosaic*") (quoting SAA 1994

U.S.C.C.A.N. at 4153).  Otherwise, every public highway would expose imported goods to

countervailing duties.  *Carlisle Rubber & Tire Co. v. United States*, 564 F. Supp. 834, 838 (Ct.

Int'l Trade 1983).  "The requirement that subsidies be 'specific' before they can be countered by

countervailing duties exists to 'winnow out . . . those foreign subsidies which truly are broadly

available and widely used throughout an economy . . . such as certain public infrastructure-

related programs.'"  *POSCO*, 2025 WL 2269772, at *3 (quoting *Gov't of Quebec v. United*

*States*, 105 F.4th 1359, 1375 (Fed. Cir. 2024) (quoting SAA at 929)).

The issue presented in this appeal is whether Commerce's *de facto* specificity

determination under 19 U.S.C. § 1677(5A)(D)(iii)(III) for a widely available and used good like

electricity is supported by substantial evidence and is otherwise in accordance with law.  Under

section 1677(5A)(D)(iii)(III), Commerce must find that an enterprise or industry "receives a

disproportionately large amount of the subsidy."  The term "disproportionate" is defined as

NON-CONFIDENTIAL

"being out of proportion."  "Disproportionate," Merriam-Webster Dictionary,

https://www.merriam-webster.com/dictionary/disproportionate (last visited November 24, 2025)

(attached as Exhibit A).[3]  Consistently, in *Hyundai Steel I*, the court found that "disproportionate

refers to 'having or showing a difference that is not fair, reasonable, or expected, and

disproportionality exists when something is 'too large or too small in relation to something

else.'"  745 F. Supp. 3d at 1351.  In *POSCO*, the court stated that "{w}hen something is

'disproportionate' it '{has} too much or too little in relation to something else; not suitable in

comparison with something else in size, amount, importance, etc.'"  *POSCO*, 2025 WL 2269772

at *3 (citing BLACK'S LAW DICTIONARY (12th ed. 2024)).

      In the *Final Determination*, Commerce did not give meaning to the term disproportionate

but instead simply found that "the chemical industry, as a group of industries, is a

disproportionate user of electricity because the chemical industry consumed a larger percentage

of electricity during the POI than many other manufacturing industries."  Final IDM at 24.  This

decision was based on confidential GOK data that showed the amount of industrial class

electricity consumed by certain industries, including the chemical industry, that were identified

by Commerce.  *See* Final IDM at 23.  This GOK data showed that the chemical industry

grouping consumed [        ] percent of industrial electricity.  GOK 1SQR at 13.  This *de facto*

specificity analysis under 19 U.S.C. § 1677(5A)(D)(iii)(III) is unsupported by substantial

evidence because it fails to demonstrate that the chemical industry received a disproportionately

large amount of the subsidy under the electricity for LTAR program.  This court's decisions in

*Hyundai Steel I*, *Hyundai Steel II*, and *POSCO* are directly on point as they all involved

---

[3] Pursuant to the practice comment in Rule 81 of the Rules of the U.S. Court of International
Trade, KPB attaches hereto printouts of the cited internet-based definitions.

challenges to Commerce's *de facto* specificity determination under section 1677(5A)(D)(iii)(III) for the same electricity for LTAR program in Korea.

In *Hyundai Steel I*, the court reviewed Commerce's *de facto* specificity determination whereby Commerce had simply grouped together the steel industry and three other industries and concluded that this group consumed a disproportionately large amount of industrial electricity. *See Hyundai Steel I*, 745 F. Supp. 3d at 1352. Commerce had not compared this group of industries to anything and simply found that the percentage of industrial electricity consumed by this group was "disproportionate." *See id.* ("Nowhere does Commerce identify to what the benefit is disproportionate."). In finding that Commerce's disproportionality determination was unsupported by substantial evidence the court found it important that Commerce had grouped the industries together based on the amount of electricity consumed since the amount of the subsidy received was based on usage. *See id.* The court also noted that electricity prices are set using a standard pricing mechanism ensuring that no one company or industrial user receives a more preferential rate for electricity. *See id.* at 1352-53.

