## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| KUMHO P & B CHEMICALS INC., | ) |
| | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| and | ) |
| | ) |
| KUKDO CHEMICAL CO., LTD. and | ) |
| U.S. EPOXY RESIN PRODUCERS *AD HOC* | ) |
| COALITION | ) |
| | ) |
| *Consolidated Plaintiffs,* | ) |
| | ) |
| v. | ) Consolidated Court No. |
| | ) 25-cv-00143-GSK |
| UNITED STATES, | ) |
| | ) |
| *Defendant,* | ) |
| | ) |
| and | ) |
| | ) |
| U.S. EPOXY RESIN PRODUCERS *AD HOC* | ) |
| COALITION, | ) |
| KUMHO P & B CHEMICALS INC., and | ) |
| KUKDO CHEMICAL CO., LTD. | ) |
| | ) |
| *Defendant-Intervenors.* | ) |

## RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD OF CONSOLIDATED PLAINTIFF KUDKO CHEMICAL CO., LTD.

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade,

Consolidated Plaintiff Kukdo Chemical Co., Ltd. ("Kukdo Chemical") hereby respectfully moves

for judgment on the agency record on the issues raised in its Complaint challenging the *Final*

*Determination* and resulting countervailing duty order in the countervailing duty investigation on

*Certain Epoxy Resins From the Republic of Korea* of the U.S. Department of Commerce

("Commerce").  *See Certain Epoxy Resins From the Republic of Korea: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 90 Fed. Reg. 14,605 (Dept. Comm., Apr. 3, 2025) ("*Final Determination*"); *Certain Epoxy Resins From Taiwan: Amended Final Countervailing Duty Determination; Certain Epoxy Resins From the Republic of Korea and Taiwan: Countervailing Duty Orders*, 90 Fed. Reg. 22,235 (Dept. Comm., May 27, 2025) ("*Countervailing Duty Order*").

For the reasons set forth in the attached Memorandum in Support of Kukdo Chemical's Rule 56.2 Motion for Judgment Upon the Agency Record, Commerce's *Final Determination* is not supported by substantial evidence on the record or is otherwise not in accordance with law. Kukdo Chemical respectfully moves this Court to so hold, to declare the *Final Determination* unlawful, to remand this case to Commerce to correct its errors, and to grant such other relief as this Court deems just and proper.

Kukdo Chemical submits the attached Memorandum in support of this motion.

<div style="margin-left:40%">

Respectfully submitted by:

/s/ J. David Park
J. David Park
Henry D. Almond
Kang Woo Lee
Archana Rao Vasa

***Counsel to Kukdo Chemical Co., Ltd.***

ARNOLD & PORTER KAYE SCHOLER LLP
601 MASSACHUSETTS AVENUE, N.W.
WASHINGTON, D.C.  20001
PHONE:  (202) 942-5000
FAX:  (202) 942-5999
E-MAIL: DAVID.PARK@APKS.COM

</div>

**Date:  December 2, 2025**

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE

|  |  |
|---|---|
| KUMHO P & B CHEMICALS INC., ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| **and** ) | |
| ) | |
| KUKDO CHEMICAL CO., LTD. and ) | |
| U.S. EPOXY RESIN PRODUCERS *AD HOC* ) | |
| COALITION ) | **NON-CONFIDENTIAL** |
| ) | **VERSION** |
| *Consolidated Plaintiffs,* ) | |
| ) | **Consolidated Court No.** |
| v. ) | **25-cv-00143-GSK** |
| ) | |
| UNITED STATES, ) | |
| ) | **Business proprietary information** |
| *Defendant,* ) | **removed from pages 24, 25, and** |
| ) | **26.** |
| **and** ) | |
| ) | |
| U.S. EPOXY RESIN PRODUCERS *AD HOC* ) | |
| COALITION, ) | |
| KUMHO P & B CHEMICALS INC., and ) | |
| KUKDO CHEMICAL CO., LTD. ) | |
| ) | |
| *Defendant-Intervenors.* ) | |

MEMORANDUM IN SUPPORT OF CONSOLIDATED PLAINTIFF
KUKDO CHEMICAL CO., LTD.'S RULE 56.2 MOTION FOR JUDGMENT UPON THE
AGENCY RECORD

| | |
|---|---|
| **ARNOLD & PORTER KAYE SCHOLER LLP** | J. David Park |
| **601 MASSACHUSETTS AVENUE, N.W.** | Henry D. Almond |
| **WASHINGTON, D.C. 20001** | Kang Woo Lee |
| **PHONE:  (202) 942-5646** | Archana Rao Vasa |
| **FAX:  (202) 942-5999** | |
| | *Counsel to Kukdo Chemical Co., Ltd.* |
| | *Consolidated Plaintiff and* |
| | *Defendant-Intervenor* |

**Dated:  December 2, 2025**

TABLE OF CONTENTS

I.    STATEMENT PURSUANT TO RULE 56.2 ................................................1

      A.    ADMINISTRATIVE DETERMINATION UNDER REVIEW .........................1

      B.    ISSUES PRESENTED FOR REVIEW ....................................................1

II.   STATEMENT OF FACTS .........................................................................2

III.  SUMMARY OF ARGUMENT ..................................................................10

IV.   STANDARD OF REVIEW ........................................................................13

V.    ARGUMENT ...........................................................................................14

      A.    COMMERCE ERRED IN FINDING THAT THE CHEMICAL
            SUBSTANCE REGISTRATION SUPPORT PROGRAM PROVIDES
            A COUNTERVAILABLE SUBSIDY ....................................................14

            1.    *Commerce Is Unable To Articulate What Constitutes A Financial
                  Contribution Under The CSRSP Program* ....................................15

            2.    *Commerce's Reliance on 19 C.F.R. § 351.529 is Inapposite* ................17

            3.    *No Financial Contribution Exists Under 19 C.F.R. § 351.529(a)* ..........19

      B.    COMMERCE'S BENEFIT CALCULATION IS UNSUPPORTED BY
            SUBSTANTIAL EVIDENCE ............................................................21

            1.    *Commerce Overstates Any Benefit Allegedly Conferred by the
                  CSRSP Program* .......................................................................23

            2.    *Commerce's Benefit Calculation Amounts To Double Counting* ..........25

      C.    COMMERCE'S DETERMINATION REGARDING THE
            TRANSNATIONAL SUBSIDY PROVISION OF ECH FOR LTAR IS
            UNSUPPORTED BY SUBSTANTIAL RECORD EVIDENCE AND
            CONTRARY TO LAW ....................................................................27

            1.    *Commerce Is Unable To Articulate How The Provision Of ECH
                  For LTAR Fits Within "Transnational Subsidy" Framework* ...............28

            2.    *Substantial Record Evidence Does Not Support Commerce's
                  Countervailability Determination* ................................................30

      D.    COMMERCE ABUSED ITS DISCRETION WHEN CALCULATING
            THE ALLEGED BENEFIT FOR THE FIRST-EVER ANALYSIS OF
            THE TRANSNATIONAL SUBSIDY PROVISION OF GOODS FOR
            LTAR .......................................................................................34

      E.    COMMERCE'S COUNTERVAILABLE DETERMINATION WITH
            RESPECT TO THE PROVISION OF ELECTRICITY FOR LTAR IS
            UNSUPPORTED BY SUBSTANTIAL RECORD EVIDENCE AND
            OTHERWISE CONTRARY TO LAW ................................................40

VI.   CONCLUSION .....................................................................................42

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### <u>CASES</u>

*AK Steel Corp. v. United States*,
    192 F.3d 1367 (Fed. Cir. 1999)...................................................................................40

*Burlington Truck Lines, Inc. v. U.S.*,
    371 U.S. 156 (1962)...............................................................................13, 14, 32

*Changzhou Wujin Fine Chemical Factory Co., Ltd. v. U.S.*,
    701 F.3d 1367 (Fed. Cir. 2012)...................................................................................30

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938)...................................................................................12

*Fine Furniture (Shanghai) Ltd. v. United States*,
    748 F.3d 1365 (Fed. Cir. 2014)...................................................................................30

*Gerritsen v. Shirai*,
    979 F.2d 1524 (Fed. Cir. 1992)...................................................................................13

*Gujarat Fluorochemicals Limited v. United States*,
    617 F.Supp.3d 1328 (Ct. Int'l Trade 2023) ...................................................................................13

*Hyundai Steel Company v. United States*,
    659 F.Supp.3d 1327 (Ct. Int'l Trade 2023) ...................................................................................12, 19, 40

*Hyundai Steel Company v. United States*,
    745 F.Supp.3d 1345 (Ct. Int'l Trade 2024) ...................................................................................40

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003)...................................................................................38

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006)...................................................................................13, 38

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
    659 F.3d 1142 (Fed. Cir. 2011)...................................................................................13

*SKF U.S.A., Inc. v. United States*,
    675 F. Supp.2d 1264 (Ct. Int'l Trade 2009) ...................................................................................30

*Sterling Fed. Sys., Inc. v. Goldin*,
    16 F.3d 1177 (Fed. Cir. 1994)...................................................................................13

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951) ..........................................................................................12

**STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(i) ............................................................................12

19 U.S.C. § 1677(4)(A) ......................................................................................33

19 U.S.C. § 1677(5) & (5A) .................................................................13, 15, 29

19 U.S.C. § 1677(5)(B) ......................................................................................15

19 U.S.C. § 1677(5)(B)(iii) ...........................................................................15, 16

19 U.S.C. § 1677(5)(D) .................................................................................15, 16

19 U.S.C. § 1677(5)(D)(i) ..................................................................................14

19 U.S.C. § 1677(5)(D)(ii) .......................................................................16, 17, 18

19 U.S.C. § 1677(5A)(D)(iii)(III) .........................................12, 33, 39, 40

19 U.S.C. § 1677e(b)(1) .....................................................................................38

19 U.S.C. § 1677m(d) ...................................................................................36, 37

**REGULATIONS**

19 C.F.R. § 351.308(a) .......................................................................................32

19 C.F.R. §351.503(a) ........................................................................................17

19 C.F.R. § 351.529(a) ..........................................................................16, 17, 18, 19

19 C.F.R. § 351.529(b) ..................................................................................16, 17

**ADMINISTRATIVE DETERMINATIONS**

*Certain Epoxy Resins From the People's Republic of China, India, the Republic
  of Korea, and Taiwan: Initiation of Countervailing Duty Investigations*, 89
  Fed. Reg. 33,319 (Dep't Comm., Apr. 29, 2024), P.R. 58 .....................................2

*Certain Epoxy Resins From the Republic of Korea and Taiwan: Countervailing
  Duty Orders*, 90 Fed. Reg. 22,235 (Dept. Comm., May 27, 2025) .......................1, 9

*Certain Epoxy Resins From the Republic of Korea: Final Affirmative*
   *Countervailing Duty Determination and Final Negative Critical*
   *Circumstances Determination*, 90 Fed. Reg. 14,605 (Dept. Comm., Apr. 3,
   2025) ........................................................................................................................ *passim*