Given these circumstances where the subsidy amount is tied to usage and where no preferences are provided to any company or industrial user, the court found that Commerce's disproportionality determination:

> {E}lides the reality that programs designed to confer benefits on usage levels will necessarily result in larger users receiving a proportionally larger percentage of the subsidy . . . Disproportionality requires that an enterprise or industry is favored in some way (i.e., it receives more than its fair share). Commerce must explain how the combined industries it identifies benefit more than would be expected, based on their usage given that the subsidy in question is designed to confer benefits on usage levels, or in relation to some other comparator.

*Hyundai Steel I*, 745 F. Supp. 3d at 1353. The court also found that when analyzing disproportionality "receipt of a greater monetary benefit from the program than others is not

determinative of disproportionality." *Id.* at 1351 (citing *AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999)).

In response to the court's remand in *Hyundai Steel I*, Commerce offered several comparative analyses to try and rehabilitate its specificity determination, one of which is virtually the same one used in the *Final Determination* here.  More specifically, one of Commerce's comparative analyses on remand showed that the group of industries consumed "a greater percentage of the industrial class electricity during the POR than other industries."  *See Hyundai Steel II*, 2025 WL 2400442, at *4.  The court rejected this analysis (as well as other analyses not relevant here), which it aptly characterized as a "more equates with disproportionate" type analyses.  *See id.*  In doing so, the court reaffirmed the fundamental point from *Hyundai Steel I* that disproportionality "requires a comparison of the amount of subsidy and an attribute of the industry, not a comparison of the amount of a subsidy given to different industries."  *Id.* at *5 (citing *Hyundai Steel I*, 745 F. Supp. 3d at 1351-52) (citing *AK Steel Corp.*, 192 F. 3d at 1385; *Royal Thai Gov't v. United States*, 436 F.3d 1330, 1336 (Fed. Cir. 2006)).

The *POSCO* decision is also directly on point.  In *POSCO*, the court was also reviewing Commerce's disproportionality determination with respect to the electricity for LTAR program in Korea.  *POSCO*, 2025 WL 2269772, at *4.  In that case, Commerce had grouped together the steel industry with two other industries and concluded that they had consumed a disproportionate amount of industrial electricity.  *See id.*  Commerce found it significant that this grouping consumed over half of the industrial electricity in Korea.  *See id.*  While recognizing that the subsidy was directly tied to how much electricity the industry uses (*i.e.,* it was usage based) Commerce found that "disproportionate consumption of electricity compared to the average

industry is enough to show disproportionate use of the subsidy, with no need to investigate if the subsidy received by the Korean steel industry does not align with its usage of electricity." *Id.*

In holding that Commerce's disproportionality determination was unsupported by substantial evidence, the *POSCO* court found that "{s}ubsidized electricity is the type of 'widely used … public infrastructure' that countervailing duties will ordinarily not cover." *POSCO*, 2025 WL 2269772, at *4 (citing *Gov't of Quebec*, 105 F.4th at 1375). The court thus found that disproportionality as that term is defined must be shown to "'ensure{} that countervailing duties are not improperly levied against subsidies that are generally available and widely used across the economy.'" *Id.* Also, since the electricity subsidy was directly tied to usage, the court found that Commerce's reliance on the fact that the Korean steel industry uses a large amount of electricity to be insufficient to show disproportionality. *See id.* at *4. The court held that Commerce:

> {W}as required by the plain meaning of the statute to use a baseline that shows the Korean steel industry's subsidy is out of line with the industry's own usage, not just the 'benefits {received by} others . . . It is an obvious fact of life that 'virtually every' generally available and widely used subsidy – roads, bridges, schools, highways – will be used by, and therefore benefit, some industries more than others . . . Commerce's 'untenable' logic would lead to almost every generally available subsidy being de facto specific to every 'large company … merely because of the size of the company.' *AK Steel Corp.*, 192 F.3d at 1385. Commerce must show more to support a finding of disproportionate subsidy use.