*Certain Epoxy Resins From the Republic of Korea: Preliminary Negative*
   *Countervailing Duty Determination, Preliminary Negative Critical*
   *Circumstances Determination and Alignment of Final Determination With*
   *Final Antidumping Duty Determination*, 89 Fed. Reg. 74,912 (Dep't Comm.,
   Sept. 13, 2024) ............................................................................................................... 3

*Countervailing Duties, Final Rule,* 63 Fed. Reg. 65,348 (Dept. Commerce, Nov.
   25, 1998) ........................................................................................................................ 16

*Regulations Improving and Strengthening the Enforcement of Trade Remedies*
   *Through the Administration of the Antidumping and Countervailing Duty*
   *Laws*, *Final Rule*, 89 Fed. Reg. 20,766 (Dept. Commerce Mar. 25, 2024) ..................... *passim*

*Regulations Improving and Strengthening the Enforcement of Trade Remedies*
   *Through the Administration of the Antidumping and Countervailing Duty*
   *Laws*, *Proposed Rule*, 88 Fed. Reg. 29,850 (Dept. Commerce May 9, 2023) ........................ 17

I.    **STATEMENT PURSUANT TO RULE 56.2**

A.    **ADMINISTRATIVE DETERMINATION UNDER REVIEW**

Kukdo Chemical Co., Ltd. ("Plaintiff" or "Kukdo Chemical"), a Korean producer and exporter of epoxy resins, brings this action to challenge the U.S. Department of Commerce's ("Commerce's") final determination and resulting countervailing duty order in the countervailing duty investigation on Certain Epoxy Resins from the Republic of Korea.  *See Certain Epoxy Resins From the Republic of Korea: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 90 Fed. Reg. 14,605 (Dept. Comm., Apr. 3, 2025) ("*Final Determination*"); *Certain Epoxy Resins From Taiwan: Amended Final Countervailing Duty Determination; Certain Epoxy Resins From the Republic of Korea and Taiwan: Countervailing Duty Orders*, 90 Fed. Reg. 22,235 (Dept. Comm., May 27, 2025) ("*Countervailing Duty Order*").  The challenged findings and conclusions of fact and law are set out primarily in Commerce's Issues and Decision Memorandum accompanying the *Final Determination*, P.R. 531, (Mar. 28, 2025) ("Final Decision Memo").

B.    **ISSUES PRESENTED FOR REVIEW**

1.  Whether Commerce's determination that the Chemical Substance Registration Support Program ("CSRSP") constitutes a countervailable subsidy was unsupported by substantial record evidence and contrary to law.  As discussed in **Section V.A.1**, Commerce is unable to articulate how Consolidated Plaintiff Kukdo Chemical's participation in the CSRSP program results in a financial contribution to Kukdo Chemical, which itself is sufficient to support a finding that Commerce's determination was unsupported and contrary to law.

2.  Whether Commerce's benefit calculation for the CSRSP program is unsupported by substantial record evidence and contrary to law.  As discussed in **Section V.B**, Commerce vastly overstated any benefit conferred upon Kukdo Chemical by the CSRSP Program.  Moreover, in

making its benefit calculation, Commerce erroneously double counted an alleged benefit of the program, attributing it in some instances to both to Kukdo Chemical and other unrelated companies and in some instances to both Kukdo Chemical and to its wholly-owned subsidiary.

3.    Whether Commerce's determination regarding the provision of epichlorohydrin ("ECH") sourced from suppliers in China under the "transnational subsidy" provision for less-than-adequate renumeration ("LTAR") was unsupported by substantial record evidence and contrary to law.  As addressed in **Section V.C.1**, Commerce did not follow its own well-established practice in making this countervailability determination, nor did it comply with its statutory obligations for supporting its determination with substantial record evidence.

4.    Whether Commerce abused its discretion in applying adverse facts available ("AFA") for its first-ever benefit calculation of the transnational subsidy provision of ECH for LTAR. Despite Kukdo Chemical's full and unreserved compliance with Commerce's requests throughout the investigation, Commerce found unsupported deficiencies in Kukdo Chemical's freight expenses reporting for purchases of ECH.  As discussed in **Section V.D**, these perceived deficiencies were entirely the result of Commerce's opaque reporting requirements, a mere pretext for applying AFA in its benefits calculation.

5. Whether Commerce's countervailable determination that the provision of electricity for LTAR was *de facto* specific is unsupported by substantial record evidence and otherwise contrary to law. As discussed in **Section V.E**,  Commerce did not sufficiently support its specificity analysis with record evidence as required by well-established law and accepted practice.

## II.    STATEMENT OF FACTS

On April 29, 2024, Commerce initiated a countervailing duty investigation on Certain Epoxy Resins from the Republic of Korea.  *See Certain Epoxy Resins From the People's Republic of China, India, the Republic of Korea, and Taiwan: Initiation of Countervailing Duty*

*Investigations*, 89 Fed. Reg. 33,319 (Dep't Comm., Apr. 29, 2024) ("*Initiation Notice*"), P.R. 58. Commerce initiated its investigation based on a petition filed by the U.S. Epoxy Resin Producers *Ad Hoc* Coalition ("Petitioner"). *See* Petitions for the Imposition of Antidumping and Countervailing duties on Imports of Certain Epoxy Resins from China, India, South Korea, Taiwan and Thailand (Apr. 3, 2024), C.R. 1-31, P.R. 1-31. Commerce's period of investigation ("POI") was January 1, 2023, through December 31, 2023. *See* Commerce's Initiation Checklist (Apr. 23, 2024), C.R. 39, P.R. 57.

On May 9, 2024, Commerce selected Kukdo Chemical Co., Ltd. ("Kukdo Chemical") and Kumho P & B Chemicals Inc. ("Kumho") as the mandatory respondents. *See* Department Memorandum "Countervailing Duty Investigation of Epoxy Resins from the Republic of Korea: Respondent Selection" (May 9, 2024), C.R. 42, P.R. 66. On May 10, 2024, Commerce issued its countervailing duty questionnaire. *See* Commerce's Initial Countervailing Duty Questionnaire (May 10, 2024), P.R. 64. Kukdo Chemical responded to Commerce's initial questionnaire and subsequent supplemental questionnaires, and cooperated fully with the investigation. *See e.g.*, Kukdo Chemical Sec. III Questionnaire Response (June 3, 2024), C.R. 47, P.R. 88; Kukdo Chemical Supplemental Questionnaire Response (Aug, 5, 2024), C.R. 362, P.R. 260.

On August 8, 2024, Petitioner filed new subsidy allegations, alleging that the mandatory respondents received so-called "transnational subsidies" from the government of the People's Republic of China ("GOC"). Petitioner New Subsidy Allegations (Aug. 8, 2024), C.R. 425, P.R. 280. Commerce issued a supplemental questionnaire to Petitioner regarding the new subsidy allegations, and, on September 4, 2024, Petitioner responded to the supplemental questionnaire. Petitioner New Subsidy Allegations Supplemental Questionnaire Response (Sept. 4, 2024), C.R. 489, 334.

On September 13, 2024, Commerce published its negative Preliminary Determination in the investigation, calculating a *de minimis* preliminary *ad valorem* subsidy rate of 0.74 percent for Kukdo Chemical.  *See Certain Epoxy Resins From the Republic of Korea: Preliminary Negative Countervailing Duty Determination, Preliminary Negative Critical Circumstances Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 89 Fed. Reg. 74,912  (Dep't Comm., Sept. 13, 2024), P.R. 358 and accompanying Issues and Decision Memorandum ("Prelim. I&D Memo"), P.R. 351.  Regarding Petitioner's August 7, 2024, new subsidy allegations, Commerce stated it intended to issue a post-preliminary determination whether to initiate an investigation of the programs alleged in Petitioner's new subsidy allegations.  *See* Prelim. I&D Memo, P.R. 351 at 4.

In the Preliminary Determination, among its program-specific preliminary subsidy findings, Commerce determined that Kukdo Chemical, and its cross-owned affiliate, Kukdo Finechem Co., Ltd. ("Kukdo Finechem") received countervailable subsidies pursuant to the Chemical Substance Registration Support Project ("CSRSP") program.  *See* Prelim. I&D Memo, P.R. 351 at 35.  Commerce preliminarily concluded that the program conferred a financial contribution from the Government of Korea to the mandatory respondents in the form of a direct transfer of funds that is *de jure* specific, and this financial contribution constituted a countervailable benefit.  *Id.*

Commerce's analysis of the countervailability of the CSRSP program was an issue of first impression in Commerce's countervailing duty proceedings involving Korea.  As relevant to this appeal, the Government of Korea mandates the registration of chemical substances for any person who intends to manufacture or import more than one ton of the substance at issue per year, and this program essentially operates to have the Korean Government contribute to the

payment of certain testing and analysis to support the registration of the chemical.  *See* Kukdo
Chemical's Initial Countervailing Duty Questionnaire Response (July 3, 2024) at Exhibit OTH-
13-A, at 1, C.R. 285-287, P.R. 202-203.  Under this program, the companies that intend to import
or manufacture the chemical are required to form a "consultative body" ("CB") to facilitate the
registration of the chemical.  *Id.* at 2-3.  A private, non-profit entity that administers the CSRSP
program paid private consulting companies for services performed on behalf of CBs under this
program. *Id.*

Commerce preliminarily found that the CSRSP program provided a financial contribution
in the form of a grant.  *See* Prelim. I&D Memo, P.R. 351 at 34-35.  Commerce determined the
amount of the grant to be the amount paid to the private consulting companies for services
performed on behalf of the CBs.  *Id.* at 35.  To calculate the countervailable benefit, Commerce
divided the total amount that was paid to service providers on behalf of CBs in which Kukdo
Chemical and/or Kukdo Finechem was a member company, by Kukdo Chemical's and Kukdo
Finechem's respective total sales during the POI.  *Id.*  As discussed further below, Commerce
modified its analysis in the Final Determination.

Subsequent to the Preliminary Determination, on November 12, 2024, Commerce
initiated an investigation of two new subsidy programs pursuant to allegations from Petitioner's
August 7, 2024, new subsidy submission:  (1) The provisions of Epichlorohydrin ("ECH") and
Bisphenol A ("BPA") for less than adequate remuneration ("LTAR") from the PRC; and (2) the
alleged subsidies from the parallel countervailing duty investigation on *Epoxy Resins from the
People's Republic of China* conferred upon so called "international consortia."  *See*
Memorandum re: Countervailing Duty Investigation of Certain Epoxy Resins from the Republic
of Korea: *Initiation of Investigation of Additional New Subsidy Programs* (Nov. 12, 2024), C.R.

529, P.R. 387.  Commerce issued additional new subsidy allegation questionnaires ("NSA

Questionnaire") to the Government of Korea, the government of the People's Republic of China

("PRC"), Kukdo Chemical, and Kumho.  *See* Department Memorandum "Additional New

Subsidy Allegations Questionnaire" (Nov. 25, 2024) ("NSA Questionnaire"), P.R. 393.   The

government of the PRC did not respond to Commerce's NSA Questionnaire.  Kukdo Chemical,

as well as the Government of Korea and Kumho, responded fully to Commerce's NSA

Questionnaires.  *See* Kukdo Chemical New Subsidy Allegations Questionnaire Response (Dec.