*Id.*

This court's decision in *Bethlehem Steel Corp. v. United States* is also on point. 140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001). In that case, Commerce found that despite the majority (51%) of the benefits from an electricity grant program going to a single industry (steel) the benefits received were not disproportionate because high electricity usage was an inherent characteristic of the steel industry, all recipients received an identical rate reduction based on a

13

standard pricing mechanism, and the subsidy was not designed to benefit any one industry. *See id.* at 1368–70. The court sustained Commerce's determination that the amount of subsidy received by the steel industry was not disproportionate. *Bethlehem Steel*, 140 F. Supp. 2d at 1369. In doing so, the court stated:

> In virtually every program that confers benefits based on usage levels one or more groups will receive a greater share of the benefits than another group. To impose countervailing duties on an industry where disparity alone is demonstrated, but no evidence is produced indicating that the benefit was industry specific, is anathema to the purpose of the countervailing duty laws.

*Bethlehem Steel*, 140 F. Supp. 2d at 1369. The Federal Circuit has also cautioned against this type of "more equates to disproportionate" analysis: "{t}he domestic producers' methodology could produce an untenable result, *i.e.,* that a benefit conferred on a large company might be disproportionate merely because of the size of the company." *See AK Steel*, 192 F.3d at 1385. These cases are directly applicable to Commerce's disproportionality decision in the *Final Determination*.

The instant case involves the same electricity for LTAR program in Korea where the amount of subsidy received is tied to how much electricity is consumed.[4] *See* Final IDM at 26 ("In contrast, for the provision of industrial electricity for LTAR, electricity consumption is directly tied to the amount of subsidy conferred through the pricing of electricity."). Additionally, electricity pricing is based on a standard pricing mechanism whereby no one company or industrial user receives a more preferential rate for electricity than other companies or industrial users. *See* GOK IQR at Ex. E-10 (showing that the industrial electricity tariff rate is applicable to all electricity users involved in mining, manufacturing, and other businesses).

---

[4] KPB acknowledges that the program in *Bethlehem Steel* was not an electricity for LTAR program, but the benefits received by the steel industry in that case were similarly tied to usage levels as larger companies would have higher levels of electricity reduction and hence received a larger amount of the subsidy. *See* discussion of *Bethlehem Steel*, *infra*.

These two aspects of the program mean that a larger company may receive a larger amount of the subsidy by virtue of their size alone. As discussed above, this type of "more equates with disproportionate" analysis has been repeatedly rejected. *See, e.g., Hyundai Steel I*, 745 F. Supp. 3d at 1351 (stating that "receipt of a greater monetary benefit from the program than others is not determinative of disproportionality."); *Hyundai Steel II*, 2025 WL 2400442, at *4 ("Commerce's position appears to be that receiving more of the subsidy equates with disproportionality. The Court has already rejected this position."); *POSCO*, 2025 WL 2269772, at *4 ("Commerce . . . was required . . . to use a baseline that shows that the Korean steel industry's subsidy is out of line with the industry's own usage, not just the 'benefits' {received by} others.'"); *AK Steel*, 192 F.3d at 1385 ("{t}he domestic producers' methodology could produce an untenable result, *i.e.,* that a benefit conferred on a large company might be disproportionate merely because of the size of the company.").