17, 2024) ("Kukdo NSA Response"), C.R. 591, P.R. 429; GOK New Subsidy Allegations

Questionnaire Response (Jan. 3, 2025) ("GOK NSA Response"), P.R. 445; Kumho New Subsidy

Allegations Questionnaire Response (Dec. 20, 2024) (Kumho NSA Response), C.R.595, P.R.

434.

  Commerce conducted verifications of the Government of Korea, Kumho, and

Kukdo Chemical from January 6, 2025, through January 15, 2025.  *See* Verification Agenda

Pertaining to Kukdo (Dec. 31, 2024), C.R. 609, P.R. 443; Verification Agenda Pertaining to GOK

(Dec. 27, 2024), C.R. 607, P.R. 440; Verification Agenda Pertaining to Kumho (Dec. 31, 2024),

C.R. 608, P.R. 442.  On February 10, Commerce issued the verification report for the

Government of Korea, and on February 11 and 12, Commerce issued the verification reports for

Kumho and Kukdo Chemical, respectively.   GOK Verification Report (Feb. 10, 2025), C.R. 659,

P.R. 467;  Kukdo Verification Report (Feb. 12, 2025), C.R. 661, P.R. 469; Kumho Verification

Report (Feb. 11, 2025), C.R. 660, P.R. 468.

  On February 13, 2025, Commerce issued a memorandum establishing the briefing

schedule limited to the issues discussed in its Preliminary Determination, *i.e.,* issues other than

the scope of the investigation and Commerce's initiation of November 12, 2024, new subsidy

allegations.  *See* Department Memorandum "Briefing Schedule" (Feb. 13, 2025), P.R. 471.
Between February 24, 2025 and March 5, 2025, Petitioner, the Government of Korea, Kukdo
Chemical, and Kumho submitted their case and rebuttal briefs.  *See e.g.*, Kukdo Chemical Case
Brief (Feb. 25, 2025), C.R. 676, P.R. 486; Kukdo Chemical Rebuttal Brief (Mar. 5, 2025), C.R.
682, P.R. 502.

       On March 11, 2025, Commerce issued its post-preliminary issues and decision
memorandum ("Post-Prelim. I&D Memo") concerning the new subsidy investigation.
Department Memorandum "Post-Preliminary Issues and Decision Memorandum" (Mar. 12,
2025) ("Post-Prelim. I&D Memo"), C.R. 684, P.R.507.  Commerce preliminarily found that the
provision of ECH for LTAR from PRC suppliers constituted a countervailable transnational
subsidy.  *Id*. at 6.  Citing to the fact that the government of the PRC did not respond to
Commerce's NSA Questionnaire, Commerce relied on facts available to determine that Kukdo
Chemical's purchases of ECH from suppliers in China were properly considered as purchases
from PRC authorities whose sales of ECH for LTAR constituted a financial contribution, and that
the transnational provision of ECH for LTAR was *de facto* specific to Korean epoxy resins
producers.  *Id.* at 6-8.

       As to the countervailable benefit, Commerce established a benchmark for the value of
ECH purchases using Kukdo Chemical's input purchase template.  Specifically, Commerce
compared the prices that Kukdo Chemical paid to non-Chinese unaffiliated ECH suppliers with
the price that Kukdo Chemical paid for ECH inputs purchased from Chinese suppliers.  *Id*. at 9-
11.  Commerce adjusted the benchmark price to derive the "delivered price" by including
delivery charges and import duties, as applicable.  *Id.*  When calculating delivered price for
imports of Chinese-origin ECH, Commerce applied facts available with adverse inferences to

Kukdo Chemical's per-unit delivery charges for freight from port-to-destination within Korea. *Id.* at 6-7.  Commerce stated that it applied averse facts available because Commerce "discovered" that Kukdo Chemical's reported monthly ECH inland freight costs were incomplete.  *Id.* at 6.  In addition, as facts available, commerce also added a value-added tax ("VAT") of 10 percent of the material cost of ECH for all imports reported in Kukdo Chemical's input purchase table.  *Id.* at 10.

Commerce preliminarily found the transnational provision of ECH for LTAR benefit amount to be non-measurable.  *Id*. at 7-8.  Thus, the preliminary, *de minimis* subsidy rate of 0.74 percent remained unchanged for Kukdo Chemical.  *Id*.  at 10.

On March 12, 2025, Commerce issued a separate briefing schedule for issues related to the new subsidy allegations.  *See* Department Memorandum "Second Briefing Schedule" (Mar. 12, 2025), P.R. 510).  Between March 17, 2025 and March 24, 2025, Petitioner, the Government of Korea, Kukdo Chemical, and Kumho submitted case and rebuttal briefs.  *See e.g.*, Kukdo Second Case Brief (Mar. 18, 2025), C.R. 690, P.R. 520; Kukdo Second Rebuttal Brief (Mar. 24, 2025), C.R. 696, P.R. 529.

On April 3, 2025, Commerce issued its Final Determination in the investigation.  *See Certain Epoxy Resins From the Republic of Korea: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 90 Fed. Reg. 14,605 (Dept. Comm., April 3, 2025), and accompanying Issues and Decision Memorandum. Department Memorandum "Final Issues and Decision" (Mar. 31, 2025) ("Final I&D Memo"), P.R. 531.

In the Final Determination, Commerce revised its calculations for Kukdo Chemical's purchases of electricity for LTAR from the Korea Electric Power Corporation ("KEPCO").

Commerce stated that it adjusted the electricity cost benchmark to include KEPCO's fuel cost shortfall that the company incurred during the POI, although in its calculations Commerce simply added the cost shortfall on Kukdo Chemical's reported electricity purchases. *See* Final I&D Memo, P.R. 531 at Cmt 3.

In addition, Commerce continued to apply adverse facts available to Kukdo Chemical's freight expenses for the transnational provision of ECH for LTAR. *Id.* at Cmt 19. With respect to VAT payments on purchases of ECH, unlike in the Post-Preliminary Determination, where Commerce included the VAT amounts on facts available only for imported ECH purchases, in the Final Determination Commerce also included the VAT amount for domestic purchases of ECH based on adverse facts available for its benefit analysis under the transnational provision of ECH for LTAR. *Id.* As a result, in the Final Determination, Commerce calculated a measurable benefit of 0.06 percent *ad valorem* subsidy rate for this program. *Id.*

With respect to the CSRSP program, Commerce continued to find that the program constituted a countervailable subsidy. *Id.* at 57. For financial contribution, Commerce no longer determined that the program involved a financial contribution in the form of a direct transfer of funds. *Id.* Rather, Commerce determined that the GOK provided a funding mechanism through which the program participants received funding they would otherwise be required to pay. *Id.* In addition, Commerce continued to find that the program conferred a countervailable benefit and disagreed with Kukdo Chemical's argument that Commerce double-counted the benefit by attributing the full grant amount to the CBs to both Kukdo Chemical and Kukdo Finechem where both companies participated (along with other companies) in the same CB, as well as in an instance where both mandatory respondents, Kukdo Chemical and Kumho participated in the same CB. *Id.* at Cmt 9.

On April 7, 2025, Kukdo Chemical alleged ministerial errors with respect to Commerce's benefit calculations for the CSRSP program and the provision of electricity for LTAR. *See* Kukdo Ministerial Error Comments (Apr. 9, 2025), C.R. 707, P.R. 545. Petitioner claimed that Commerce's application of adverse facts available with respect to Kukdo Chemical's VAT reporting constituted a ministerial error. Petitioner Ministerial Error Comments (Apr. 10, 2025), C.R.710, P.R. 547. On April 29, 2025, Commerce disagreed with all of these arguments stating that the allegations did not constitute ministerial errors, and made no changes to the Final Determination. *See* Department Memorandum "Ministerial Error" (Apr. 29, 2025), C.R. 715, P.R. 552.

On May 27, 2025, Commerce published the Countervailing Duty Order. *See Certain Epoxy Resins From Taiwan: Amended Final Countervailing Duty Determination; Certain Epoxy Resins From the Republic of Korea and Taiwan: Countervailing Duty Orders*, 90 Fed. Reg. 22,235 (Dept. Comm., May 27, 2025). After the publication of the Final Determination in the Federal Register, on June 26, 2025, Kukdo Chemical timely filed this appeal to this Court. *See* Summons, ECF No. 1.

## III.     SUMMARY OF ARGUMENT

This case comes before the Court because the Commerce Department ("Commerce") conducted its investigation with a singular goal in mind: to put in place a countervailing duty order on epoxy resins produced and/or exported by Kukdo Chemical Co., Ltd. ("Kukdo Chemical") from the Republic of Korea. Commerce reversed its negative preliminary determination and calculated a subsidy rate of 1.01 percent – one hundredth of a percentage point above the one percent *de minimis* threshold – in the final determination resulting in the countervailing duty order with respect to Kukdo Chemical. In doing so, Commerce disregarded the facts, invented methodologies, and otherwise ignored good practice and applicable law.

While Commerce retains some discretion in assessing the facts and rendering determinations, its findings here are so erroneous and contrary to the record evidence that they cannot stand unmodified. Specifically, Commerce's determinations erred in five key respects.

First, Commerce's determination that the Chemical Substance Registration Support Program ("CSRSP") constitutes a countervailable subsidy is unsupported by substantial record evidence and is contrary to law. Focusing on calculating a benefit where none properly existed, Commerce overlooked a critical element of the existence of a countervailable subsidy; that is, whether a government authority provided a financial contribution as defined in the statute that conferred a benefit to a recipient. Commerce initially (and incorrectly) determined that the program provided a financial contribution in the form of a direct transfer of funds. With an express acknowledgement that the Government of Korea ("GOK") did not provide any funds to Kukdo Chemical, Commerce in the *Final Determination* concluded that Kukdo Chemical benefited from this program because the GOK provide financial contribution "in the form of a funding mechanism." Final I&D Memo at p. 60. Put differently, Commerce's determination only speaks to the form of a financial contribution, if any existed, rather than the substance of it, which Commerce was obligated to find with supporting record evidence under the statute. On this basis alone, the Court should find that Commerce did not act in accordance with law.

Second, Commerce's countervailable benefit calculation for the CSRSP program is flawed and overstates any benefit allegedly conferred on Kukdo Chemical. Although any countervailable subsidy program relates to some contribution of funds or some other thing of value by the government to a respondent company, Commerce treated the benefit from this program as if each participating recipient received the full amount of government outlay. In particular, in the case of the two mandatory respondents, Kukdo Chemical and Kumho P & B

Chemicals Co., Ltd. ("Kumho"), Commerce attributed the full amount of government outlay as the benefit amount to each respondent, instead of allocating the benefit to each respondent.