Moreover, electricity is a broadly available and widely used commodity that is consumed by virtually every industry and individual in an advanced industrial economy like Korea. *See* Final IDM at 24 (recognizing that electricity is a widely available commodity). The GOK's provision of electricity is exactly the type of widely used public program that is *not* intended to be countervailed because electricity is broadly available and consumed by virtually all individuals and enterprises in Korea. *See* SAA, 1994 U.S.C.C.A.N. at 4242 (citing to *Carlisle Rubber & Tire*, 564 F. Supp. at 838 (stating that countervailing generally available government benefits such as "public highways and bridges, as well as tax credits for expenditures on capital investment even if available to all industries and sectors… simply defies reason.")); *Mosaic*, 2025 WL 974056 at *14 ("Under the guiding principle addressed in the SAA, Commerce must distinguish between subsidies that are provided to or used by discrete segments of the economy

15

and those . . . that distribute the benefit throughout the entire economy."). In citing favorably to *Carlisle Rubber & Tire*, the SAA recognizes that finding widely used programs such as these to be "specific" would produce absurd results. SAA, 1994 U.S.C.C.A.N. at 4242. More recently, the *POSCO* court found that "{s}ubsidized electricity is they type of '"widely used . . . public infrastructure' that countervailing duties will ordinarily not cover. *POSCO*, 2025 WL 2269772, at *4 (citing *Gov't of Quebec*, 105 F. 4th at 1375).

In sum, Commerce's determination that the chemical industry group received a disproportionate amount of the electricity for LTAR subsidy is not supported by substantial evidence because Commerce has not shown that the chemical industry's consumption of the widely available and broadly used commodity, electricity, is more than would be expected. Instead, Commerce has simply found that the chemical industry group consumed a lot of industrial electricity compared to some other industries without any attempt to show that this results in receipt of a disproportionate amount of the electricity for LTAR subsidy.

## 2. Commerce's Attempts to Justify Its Disproportionality Determination Are Not Persuasive.

Commerce offers several justifications in the *Final Determination* to support its disproportionality determination, none of which are persuasive.

First, Commerce attempts to support its decision by noting that "a wide diversification of economic activities exists in Korea, including 19 industry groupings with a broad range of distinctly different types of economic activities within these groupings . . . ." *Id* at 23 (citing to Memorandum from Thomas Martin, Senior International Trade Compliance Analyst, Office IV, AD/CVD Operations to The File, "Countervailing Duty Investigation of Certain Epoxy Resins from the Republic of Korea (Korea): Placement of Korea Economic Diversification Memorandum on the Record" at Attachment (July 15, 2024) ("Economic Diversification

16

Memorandum") PR 227).  However, Commerce fails to link the fact that the economy of Korea is diverse with its finding that the chemical industry grouping received a disproportionately large amount of the subsidy.  The fact that there are 19 industry groupings may show that, overall, the Korean economy is diverse, but most of the industry groups such as wholesale and retail trade, accommodation and food service, education, and membership organizations do not consume *industrial* electricity.  They are thus not relevant to the question of whether the chemical industry grouping consumed a disproportionate amount of *industrial* electricity, which was Commerce's chosen method for analyzing disproportionality.  Furthermore, while Commerce must consider the extent of economic diversification, this criterion should "serve to inform the application of, rather than supersede or substitute for, the enumerated specificity factors."  *See* SAA, 1994 U.S.C.C.A.N. at 4243.

Second, Commerce argues that its decision to countervail the provision of electricity in Korea is permissible even though it is a widely available commodity because its specificity analysis is limited to industrial users.  *See* Final IDM at 24.  However, the fact that Commerce chose to focus its disproportionality analysis on industrial users of electricity does not change the fact that the input at issue from this program – electricity – is the type of broadly available and widely used program that the SAA and numerous court decisions have cautioned against treating as countervailable at all.  Moreover, electricity rates for industrial users such as the chemical industry are set based on a standard pricing mechanism and thus no enterprise or industry receives a more preferential rate for electricity than other companies or industrial users.  GOK IQR at 72-73 & Exhibit E-10 (showing that the same industrial electricity tariff rate is applicable to all electricity users involved in mining, manufacturing, and other businesses).  Furthermore, the industrial tariff rates are *higher* than the residential, general, agricultural and educational

tariffs and thus it can hardly be said that the chemical industry is being singled out for electricity subsidies. *See id.* at Exhibit E-10 (showing industrial users pay higher rates than other users and industrial users with high usage (contract demand of 300kW or more) pay the highest rates).