Even more absurd than the double counting across unrelated companies, with respect to Kukdo Chemical and its cross-owned reporting company Kukdo Finechem, Commerce double counted the alleged benefit, attributing it to both companies separately even though Kukdo Finechem is a wholly owned subsidiary of Kukdo Chemical. There is no record support for the proposition that this program benefitted each Kukdo corporate entity fully and separately such that double counting was warranted. These fallacies, unsupported by record evidence, distorted Commerce's benefit calculation such that it cannot be sustained.

Third, Commerce's countervailing duty determination regarding the transnational subsidy provision of epichlorohydrin ("ECH") for less-than-adequate-renumeration ("LTAR") predetermined the result and fell far short of satisfying the necessary elements of a countervailable subsidy. As a threshold matter, Commerce could not articulate how the provision of ECH for LTAR fits within its own "transnational subsidy" framework; its analysis lacked any conceivable benefit connecting the transnational subsidy of ECH for LTAR to Kukdo Chemical and any benefit to the grantor country's (the Government of China ("GOC") chemical industry. Moreover, Commerce failed to sufficiently find a financial contribution to Kukdo Chemical from GOC which conferred a specific benefit to Kukdo Chemical's production, manufacture, or exportation of merchandise. Thus, Commerce's findings with respect to this issue are unsupported by substantial record evidence and are contrary to law, and cannot be upheld.

Fourth, Commerce abused its discretion when calculating the alleged benefit for the transnational subsidy provision of ECH for LTAR. Despite Kukdo Chemical's full compliance with any and all requests to the best of its ability, Commerce resorted to adverse facts available

("AFA") for Kukdo Chemical's inland freight values for its ECH purchases.  Commerce justified

its decision by framing Kukdo Chemical's alleged failure to provide complete data as evidence

of non-compliance with Commerce's request for information.  However, the record demonstrates

that Commerce did not request the specific information that it eventually required for its novel

analysis.  Commerce's failure to request information it later deems necessary should not be the

basis for the application of AFA. Its AFA finding in this case thus cannot be sustained.

 <u>Fifth</u>, Commerce's countervailable determination with respect to the provision of

electricity for LTAR is unsupported by substantial record evidence and is otherwise contrary to

law. Specifically, Commerce determined that the provision of electricity for LTAR was *de facto*

specific under 19 U.S.C. § 1677(5A)(D)(iii)(III).  It was not.  Just as this Court determined in

*Hyundai Steel*, this finding is not supported by substantial record evidence because Commerce

failed to explain how the chemical industry benefited more than expected, or more than other

industries, regarding the alleged provision of electricity for LTAR.  Rather, Commerce merely

concluded, without evidence, that the chemical industry consumed more electricity than "many

other manufacturing industries."  The Court should find that Commerce did not support its *de

facto* specificity determination with substantial evidence, or any evidence.

## IV.  STANDARD OF REVIEW

 The Court will hold Commerce's determinations unlawful in a countervailing duty

proceeding where they are "unsupported by substantial evidence on the record, or otherwise not

in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

 Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

Importantly, "{t}he substantiality of evidence must take into account whatever in the record

fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

The substantial evidence standard of review essentially asks whether, given the evidence on the record as a whole, the agency's conclusion was reasonable. *See Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006).

When reviewing an agency decision for abuse of discretion, the court examines whether the decision "1) is clearly unreasonable, arbitrary, or fanciful; 2) is based on an erroneous conclusion of law; 3) rests on clearly erroneous fact findings; or 4) follows from a record that contains no evidence on which the {agency} could rationally base its decision." *Sterling Fed. Sys., Inc. v. Goldin*, 16 F.3d 1177, 1182 (Fed. Cir. 1994) (quoting *Gerritsen v. Shirai*, 979 F.2d 1524, 1529 (Fed. Cir. 1992)); *see also Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1147-48 (Fed. Cir. 2011) (noting that a clear error of judgment occurs when an action is "arbitrary, fanciful, or clearly unreasonable.").

Commerce must also comply with the general requirement that agencies establish and articulate a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. U.S.*, 371 U.S. 156, 168 (1962).

## V.    ARGUMENT

### A.    COMMERCE ERRED IN FINDING THAT THE CHEMICAL SUBSTANCE REGISTRATION SUPPORT PROGRAM PROVIDES A COUNTERVAILABLE SUBSIDY

Commerce's determination that the Chemical Substance Registration Support Program ("CSRSP") is a countervailable subsidy is unsupported by substantial record evidence and contrary to law.  The necessary elements of a countervailable subsidy are the existence of (1) a government financial contribution, (2) specificity, and (3) conferral of a benefit on the recipient. *See* 19 U.S.C. § 1677 (5) & (5A); *see also Gujarat Fluorochemicals Limited v. United States*, 617 F.Supp.3d 1328, 1332 (Ct. Int'l Trade 2023) ("A 'countervailable subsidy' exists, generally, where an authority provides a financial contribution to a 'person' and a 'benefit is thereby

conferred' and where the subsidy meets the requirements of 'specificity,' as determined according to various rules set forth in the statute."). In the *Final Determination*, Commerce determined that the CSRSP operated as a "form of a funding mechanism through which a financial contribution is provided," and a countervailable benefit existed to the extent that the government had exempted certain fees. Final I&D Memo, P.R. 531 at p. 60. Because Commerce erred in finding that a financial contribution exists, and because there is no evidence of the conferral of a countervailable benefit to Kukdo Chemical for its participation in the CSRSP program, the Court should find that Commerce's determination that the CSRSP program is a countervailable subsidy is unsupported by substantial record evidence and contrary to law.

> ### 1.    *Commerce Is Unable To Articulate What Constitutes A Financial Contribution Under The CSRSP Program*

Commerce did not fulfill its statutory obligations to articulate how Kukdo Chemical's participation in the CSRSP program results in a financial contribution to Kukdo Chemical. On this basis alone, the Court should find that Commerce did not act in accordance with law. *See Burlington Truck Lines, Inc. v. U.S.,* 371 U.S. 156, 168 (1962) (Requiring that agencies establish and articulate a "rational connection between the facts found and the choice made."). Commerce's determination is illogical, contradictory, and wholly unsupported by the facts. Commerce initially determined that the CSRSP program provides a financial contribution in the form of a direct transfer of funds under 19 U.S.C. § 1677(5)(D)(i). *See* Prelim I&D Memo, P.R. 351 at p. 35.

In its final analysis, Commerce "acknowledge{d} that the CSRSP program does not involve a financial contribution under {19 U.S.C. § 1677(5)(D)(i)} in the form of a direct transfer of funds." Final I&D Memo, P.R. 531 at p. 57. Rather, Commerce determined that financial contribution exists "in the form of a funding mechanism through which a financial

contribution is provided." *Id*. at 60. Other than referring to another statutory definition under which the program may constitute a subsidy, Commerce did not on elaborate how Kukdo Chemical's participation in the CSRSP program results in the GOK providing a "financial contribution" to Kukdo Chemical, which is an element necessary to find a subsidy countervailable. *See* 19 U.S.C. § 1677 (5) & (5A). In other words, while Commerce attempted to characterize the form of a subsidy under its statutory framework, 19 U.S.C. § 1677(5)(B) (describing subsidy as that (i) provides a financial contribution; (ii) provides any form of income or price support; or (iii) makes a payment to a funding mechanism to provide a financial contribution to a person and a benefit is thereby conferred), Commerce fell short of explaining what constitutes "financial contribution" in the program under examination in the investigation, or that providing the said contribution "would normally be vested in the government." 19 U.S.C. § 1677(5)(B)(iii). Stated plainly, to find a subsidy countervailable, Commerce is required to find that a subsidy provides a financial contribution, as defined under 19 U.S.C. § 1677(5)(D), and, if a financial contribution was made via a funding mechanism Commerce must also find that providing the contribution would normally be vested in the government. Commerce made neither finding in the investigation.

The statute defines financial contribution as (i) the direct transfer of funds; (ii) foregoing or not collecting revenue that is otherwise due; (iii) providing goods or services; or (iv) purchasing goods. *See* 19 U.S.C. § 1677(5)(D). The CSRSP program meets none of these elements. In the *Final Determination*, Commerce determined that the CSRSP program did not involve the transfer of funds. *See* Final I&D Memo, P.R. 531 at p. 57. The program, the purpose of which was to "minimize the burden of registering imported and/or manufactured chemical substances for SMEs and to ensure smooth implementation of chemical substance registration

requirements," *see* Prelim I&D Memo, P.R. 351 at p.34 (citing GOK Initial Questionnaire Response (July 3, 2024) ("GOK IQR"), C.R. 92, P.R. 117 at 514), did not involve providing goods or services, or purchasing goods as defined under 19 U.S.C. § 1677(5)(D). Commerce's only explanation was that because the program participant companies, such as Kukdo Chemical, "can receive funding from the GOK to alleviate the financial burden" for services related to the registration of chemical substances, the CSRSP program provides a financial contribution within the meaning of 19 U.S.C. § 1677(5)(B)(iii). *See* Final I&D Memo, P.R. 531 at 57.

However, 19 U.S.C. § 1677(5)(B)(iii) does not address the necessary elements for finding of a countervailable subsidy. This provision of the statute describes a method under which an authority may provide a subsidy, *e.g.,* through a funding mechanism or by entrusting or directing a private entity to make a financial contribution. For a subsidy to be a countervailable, Commerce was still required to find a financial contribution as defined under 19 U.S.C. § 1677(5)(D) to a person to whom "a benefit is thereby conferred." 19 U.S.C. § 1677(5)(B)(iii). Without having articulated what constitutes a financial contribution, Commerce relied on the newly promulgated regulation, 19 C.F.R. § 351.529(b), to conclude that Kukdo Chemical received a countervailable benefit in the form of "exempt" fees that were otherwise due. *See* Final I&D Memo, P.R. 531 at p. 60. Commerce's reliance on 19 C.F.R. § 351.529(b) is misguided; these fees do not constitute a financial contribution and thus are not countervailable subsidies under applicable law.

### 2.    *Commerce's Reliance on 19 C.F.R. § 351.529 is Inapposite*

As an initial matter, 19 C.F.R. § 351.529(b) contains a specific method for measuring benefit resulting from the finding of a financial contribution within the meaning of 19 U.S.C. § 1677(5)(D)(ii). *See Countervailing Duties, Final Rule,* 63 Fed. Reg. 65,348, 65,360 (Dept. Commerce, Nov. 25, 1998) ("*CVD Preamble*") (when Commerce determines that a financial

contribution has been provided in a form which is specifically identified in the statute or regulations, Commerce "will identify and measure the resulting benefit in accordance with the rules contained in the statute and regulations"); *see also* 19 C.F.R. §351.503(a) ("In the case of a government program for which a specific rule for the measure of a benefit is contained in this subpart E, the Secretary will measure the extent to which a financial contribution (or income or price support) confers a benefit as provided in that rule."). The specific rule for the measure of a benefit under 19 C.F.R. § 351.529(b) is for measuring countervailable benefit for "foregoing or not collecting revenue that is otherwise due," as specifically provided under 19 C.F.R. § 351.529(a). Commerce explained that under 19 C.F.R. § 351.529(a), "a financial contribution exists if Commerce determines that a fee, fine, or penalty which is otherwise due has been foregone or not collected within the meaning of {19 U.S.C. § 1677(5)(D)(ii)}." *See Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, *Final Rule*, 89 Fed. Reg. 20,766, 20,827 (Dept. Commerce Mar. 25, 2024).