Finally, Commerce seeks to distinguish the *Hyundai Steel I* and *Bethlehem Steel* cases discussed above. Commerce argues that *Bethlehem Steel* is inapplicable because the instant case involves an LTAR program, where usage of the subsidy is directly tied to the level of subsidization received by the respondent, and the program in *Bethlehem Steel* was not. Final IDM at 26. However, this is a distinction without a difference. In *Bethlehem Steel*, the program involved electricity discounts for companies that agreed to lower their electricity usage during certain designated times of high electricity demand. *Bethlehem Steel,* 140 F. Supp. 2d at 1367. The program here involves the provision of electricity for LTAR. But this difference in the nature of the program does not render *Bethlehem Steel* inapposite. That case stands for the proposition that disparity in the amount of benefits received based on usage levels alone is not a sufficient basis to find that a subsidy is *de facto* specific based on disproportionate receipt of the subsidy. That aspect of the holding is not contingent upon the nature of the program; it applies for any program where benefits are based on usage levels.

In the instant case the amount of the benefit from the electricity for LTAR program is tied to usage, just as the benefit from the electricity discount program at issue in *Bethlehem Steel* was tied to usage. Commerce calculated a percentage adjustment to increase the per-unit price of electricity to determine the benefit. *See* Memorandum from Thomas Martin, International Trade Compliance Analyst, AD/CVD Operations, Office IV, Enforcement and Compliance to The File "Countervailing Duty Investigation of Certain Epoxy Resins from the Republic of Korea: Preliminary Determination Analysis Memorandum for Kumho P&B Chemicals and Kumho

18

Petrochemical Co., Ltd." (Sept 9, 2024) CR 505-506, PR 353 at 4.  So, the more units of electricity a party consumes, the higher the subsidy amount.  The benefit is therefore tied to usage, just as in *Bethlehem Steel*, where a larger company with high usage would receive a larger benefit as the program links the benefit to reduction in usage levels.

As for *Hyundai Steel I*, Commerce argues that it is inapplicable because the court "took particular issue with the grouping of the steel industry with other industries" but in the instant case Commerce's *de facto* specificity analysis "only focused on the chemical manufacturing industry's receipt of the subsidy and did not group other industries with the chemical manufacturing industry."  Final IDM at 27.  This is not an accurate characterization of the *Hyundai Steel I* decision.  While the court did take issue with Commerce's grouping of industries, the court held more fundamentally that "{d}isproportionality requires that an enterprise or industry is favored in some way (i.e., it receives more than its fair share).  Commerce must explain how the combined industries it identifies benefit more than would be expected, based on their usage given that the subsidy is designed to confer benefits on usage levels, or in relation to some other comparator."  *Hyundai Steel I*, 745 F. Supp. 3d at 1353; *see Hyundai Steel II*, 2025 WL 2400442, at *5 (reaffirming the fundamental point from *Hyundai Steel I* that disproportionality "requires a comparison of the amount of subsidy and an attribute of the industry, not a comparison of the amount of a subsidy given to different industries").

In sum, the justifications provided by Commerce in the *Final Determination* do not support its disproportionality determination.

## VII.   **CONCLUSION**

Based on the foregoing, Plaintiff KPB respectfully requests that this Court hold that Commerce's *Final Determination* is unsupported by substantial record evidence and otherwise not in accordance with law, and remand the *Final Determination* to Commerce for a redetermination consistent with the judgment and findings of this Court.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Nicholas C. Duffey

**MORRIS MANNING & MARTIN LLP**
1333 New Hampshire Avenue, NW, Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Plaintiff Kumho P&B Chemicals Inc.*

Dated: December 2, 2025

Certificate Of Compliance

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 5,747 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

/s/ Brady W. Mills
Brady W. Mills

Dated: December 2, 2025

**Exhibit A**



# disproportionate *adjective*

dis·pro·por·tion·ate    ˌdis-prə-ˈpȯr-sh(ə-)nət ◀))

Synonyms of *disproportionate* ›

**:** being out of proportion

  a *disproportionate* share

### adverb

He believes that middle-class people bear a ***disproportionate*** share of the tax burden.