When promulgating this new regulation, Commerce explained that it was codifying its "long-standing practice covering unpaid or deferred fees, fines, and penalties" in situations where "the government fails to enforce its regulations, requirements, or obligations by not collecting a fee, a fine, or a penalty that the government should otherwise collected under those regulations, requirements, or obligations." *Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, *Proposed Rule*, 88 Fed. Reg. 29,850, 39,858 (Dept. Comm., May 9, 2023). Here, the CSRSP program does not have anything to do with "unpaid or deferred fees." Commerce's reliance on 19 C.F.R. § 351.529(a) is therefore entirely inapposite. As the GOK

explained, the program provides support for the costs associated with the legally required registration of "phase-in" chemicals and the associated costs to "minimize the burden of registering imported and/or manufactured chemical substances for SMEs."  Prelim I&D Memo, P.R. 351 at 34 (quoting GOK IQR, C.R. 92, P.R. 117 at 514).  It does not, by definition or in practice, exempt certain producers from paying a fee the GOK would have otherwise collected.  Thus, on its face, Commerce's application of 19 C.F.R. § 351.529(a) to frame the CSRSP program as a countervailable subsidy fails.

### 3.    *No Financial Contribution Exists Under 19 C.F.R. § 351.529(a)*

Even assuming *arguendo* that Commerce's reliance on 19 C.F.R. § 351.529(a) was appropriate to examine the CSRSP program, Commerce is still required to find that a financial contribution exists.  As Commerce explained in its *Final Rule*, "when a government fails to enforce its regulations, requirements, or obligations by not collecting a fee, a fine, or a penalty, such inaction can be considered a countervailable subsidy.  In that case, the government has forgone revenue it was otherwise due, therefore, benefiting the party not paying the fee, fine, or penalty, pursuant to {19 U.S.C. § 1677(5)(D)(ii)}."  *Final Rule* at 20,827.

In determining that Kukdo Chemical received a countervailable benefit in the form of exempt fees, Commerce undertook no analysis to determine whether such fees were "otherwise due" that have been forgone or not collected by the GOK within the meaning of 19 U.S.C. § 1677(5)(D)(ii).  Here, the record confirms that there are no fees "otherwise due" to the GOK for Kukdo Chemical's participation in the CSRSP program.  Under the Act on the Registration and Evaluation of Chemical Substances in 2019, the GOK mandated the registration of chemical substances with the Minister of Environment ("MOE") for any person who intends to manufacture or import more than one ton of specified chemical substances per year.  *See* GOK IQR, C.R. 92, P.R. 117 at 514.  To implement its mandate, the MOE established the Korea

Chemicals Management Association ("KCMA"), a private, non-profit entity, to administer the

CSRSP program.  *Id*. at 516; *see also* Prelim. I&D Memo, P.R. 351 at 35.  Relevant to this

investigation, the program enabled SMEs to register chemical substances with the MOE through

the Consulting Support Program ("CSP") and produce the required toxicity report with the

assistance of the Support for Production Cost of Toxicity Test Data ("SPCTT") for each

registration.  *See* GOK Verification Report, C.R. 659, P.R. 467 at 17.  The CSRSP program

requires that for each registration application, participants form a consultative body ("CB") for

each substance and select a representative for each CB.  *See* GOK IQR, C.R. 92, P.R. 117 at 516.

For the CSP service, CBs receive consulting services from a private consulting company for

preparing and submitting the chemical substance registration with the MOE.  *See* GOK

Verification Report at 17.  KCMA pays the consulting company for services performed on behalf

of CBs.  *See* Kukdo Verification Report at 16, C.R. 661, P.R. 469; Kumho Verification Report,

C.R. 660, P.R. 468 at 13.  Also with respect to the SPCTT service, KCMA pays for costs that

CBs incur for toxicity testing of a chemical substance.  *Id*.  Put differently, there were no fees

that were exempt or otherwise due to the GOK under this program.

    As this Court has recently explained, foregoing or not collecting revenue that is otherwise

due and Congress's use of the simple present tense "is" "denotes an existent obligation that is

due presently or would be due at some time in the future."  *Hyundai Steel Company v. United

States*, 659 F.Supp.3d 1327, 1334 (Ct. Int'l Trade 2023).  The Court further explained, "{a}s

such, the revenue that is foregone must be due either presently or on some future date, but it

must, nevertheless, be 'otherwise due.'"  *Id*.  Here, the record shows that there are no present,

much less, future "obligation" to pay any fees to the GOK to register "phase-in" chemicals under

Korean law.  There is no revenue so to speak of for the GOK to collect from the implementation

of the chemical registration program.  Put plainly, Commerce's analytical framework under 19 C.F.R. § 351.529(a) simply fails.

### B.    COMMERCE'S BENEFIT CALCULATION IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

Commerce's benefit calculation for the CSRSP program contains major flaws and overstates any benefit allegedly conferred upon Kukdo Chemical.  The record confirms that in order to receive any benefit as Commerce has defined it, *i.e.,* costs associated with the registration of the phase-in chemicals and the required toxicity report, the program participants were *required to* form a consultative body ("CB").  Pursuant to the program requirements, CBs consisted of at least two participants.  *See* Kukdo Verification Exhibits at Exhibit 11 (containing the revised Exhibit S-32-A of Kukdo's NSA Questionnaire Response).  In this investigation, the CBs that Commerce examined consisted of participants ranging from two to nine participants.  *Id*.  In the *Final Determination*, Commerce attributed the *entire amount of the benefit to each participant of the CB*.  *See* Final I&D Memo, P.R. 531 at 60.

The record does not support Commerce's benefit calculation.  For example, if the benefit amount conferred upon a particular CB was $100, and the CB consisted of 4 participants, Commerce illogically regarded the benefit amount attributable to each participant as if each participant had received the entire $100 rather than dividing the benefit amount by the number of participants (4), or otherwise allocating the total government outlay across the companies.  The absurdity in Commerce's methodology is particularly glaring where either (a) both mandatory respondents, *i.e.,* Kukdo Chemical and Kumho, participated in the same CB, or (b) where Kukdo and its cross-owned reporting company, Kukdo Finechem participated in the same CB.  With respect to the former, under Commerce's methodology, it attributed the same benefit amount twice to each mandatory respondent.

For the latter, Commerce *double counted* the benefit that Kukdo Chemical and its cross-owned reporting company received for the same CB – that is, where Kukdo Chemical and Kukdo Finechem were both participating in the same CB Commerce treated the full outlay by the GOK to be a benefit to both Kukdo Chemical and Kukdo Finechem.  This is a critical point.  In the example above where the GOK incurred costs of $100 to support the CB, Commerce attributed $100 to Kukdo Chemical and $100 to Kukdo Finechem.  Because Commerce found the companies to be cross owned, in the subsidy calculations this $200 "benefit" would then be divided by the two companies combined sales to calculate a subsidy rate.  While we submit that this is an absurd and unsupported result on its face, this conclusion rests on multiple factual predicates which are unsupported in the record.

In particular, at bottom, any countervailable subsidy program relates to some contribution of funds or some other thing of value by the government to a respondent company.  In this instance, Commerce should have (and the Court should) look to how this chemical registration and approval process would look in the absence of government funding.  To accept Commerce's position that the full government outlay benefitted both Kukdo Chemical and Kukdo Finechem, one would have to assume that both Kukdo Chemical and Kukdo Finechem would be required to independently incur the full $100 testing and registration cost to have the substance at issue approved.  Yet, there is no support in the record that such duplicative outlay by the companies would be required.  Commerce's inherent conclusion on this point is also fundamentally undermined by the relationship between the two companies.  In particular, Kukdo Finechem is a 100 percent owned subsidiary of Kukdo Chemical.  *See* Affiliated Companies Response at Exhibit 1.  Commerce's double counting presumes, despite this relationship between the companies, that the two companies would be somehow unable to coordinate on a joint effort to

have the substance at issue tested and registered, but there is no evidence to support this unstated

presumption that is central to Commerce's conclusion.  In short, if the GOK's involvement was

wholly removed from the registration process in this example, the relationship between

Kukdo Chemical and Kukdo Finechem confirms that the companies would incur a combined

cost of $100 to have the substance tested and approved, and not the $200 that Commerce found

in the Final Determination.

Setting aside the countervailability of the program, where the benefit amount was

conferred upon a group consisting of individual members, attributing the entire amount of benefit

to each individual member, regardless of the number of participants, overstates any benefit

allegedly received by a particular member company.  This aspect of Commerce's determination,

regardless of how Commerce characterizes "financial contribution" is unsupported by substantial

record evidence.   In this sections that follow we address these issues with particularity to

Commerce's specific findings and calculations.

### 1.   *Commerce Overstates Any Benefit Allegedly Conferred by the CSRSP Program*

As discussed above, Commerce overstated the benefit Kukdo Chemical allegedly

received under the CSRSP program.  The record confirms that Kukdo Chemical is not (and

cannot be) the sole party that participated in a CB that was formed to register chemical

substances under the CSRSP program.  The program required that a CB be composed of at least

two participants, and the CB, rather than the individual participants, entered into contracts with

KCMA and the private consulting company or the testing firm to register a chemical substance

with the MOE.  In other words, any benefit a participant may have received from a CB cannot be

the full contract amount that the CB entered into with KCMA and the private consulting

company or the testing firm.  *See* Kukdo Chemical's Affirmative Case Brief, dated February 24,

NON-CONFIDENTIAL VERSION

2025, at Sec. II; *see id* at Attachment, C.R. 676; P.R. 486 (containing a worksheet demonstrating the benefit calculation that allocates the benefit amount attributable to each Kukdo Chemical and Kukdo Finechem).

As is clear in Commerce's verification reports, there are multiple participants to a CB that were parties to a contract between the CB and the consulting company and/or testing company. *See e.g.*, Kukdo Verification Report, C.R. 661, P.R. 469 at 16; Kumho Verification Report, C.R. 660, P.R. 468 at 13. It was also clear in the verification reports that attributing the entire contract amount to Kukdo Chemical where there is more than one participant to a CB *overstates* the amount of benefit that Kukdo Chemical allegedly received. One of the contracts that Commerce examined during the GOK's verification, [                        ], involved two active participants, [

                    ]. *See* GOK Verification Report, C.R. 659, P.R. 467 at 18. Kukdo Chemical reported this contract in its August 23, 2024 Supplemental Questionnaire at Exhibit S-32-A. In its exhibit, Kukdo Chemical also reported that there were two participants to the CB that received "registration consulting support" and "hazardous test data production support." *See* Kukdo's August 23, 2024 Supplemental Questionnaire Response at Exhibit S-32-A. Commerce examined the underlying "Registration Consulting Support Contract" and the "Testing Data Production" contract. These contracts included in Kukdo Chemical's submission showed that [            ] was the representative company for the CB that was formed to register a chemical substance along with another company, Kukdo Chemical. The contract amounts for the "Registration Consulting Support Contract" and the "Testing Data Production" contract were [           ] KRW and [            ] KRW. *See* Kukdo's Verification Report, C.R. 661, P.R. 469 at Exhibit VE-11, pp. 82-90.