A ***disproportionate*** number of the students are poor.

## Recent Examples on the Web

ⓘ **Examples are automatically compiled from online sources to show current usage.** Read More

Female journalists around the world face mounting attacks, both on and offline and are subjected to specific and ***disproportionate*** threats, according to UNESCO.

— Marni Rose McFall, *MSNBC Newsweek*, 28 Nov. 2025



**Definition**     Example Sentences     Word History     Rhymes     Entries Near     Show More ⌄

In markets with small audiences for independent cinema, these decisions can carry **disproportionate** weight.

– Essie Assibu, *Variety*, 22 Nov. 2025

If Nielsen's latest batch of usage data goes a long way toward explaining why the NFL is an important part of a balanced TV diet, perhaps nothing illustrates the league's **disproportionate** impact than MoffettNathanson's annual contribution breakdown.

– Anthony Crupi, *Sportico.com*, 18 Nov. 2025

See All Example Sentences for *disproportionate*

## Etymology

borrowed from Medieval Latin *disprōportiōnātus,* past participle of *disprōportiōnāre* "to make out of proportion," from Latin *dis-* DIS- + Medieval Latin *prōportiōnāre* "to compose according to proportions" — more at PROPORTION entry 2

## First Known Use

1555, in the meaning defined above

## Time Traveler

**The first known use of *disproportionate* was in 1555**

See more words from the same year



## Definition    Example Sentences    Word History    Rhymes    Entries Near    Show More ⌄

disproportionable    **disproportionate**    disproportionated rosin

See All Nearby Words

**Style**    MLA

"Disproportionate." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/disproportionate. Accessed 2 Dec. 2025.

 Copy Citation



**Definition**    Example Sentences    Word History    Rhymes    Entries Near    Show More ⌄

# disproportionate *adjective*

dis·pro·por·tion·ate    ˌdis-prə-ˈpōr-sh(ə-)nət ◀))  -ˈpȯr-

**:** being out of proportion

**adverb**

Thesaurus: All synonyms and antonyms for *disproportionate*
Nglish: Translation of *disproportionate* for Spanish Speakers

Last Updated: 29 Nov 2025 - Updated example sentences

## Love words? Need even more definitions?

Subscribe to America's largest dictionary and get thousands more definitions and advanced search—ad free!

MERRIAM-WEBSTER UNABRIDGED



**Definition**    Example Sentences    Word History    Rhymes    Entries Near    Show More ⌄

## Top Lookups
Next refresh: 13

1 **chargoggagoggmanc...**

2 **mood**

3 **porkfish**

4 **contrast**

5 **opposed**

6 **hallmark**

7 **empathetic**



**WORD OF THE DAY**

**cajole** 🔊

See Definitions and Examples »

Get Word of the Day daily email!

Your email addre    SUBSCRIBE



**Definition**     Example Sentences     Word History     Rhymes     Entries Near     Show More ˅

**More Words with Remarkable Origins**

**The Words of the Week - Nov. 28**



### Quordle
Can you solve 4 words at once?

*Play*

### Blossom
Pick the best words!

*Play*



## Definition

Example Sentences    Word History    Rhymes    Entries Near    Show More ⌄

### The Missing Letter
A daily crossword with a twist

**Play**

### Name That Dessert!
Hope you've saved room for some sweet vocabulary.

**Take the quiz**

**See All**

**Learn a new word every day. Delivered to your inbox!**

Your email address    SUBSCRIBE

Help | About Us | Advertising Info | Contact Us | Privacy Policy | Terms of Use

© 2025 Merriam-Webster, Incorporated



**Definition**     Example Sentences     Word History     Rhymes     Entries Near     Show More ⌄