Commerce used the full contract amounts rather than the amount allocated based on the number of participants to each contract to derive the benefit amount attributable to Kukdo Chemical.  However, as just demonstrated above, Commerce cannot attribute the entire amount to one participant to a CB for the purpose of benefit calculations.  The contract that Commerce examined during the GOK verification, [                              ], was for a CB that was formed between [                                   ].  *See* GOK Verification Report at 18; *see also* Kukdo Verification Report at Exhibit VE-11; and [

                                                    ].  For the contract amount for the "Registration Consulting support Contract" in the amount of [              ] KRW, and for the "Testing Data Production" contract in the amount of [                ] KRW, the total benefit allegedly received by [                                   ] cannot exceed the full contract amounts for each contract.  The error is apparent as Commerce initially [


                    ], *see* [

          ] ([

                    ]), whereas Commerce attributed the full contract amount to Kukdo Chemical. *See* Kukdo's Prelim. Det. Analysis Memo at Attachment II.  In essence, Commerce calculated the benefit amount exceeding that was provided for in [                              ].

### 2.     *Commerce's Benefit Calculation Amounts To Double Counting*

In addition to a contract where [                                   ] were parties to a CB, Kukdo Chemical also reported [          ] separate contracts – case numbers [


                                        ] – in which both Kukdo Chemical and Kukdo Finechem were active participants to a CB.  *See* Kukdo's August 23, 2024 Supplemental

Questionnaire Response, C.R. 362, P.R. 260 at Exhibits S-32-A and S-32-B; *see also* Kukdo's

Verification Report at Exhibit VE-11, pp. 82-90 (containing the updated Exhibits S-32-A and S-

32-B). Because Kukdo Chemical identified Kukdo Finechem as a cross-owned reporting

company, pursuant to Commerce's instructions, Kukdo Chemical prepared a complete

questionnaire response for Kukdo Finechem, and, as relevant here, a separate calculation

worksheet for the CSRSP program for Kukdo Finechem. For the contracts for which both

Kukdo Chemical and Kukdo Finechem were parties, Commerce attributed the same, entire

contract amount to both Kukdo Chemical and Kukdo Finechem. Once again, this amounts to

impermissible double counting because the amount of any alleged financial contribution cannot

exceed the total amount as specified in each contract. For instance, Kukdo Chemical reported

case number **[                    ]** in both Kukdo Chemical's and Kukdo Finechem's

questionnaire responses at Exhibits S-32-A and S-32-B, respectively. *See* Kukdo's August 23,

2024 Supplemental Questionnaire at Exhibits S-32-A and S-32-B; *see also* Kukdo's Verification

Report at Exhibit VE-11, pp. 82-90 (containing the updated Exhibits S-32-A and S-32-B). The

CB that was formed under this contract consisted of two active participants, Kukdo Chemical

and Kukdo Finechem. The amount approved in 2023 for the SCP service portion was

**[            ]** KRW, and the amount approved in 2023 for the SPCTT service portion was

**[            ]** KRW, for a total amount approved in 2023 of **[            ]** KRW. *Id*. Between

Kukdo Chemical and Kukdo Finechem, the total amount of any alleged benefit cannot exceed

**[            ]** KRW, because this is the amount provided for under the SCP and SPCTT

contracts. However, in the *Final Determination* Commerce counted this amount twice, once for

Kukdo Chemical and then *again* for Kukdo Finechem. As a result, Commerce essentially

determined that the benefit amount should be double the amount approved in 2023. By

attributing the total contract amount to both Kukdo Chemical *and* again to Kukdo Finechem, Commerce double counted the amount of benefit. This aspect of Commerce's determination cannot be sustained.

### C. COMMERCE'S DETERMINATION REGARDING THE TRANSNATIONAL SUBSIDY PROVISION OF ECH FOR LTAR IS UNSUPPORTED BY SUBSTANTIAL RECORD EVIDENCE AND CONTRARY TO LAW

Commerce's countervailing duty determination regarding the transnational subsidy provision of epichlorohydrin ("ECH") for less-than-adequate-renumeration ("LTAR") was result-oriented and fell short of satisfying the necessary elements of a countervailable subsidy. ECH is one of the chemical inputs used in the production of subject epoxy resins. *See* Kukdo's IQR, C.R. 47, P.R. 88 at Vol. I-4. In the Petition on *Certain Epoxy Resins from Korea*, Petitioner did not make any subsidy allegation with respect to ECH. *See* Initiation Checklist, C.R. 39, P.R. 57. Rather, as part of their new subsidy allegations, Petitioner alleged that the Korean respondents in this investigation received subsidies from the People's Republic of China ("GOC") for "various chemical inputs," including ECH, for LTAR. *See* Petitioner New Subsidy Allegations, C.R. 425, P.R. 280.

Petitioner's cross-border, transnational subsidy allegation in this investigation was of a first impression since Commerce removed its prior regulatory prohibition on the investigation of transnational subsidies. *See Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, *Final Rule*, 89 Fed. Reg. 20,766 (Dept. Comm. Mar. 25, 2024); *see also* Final I&D Memo, P.R. 531 at 77 ("{T}his is the first case in which commerce has countervailed a transnational subsidy under the Act outside of the international consortia or upstream subsidy provisions."). The crux of Petitioner's allegation was that because Commerce has now withdrawn its transnational subsidy

regulation, Commerce should investigate any and all possible cross-border subsidies without any demonstration of the statutorily required elements of a countervailable subsidy. *See* Kukdo Chemical New Subsidy Allegations Comments (Aug. 22, 2024), P.R. 319, at 12-16.

While Commerce rejected in large part Petitioner's overly broad request, including their request to investigate the provision of some 281 chemicals from the GOC for LTAR through transnational subsidies, *see* Petitioner New Subsidy Allegations, C.R. 425, P.R. 280 at 11-16, , Commerce acceded to Petitioner's request to investigate the provision of ECH and Bisphenol A ("BPA") from GOC for LTAR. *See* Department Memorandum "Initiation of Investigation of Additional New Subsidy Programs" (Nov. 12, 2024), C.R. 529, P.R. 387 at 2-4. Commerce's affirmative countervailable determination and the resulting subsidy rate for the provision of ECH from GOC for LTAR are at issue here.

### 1.    *Commerce Is Unable To Articulate How The Provision Of ECH For LTAR Fits Within "Transnational Subsidy" Framework*

In repealing its regulation that prohibited the investigation of transnational subsidies, Commerce explained that its past regulatory restriction on the investigation of transnational subsidies would not address situations where foreign aid is "provided to promote the grantor country as well as the recipient's country manufacturing capacities for a particular industry" or any "direct investments in a third country from state-owned enterprises, with backings from state-owned policy banks, promoting the specific grantor country's industry policies." *See Final Rule* at 20,826. By removing the prohibition on the investigation of transnational subsidies, Commerce intended to address foreign aid where it benefits the grantor country or promotes the specific grantor country's industry polices as well as the recipient's country manufacturing capacities for a particular industry. *Id*.

Commerce did not follow its own policy directives, and nor did it fully discharge its obligations for supporting its countervailable determination with substantial record evidence. Commerce's analysis lacked any conceivable connection between the transnational subsidy provision of ECH for LTAR to Kukdo Chemical and any benefit to China's chemical industry or to Korea's manufacturing capacity for its epoxy resins industry.  As an initial matter, Commerce overlooked the threshold question of whether the alleged provision of ECH for LTAR is a type of "transnational subsidy" it intended to address by removing the regulatory prohibition on transnational subsidies.  In this investigation, Commerce provided no explanation that the alleged provision of ECH for LTAR benefits China, the "grantor country," or promotes China's industry policies, "as well as" Korea's manufacturing capacity for the epoxy resins industry, *i.e.,* the "recipient country."  *See* Final Rule at 20,826.  Commerce's stated purpose of repealing the transnational subsidy regulation was to "address foreign aid where it benefits the grantor country or promotes the specific grantor country's industry policies . . . ."  *Final Rule* at 20,826-27. There is no evidence, and Commerce has not explained how Chinese chemical companies selling their products to foreign competitors at allegedly low prices benefits the Chinese chemical industry.

Instead, Commerce found that the "2015 Memorandum of Understanding on Cooperation Concerning the Eurasia Initiative and the Silk Road  Economic Belt and the 21st Century Maritime Silk Road" between the GOC and the GOK (the "MOU") "evinces an intent on the part of the GOC to engage in markets in other countries in specific industries, including the petrochemical industry, of which epoxy resin is a part."  Final I&D Memo, P.R. 531 at 84. However, there is nothing in the MOU that promotes the export of epoxy resins to the United States, let alone by Kukdo Chemical specifically.  Rather, the record evidence demonstrates that

the MOU is non-binding, and there are no "legislation, regulation, bilateral agreement, memoranda of understanding, investment agreements or other documents that are related to the development of production capacity for the chemical industry in Korea or support for the chemical industry in Korea."  GOK New Subsidy Allegations Questionnaire Response, P.R. 445-454 at 2-3; *see also*, *id*. at Exhibit NSA-1 (containing the original and translated copies of the MOU).  As Commerce observed, in "today's subsidization landscape," transnational subsides may exist when there is evidence of "cross-border equity infusions, fundings, loans," "direct investments in a third country from state-owned enterprises," or a similar nexus between the benefits conferred by the recipient and the benefits accrued by the grantor country (China in this instance) and its industry.  *Final Rule*, at 20,826-827.  Commerce failed to find any nexus between the alleged provision of ECH from China for LTAR and any countervailable benefit that may have been conferred to Kukdo Chemical in this investigation.

> ### 2.    *Substantial Record Evidence Does Not Support Commerce's Countervailability Determination*

Commerce's countervailability determination in this case is unsupported by the record evidence.  Whether it is a transnational subsidy or a domestic subsidy, to find a subsidy countervailable Commerce was required to find that a government authority provided a financial contribution to a company which confers a benefit to the company's production, manufacture, or exportation of merchandise and which is specific.  *See* 19 U.S.C. § 1677(5) and (5A).  Commerce satisfied none of these elements with substantial record evidence.

*Financial Contribution*

Commerce's determination that 60 percent of Kukdo Chemical's ECH purchases from unaffiliated Chinese suppliers are actually from GOC authorities is not supported by substantial record evidence.  Kukdo Chemical provided the names of each of its Chinese suppliers and

stated that "{b}ased on publicly available information such as the shareholder information and the suppliers' websites . . . none of {its} Chinese suppliers are owned by the GOC."  Kukdo NSA Response, C.R. 591, P.R. 429 at S-2, S-3 at n.3.  Commerce solicited no additional information from Kukdo Chemical; nor did Petitioner submit any evidence on the record demonstrating that any of the suppliers that Kukdo Chemical purchased from during the period of investigation were GOC authorities.

Nevertheless, Commerce concluded that because "of the GOC's failure to timely respond to Commerce's questionnaire, we lack information on whether these unaffiliated parties are GOC authorities."  Post-Prelim I&D Memo at 7.  Thus, Commerce relied on facts available to determine that 60 percent of Kukdo Chemical's purchases of ECH from China were from GOC authorities.  *Id.* at 7-8.  This inference contravenes Commerce's "duty to accord fairness to the parties that appear before it."  *SKF U.S.A., Inc. v. United States*, 675 F. Supp.2d 1264, 1276 (Ct. Int'l Trade 2009).  Where Kukdo Chemical has responded fully to Commerce's questionnaire providing "all purchases of ECH from unaffiliated entities during the POI," including the names and addresses of all suppliers, the GOC, which had no incentive to respond to the questionnaire because the respondent companies are Korean (and the fact that the GOC is not the exporting country subject to Commerce's countervailing duty investigation), did not respond.  Here, Commerce resorted to facts available adversely impacting a cooperating respondent (Kukdo Chemical), and Commerce's determination operated to "undercut{} the cooperation-promoting goal of the AFA statute."  *Changzhou Wujin Fine Chemical Factory Co., Ltd. v. U.S.,* 701 F.3d 1367, 1378 (Fed. Cir. 2012).  Consequently, "the cooperating respondents {are} the only entities impacted by," Commerce's factual inferences.  *See Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1373 (Fed. Cir. 2014) (citing *Changzhou Wujin Fine Chemical Factory*

*Co., Ltd. v. United States*, 701 F.3d 1367, 1370 (Fed. Cir. 2012)).  The application of facts

available to determine that all of Kukdo Chemical's purchases of ECH were from government

authorities was thus unjustified.

Moreover, Commerce's reliance on facts available was unreasonable.  In particular, in

determining, based on facts available, that 60 percent of Kukdo Chemical's ECH purchases were

from state-owned suppliers, Commerce pointed to Petitioner's NSA submission at Exhibit 3

(containing Petitioner's new subsidy allegation in the parallel China CVD investigation at

Exhibit 11, page 16).  Post-Prelim Dec. Memo at 6, fn. 36.  That 60 percent figure is from a 2006

International Monetary Fund study referencing (uncited) data *from 2004*, two decades prior to

the period of investigation.  Moreover, the 60 percent figure appears to relate to the proportion of

fixed asset investment, rather than actual chemical production, sales or exports.  This dated

information is essentially useless and unreliable with respect the current period, let alone relevant

to the epoxy resin or ECH industry in general or to Kukdo Chemical's own purchases in

particular.

By contrast, in it its new subsidy questionnaire response Kukdo Chemical provided

verifiable, contemporaneous information containing its purchases of ECH from all unaffiliated

entities, including those located in China, for the period of investigation, including full names

and addresses for all ECH suppliers.  *See* Kukdo NSA Response, C.R. 591, P.R. 429 at S-3; *see*

*id.* at Exhibit S-2 (containing the ECH Input Purchase Template).  Commerce found a two-

decade old, unverifiable study to be more authoritative than Kukdo Chemical's data to conclude

that 60 percent of the ECH provided by Chinese companies was from GOC authorities.  *See*

Department Memorandum "Kukdo Final Analysis Memorandum" (Apr. 4, 2025), Cr. 704, P.R.

538 at 3.  For this conclusion, Commerce stated that one of Kukdo Chemical's ECH purchases was from a Chinese supplier, which Commerce found to be a state-owned entity.  *Id*.

Here, Commerce did not fully consider competing evidence in the record, and the choice it made lacks any link to the facts Commerce found in the investigation.  *See Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962) (The substantial evidence standard requires that Commerce "articulate {a} rational connection between the facts found and the choice made.").  With competing record evidence, Commerce chose outdated and irrelevant information over information Kukdo Chemical supplied based on its own experience (and information Commerce apparently was satisfied with, having no further inquiry on the information it received from Kukdo).  Moreover, if Commerce intended to rely on the fact that one of Kukdo Chemical's purchases was from a state-owned Chinese supplier, Commerce was required to consider this evidence rather than resorting to facts available, as necessary information was indeed available on the record.  *See* 19 C.F.R. § 351.308(a) (providing that Commerce may rely on facts available when "necessary information is not available on the record.").

*Specificity*

Commerce also erred in finding that the provision of ECH for LTAR is *de facto* specific.  When making this determination, Commerce noted that "information regarding whether epoxy resin producers are the predominant users of ECH in Korea is missing from the record."  *See* Post-Prelim Dec. Memo at 8.  Thus, it relied on the fact that "97 percent of ECH consumption in mainland China is used to produce epoxy resin," and, thus, "it is reasonable to conclude that Korean epoxy resin producers are also the primary users of ECH in Korea."  *Id*.  Based on this analysis, the "provision of ECH for LTAR is *de facto* specific to Korean epoxy resin producers . . . because the epoxy resin industry is a predominant user" of any benefits.  *Id*.

Commerce's specificity analysis lacks any conceivable connection between "ECH consumption in mainland China {that} is used to produce epoxy resin" Post-Prelim Dec. Memo at 8. and the question of whether Korean epoxy resins industry is a "predominant user of the subsidy," 19 U.S.C. § 1677(5A)(D)(iii)(III).  Under the statute, a financial contribution may be considered *de facto* specific if an "enterprise or industry is a predominant user of the subsidy." *Id*.  Relying on evidence that Chinese epoxy resin producers consume the vast majority of Chinese-origin ECH, Commerce determined that "Korean epoxy resin producers are also the primary users of ECH in Korea."  Post-Prelim Dec. Memo at 7.  However, this analysis excludes the single largest consumer of Chinese-origin ECH: the *Chinese* epoxy resin industry.  *See* Petitioner New Subsidy Allegations, C.R. 425, P.R. 280 at Exhibit 2.  Indeed, the purpose of the GOC subsidizing its chemicals industry would be to promote and expand its own domestic chemicals industry, not the chemicals industry of a foreign competitor.  *See id.* at 2-6.  In addition, the term "industry," as used in the Act, "means the producers as a whole of a *domestic like product*, or those producers whose collective output of a *domestic like product* constitutes a major proportion of the total domestic production of the product."  19 U.S.C. § 1677(4)(A).  Thus, the statute explicitly states that each individual country's production is an industry that (in the context of a transnational subsidy investigation) must be considered separately.  Because Commerce's analysis lacks any analysis or information regarding whether epoxy resin producers are the predominant users of Chinese-origin ECH, the Court should find that Commerce's specificity finding is unsupported by substantial record evidence and contrary to law.

### D.    COMMERCE ABUSED ITS DISCRETION WHEN CALCULATING THE ALLEGED BENEFIT FOR THE FIRST-EVER ANALYSIS OF THE TRANSNATIONAL SUBSIDY PROVISION OF GOODS FOR LTAR

As discussed above, this investigation was the first time Commerce analyzed the provision of goods for LTAR in the context of transnational subsidies.  As part of this allegation,

Commerce issued a standard input purchase template for Kukdo Chemical to report all purchases of ECH from unaffiliated entities during the POI and also requested a worksheet that "shows Kukdo's per-metric ton freight expenses for transporting ECH from the nearest seaport to Kukdo's factory complexes for each month of the POI."  NSA Questionnaire, P.R. 393 at 5. While Kukdo Chemical had no constructive knowledge of how Commerce intended to use the information in a benefit analysis Commerce has not previously conducted, Kukdo Chemical responded fully by providing the requested information.  *See* Kukdo NSA Response, C.R. 591, P.R. 429.

In the *Final Determination*, Commerce resorted to adverse facts available ("AFA") for Kukdo's inland freight values for its ECH purchases, because Kukdo Chemical did not report "complete ECH freight expenses 'from the nearest seaport to Kukdo's factory complexes,'" as Commerce discovered at verification.  Final I&D Memo, P.R. 531 at 89.  However, as Kukdo Chemical demonstrates below, Commerce's explanation in the *Final Determination* is nothing more than a mere pretext for its decision to apply AFA.

As an initial matter, Commerce's first and only questionnaire for the transnational subsidy provision of ECH for LTAR did not require Kukdo Chemical to provide its ECH freight data such that Commerce would associate specific ECH purchases with specific destinations. *See* NSA Questionnaire, P.R. 393.  Specifically, in its NSA Questionnaire Commerce required the following information:

> Using the attached Microsoft Excel Input Purchases Template, report all purchases of ECH from unaffiliated entities during the POI. Include ECH purchased in all forms and by all divisions of your company from unaffiliated entities. Submit this information in electronic format using Microsoft Excel and include a printout of the electronic file in your response.

> As the template specifies, please report each purchase of ECH during the POI. By each purchase, we are referring to each line item on an invoice that corresponds to a unique price and/or quantity.

*Add columns as necessary to report any fees and taxes and provide an explanation of each reported fee and tax.*

Kukdo should report this purchase information regardless of whether it used the ECH to produce the subject merchandise during the POI.

*Commerce has requested certain information from the GOK regarding the ECH producers you report. Please coordinate with the GOK immediately in order to ensure that it has a complete list of ECH producers, including full names and addresses in both Korean and/or Chinese, as applicable, and English, in a timely manner so that the GOK has sufficient time to report the necessary information in its questionnaire response by the established response deadline.*

Question B.3 then <u>separately</u> stated:

Please provide a worksheet that shows Kukdo's per-metric ton freight expenses for transporting ECH from the nearest seaport to Kukdo's factory complexes for each month of the POI. Provide supporting documentation for March and October in 2023.

If Kukdo did not incur these expenses, please provide the same information for shipping a closely-related input product or finished product to or from the nearest seaport during the POI.

Commerce's standard input purchase template did not include any request for information as to the destination of each *individual* shipment, associated with the final destination. *See* Input Purchases Template, P.R. 393 (accompanying the Department's NSA Questionnaire). Rather, Question 3 of Commerce's NSA Questionnaire was the only question in which freight expenses were requested, and this request did not include any specific request regarding the format for providing the freight expenses, other than to indicate that these expenses be provided "from the nearest seaport to Kukdo's factory complexes" and that it be provided "for each month of the POI." NSA Questionnaire, P.R. 393 at 5-6. In other words, Commerce did *not* request that freight expenses be reported that would be linked to the specific purchases reported per question B.2.

In the *Final Determination*, Commerce calculated the "benchmark for the ECH from China for LTAR calculation" by calculating "the Korean port-to-destination freight expenses for

36

all purchases of ECH from non-Chinese sources during the POI" and compared these expenses to "the Korean port-to-destination freight expenses for all purchases of ECH from Chinese sources during the POI." Post-Prelim I&D Memo at 7; *unchanged* in Final I&D Memo, P.R. 531 at Cmt. 19. This analysis assumes that Commerce would have required destination-specific freight expenses for "all purchases of ECH" for both Chinese and non-Chinese sources from Kukdo Chemical. However, as is clear from the questions repeated above, Commerce did not request this specific information. Commerce's claim that Kukdo Chemical withheld information cannot hold under these facts. Rather, the statute requires more from Commerce prior to resorting to AFA.

In particular, under 19 U.S.C. § 1677m(d), where Commerce "determines that a response to a request for information…does not comply with the request," then Commerce "shall promptly inform" the submitter and "shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion" of the investigation. 19 U.S.C. § 1677m(d). To base its decision on adverse facts available, therefore, Commerce was required to actually solicit information in the first instance tying Kukdo Chemical's individual purchase information related to the freight information for the final destination. It did no such thing in this case.

Here, Kukdo Chemical submitted its NSA response on December 17, 2024, over three months prior to the Final Determination date, and over a month prior to verification. *See* Kukdo NSA Response, C.R. 591, P.R. 429. This afforded Commerce ample time to review the submitted information and to assess whether there may be any "deficiencies" in Kukdo Chemical's submission, if any clarifications were needed, or if any additional information was necessary for Commerce to conduct its analysis. Commerce had not previously solicited

information tying Kukdo Chemical's individual purchases with freight information to the *Final Determination*.  However, if Commerce required this information for its benefit analysis, Commerce would have recognized that Kukdo Chemical's initial freight cost reporting did not capture all factory complexes where Kukdo produces subject epoxy resins in Korea.  *See, e.g.,* Kukdo Chemical Sec. III Questionnaire Response at Vol. I-2, C.R. 280, 159 (showing that Kukdo Chemical produces epoxy resins in production facilities located in three different regions).  To the extent Commerce did not recognize any deficiency in the data until verification, Commerce was still obligated to request and gather any additional necessary freight information pursuant to 19 U.S.C. § 1677m(d).

Indeed, Commerce did not request information on the destination of the ECH purchases until verification; just as it requested new information at verification as to the destination of the shipments, Commerce too should have requested corresponding freight data for the port-destination pairs.  As indicated in Kukdo Chemical's verification exhibits, many of Kukdo Chemical's purchases did not go directly to a "factory complex."  *See* Kukdo Verification Exhibit 8 (Jan. 23, 2025) C.R. 639, P.R. 459, at 4.  Thus, Commerce's question on its face would not have captured the data Commerce deemed necessary months later in the *Final Determination*.  Again, Kukdo Chemical had no reason to know how Commerce would have treated the information requested for the alleged LTAR program in the context of transnational subsidies.  If comparing "weighted-average monthly benchmark prices to the purchase prices" where port-to-destination freight values for each sales transaction formed the basis for calculating both prices, then it was incumbent on Commerce to actually request the information in a format that would have allowed it to marry purchase-specific freight expenses with the purchases reported in the Input Purchases Template.  Commerce did not do so.  If Commerce

subsequently determined that it lacked the necessary information to conduct its novel analysis, the statute requires that Commerce provide an opportunity to address any perceived deficiencies in the information provided.

In the *Final Determination*, Commerce claimed that the deficiency "was not that Kukdo did not report the freight expenses for each individual ECH purchase, but that Kukdo did not report complete ECH freight expenses 'from the nearest seaport to Kukdo's factory complexes.'" Final I&D Memo, P.R. 531 at 88-89.  Commerce's justification is self-serving.  Commerce ultimately decided for the first time that it required port-to-destination freight values for each sales transaction in the *Final Determination*.[1]  Thus, any gap in the record was the creation by Commerce for failing to request the information it later found necessary, rather than by Kukdo Chemical's alleged failure to provide it.  As such, Commerce's AFA finding cannot be sustained.

As the CAFC observed, the "focus" of subsection (a) of 19 U.S.C. § 1677(e) is "respondent's *failure to provide information*."  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003) (emphasis original).  The record does not support a finding that Kukdo has failed to furnish the requested information.  More importantly, to use an inference that is adverse to the interests of a respondent, Commerce must also find that the respondent "has failed to cooperate by not acting to the best of its ability to comply."  19 U.S.C. § 1677e(b)(1).

---

[1] Commerce claims for the first time in the *Final Determination* that had Commerce received "complete monthly inland freight data," Commerce would have used it by applying it towards the input purchase template on a monthly basis.  *See* Final I&D Memo, P.R. 531 at 89.  Again, Kukdo Chemical had no constructive knowledge as to how Commerce intended to use the information it requested in its benefit calculation for the first-ever analysis of the transnational subsidy provision of goods for LTAR.  If Commerce required information that would enable it to link any freight data to the information requested in the input purchase template, it was incumbent upon Commerce to specifically request such information.

As the CAFC put it, the "focus of subsection (b) is respondent's *failure to cooperate to the best of its ability*, not its failure to provide requested information." *Nippon Steel*, 373 F.3d at 1381 (emphasis original). Here, Commerce incorrectly determined that Kukdo "withheld information that has been requested by Commerce" for information Commerce did not request in the first place. Final I&D Memo, P.R. 531 at 80. In addition, Commerce based its determination that Kukdo Chemical failed to cooperate to the best of its ability on the fact that Kukdo Chemical did not provide the information while it had in its possession at verification. *See* Final I&D Memo at 89. However, Kukdo Chemical fully cooperated to the best of its ability by providing a fully responsive questionnaire response to Commerce's NSA Questionnaire and also at verification when Commerce requested freight data for the port-destination pairs for the first time in this investigation. Thus, Commerce's AFA determination in its benefit calculation is unsupported by substantial record evidence and not in accordance with law.

### E.    COMMERCE'S COUNTERVAILABLE DETERMINATION WITH RESPECT TO THE PROVISION OF ELECTRICITY FOR LTAR IS UNSUPPORTED BY SUBSTANTIAL RECORD EVIDENCE AND OTHERWISE CONTRARY TO LAW

Commerce's determination that the provision of electricity for LTAR was *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(III) is unsupported by substantial evidence and is otherwise not in accordance with law. Specifically, Commerce erroneously determined that the provision of electricity for LTAR is *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(III), because "the chemical industry, which includes epoxy resin, receives a disproportionate amount of the financial contribution." Final I&D Memo, P.R. 531 at 17. In particular, Commerce found that the "chemical industry consumed a larger percentage of electricity during the POI than many other manufacturing industries." *Id*. at 24. While Commerce attempted to fit its specificity

analysis within the statutory framework, Commerce's conclusion is not supported by substantial record evidence.

A domestic subsidy is *de facto* specific if, among other things, "(III) an enterprise or industry receives a disproportionately large amount of the subsidy." 19 U.S.C. § 1677(5A)(D)(iii)(III). As the CAFC stated, the disproportionality inquiry involves a case-by-case analysis which assesses benefits, not in relation to the benefits of others, but in relation to some comparator depending on the circumstances. *See AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999). Based on similar facts in this investigation, the Court in *Hyundai Steel* held that Commerce's determination that the electricity for LTAR was *de facto* specific because the steel industry and three other industries received a disproportionately large amount of the subsidy under 19 U.S.C. § 1677(5A)(D)(iii)(III) was not supported by substantial evidence. *See Hyundai Steel Company v. United States*, 745 F.Supp.3d 1345, 1352 (Ct. Int'l Trade 2024). There, Commerce simply concluded that the steel industry and three other industries combined consumed a disproportionately large amount of electricity in Korea. *Id*. The Court found that Commerce's conclusion lacked an explanation for its determination that the benefit received by a group of entities and industries it identified is disproportionate. *Id*. In addition, the Court said that Commerce also failed to identify what benefit was disproportionate. *Id*. Thus, Commerce's specificity determination was not supported by substantial evidence, because Commerce did not explain "how the combined industries it identifie{d} benefit more than would be expected, based on their usage given that the subsidy in question is designed to confer benefits on usage levels, or in relation to some other comparator." *Id*. at 1353.

Commerce committed similar errors in this investigation. Commerce undertook no comparison in its specificity analysis regarding the alleged provision of electricity for LTAR.

Rather, Commerce simply concluded that the "chemical industry consumed a larger percentage of electricity during the POI than many other manufacturing industries." Final I&D Memo, P.R. 531 at 24. The Court should find that Commerce did not support its *de facto* specificity determination with substantial evidence.

## VI.    CONCLUSION

For the foregoing reasons, Kukdo Chemical respectfully requests that this Court hold the foregoing aspects of Commerce's Final Determination unsupported by substantial record evidence and otherwise not in accordance with law. Therefore, Kukdo Chemical respectfully requests that this Court remand the Final Determination to Commerce to correct the errors set forth in this complaint and provide other such relief as this court deems appropriate.

Respectfully submitted,

/s/ J. David Park
J. David Park
Henry D. Almond
Kang Woo Lee
Archana Rao Vasa

**_Counsel to Kukdo Chemical Co., Ltd._**

ARNOLD & PORTER KAYE SCHOLER LLP
601 MASSACHUSETTS AVENUE, N.W.
WASHINGTON, D.C. 20001
PHONE: (202) 942-5646
FAX: (202) 942-5999

**Dated: December 2, 2025**

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| **KUMHO P & B CHEMICALS INC.,** ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| **and** ) | |
| ) | |
| **KUKDO CHEMICAL CO., LTD.** and ) | |
| **U.S. EPOXY RESIN PRODUCERS** *AD HOC* ) | |
| **COALITION** ) | |
| ) | |
| *Consolidated Plaintiffs,* ) | |
| ) | **Consolidated Court No.** |
| **v.** ) | **25-cv-00143-GSK** |
| ) | |
| **UNITED STATES,** ) | |
| ) | |
| *Defendant,* ) | |
| ) | |
| **and** ) | |
| ) | |
| **U.S. EPOXY RESIN PRODUCERS** *AD HOC* ) | |
| **COALITION,** ) | |
| **KUMHO P & B CHEMICALS INC.,** and ) | |
| **KUKDO CHEMICAL CO., LTD.** ) | |
| ) | |
| *Defendant-Intervenors.* ) | |

## CERTIFICATION OF COMPLIANCE WITH CHAMBERS PROCEDURE 2(B)(1)

The undersigned hereby certifies that the attached Memorandum in Support of Consolidated Plaintiff Kukdo Chemical Co., Ltd.'s Rule 56.2 Motion for Judgment Upon the Agency Record, filed on December 2, 2025, contains 12,473 words, exclusive of the table of contents, table of authorities, and counsel's signature block, according to the word count function of the word-processing system used to prepare this brief, and inclusive of the words in the embedded images, counted manually. The brief therefore complies with the maximum 14,000 word count limitation set forth in the Court's Chambers Procedures.

By:     /s/ J. David Park
        J. David Park

**Dated: December 2, 2025**