## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

|  |  |
|---|---|
| KUMHO P & B CHEMICALS INC.,<br>　　　　　　Plaintiff,<br><br>　　and<br><br>KUKDO CHEMICAL CO., LTD., and U.S.<br>EPOXY RESIN PRODUCERS *AD HOC*<br>COALITION,<br>　　　　　　Consolidated Plaintiffs,<br><br>　　v.<br><br>UNITED STATES,<br>　　　　　　Defendant,<br>　　and<br><br>U.S. EPOXY RESIN PRODUCERS *AD HOC*<br>COALITION,<br>　　　　　　Defendant-Intervenor,<br><br>　　and<br><br>KUMHO P & B CHEMICALS INC., and KUKDO<br>CHEMICAL CO., LTD.<br>　　　　　Consolidated Defendant-Intervenors. | **NON-CONFIDENTIAL VERSION**<br><br>**Consol. Court No. 25-cv-00143-gsk** |

## U.S. EPOXY RESIN PRODUCERS *AD HOC* COALITON'S
## MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of this Court, Plaintiff the U.S. Epoxy Resin Producers *Ad Hoc* Coalition moves for judgment on the agency record with regard to certain aspects of the final determination of the countervailing duty investigation issued by the International Trade Administration, United States Department of Commerce ("Commerce"), entitled Certain Epoxy Resins From the Republic of Korea: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination, 90 Fed. Reg. 14,605 (Dep't Commerce

Apr. 3, 2025) (the "*Contested Determination*") and accompanying Issues and Decisions Memorandum (Mar. 28, 2025) (the "*Contested Determination IDM*").

Plaintiff respectfully requests that the Court rule that certain aspects of the *Contested Determination* are unsupported by substantial evidence on the record or otherwise are not in accordance with law.  Plaintiff further requests that the Court remand the *Contested Determination* to Commerce with instructions to: (i) adjust the benchmark used to measure the benefit from the provision of electricity for less than adequate remuneration ("LTAR") to include a rate of return sufficient to recoup losses of the state-owned Korea Electric Power Corporation ("KEPCO"); (ii) adjust the benchmark similarly for losses of KEPCO's wholly-owned subsidiaries; (iii) adjust for regional market distortion the benchmark used to determine the benefit from provision of epichlorohydrin ("ECH") for LTAR; (iv) initiate an investigation of provision for LTAR of chemical inputs from China other than ECH and bisphenol A; (v) re-examine whether Kukdo Chemical Co., Ltd. and its affiliates are cross-owned and attribute subsidies accordingly; and (vi) recalculate the "All Others" subsidy rate to the extent necessary, consistent with any changes to the mandatory respondents' subsidy rates resulting from the reconsideration of issues (i) through (v).

The reasons justifying this motion are set forth in the accompanying Memorandum of Law In Support of the U.S. Epoxy Resin Producers *Ad Hoc* Coalition Rule 56.2 Motion for Judgment Upon the Agency Record.

Respectfully submitted,

*/s/ Stephen J. Orava*
Stephen J. Orava
Patrick J. McLain
Worth S. Anderson

KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC  20006-4706
(202) 737-0500

*Counsel for U.S. Epoxy Resin Producers*
     Ad Hoc *Coalition*

December 2, 2025

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE**

|  |  |
|---|---|
| KUMHO P & B CHEMICALS INC., <br>       Plaintiff, <br><br>    and <br><br> KUKDO CHEMICAL CO., LTD., and U.S. EPOXY RESIN PRODUCERS *AD HOC* COALITION, <br>       Consolidated Plaintiffs, <br>   v. <br><br> UNITED STATES, <br>       Defendant, <br>    and <br><br> U.S. EPOXY RESIN PRODUCERS *AD HOC* <br><br> COALITION, <br>       Defendant-Intervenor, <br><br>    and <br><br> KUMHO P & B CHEMICALS INC., and KUKDO CHEMICAL CO., LTD. <br>    Consolidated Defendant-Intervenors. | **NON-CONFIDENTIAL VERSION** <br><br> **Consol. Court No. 25-cv-00143-gsk** <br><br> Business Proprietary Information Removed from Pages ii, 10, 14, 17-22, 35-36, and 38-42. |

**U.S. EPOXY RESIN PRODUCERS *AD HOC* COALITION'S**
**MEMORANDUM OF LAW IN SUPPORT OF RULE 56.2 MOTION FOR**
**JUDGMENT UPON THE AGENCY'S RECORD**

<div style="margin-left: 40%">

Stephen J. Orava
Patrick J. McLain
Worth S. Anderson
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006-4706
(202) 737-0500
*Counsel for U.S. Epoxy Resin Producers*
   Ad Hoc *Coalition*

</div>

December 2, 2025

## TABLE OF CONTENTS

I.    STATEMENT PURSUANT TO RULE 56.2 ............................................................... 1
      A.    Administrative Determination To Be Reviewed.......................................1
      B.    Issues Presented And Summary Of Argument .........................................1
      C.    Request For Court Order And Relief Sought ...........................................3
II.   PROCEDURAL HISTORY AND FACTUAL BACKGROUND................................... 4
III.  STANDARD OF REVIEW ....................................................................................... 8
IV.   ARGUMENT............................................................................................................. 9
      A.    Commerce's Calculation of Electricity For LTAR Subsidies Failed To
            Account Fully For Losses Incurred by KEPCO ......................................9
      B.    Commerce's Calculation of Electricity For LTAR Subsidies Failed To
            Account For Losses By KEPCO's Subsidiaries .....................................13
      C.    Commerce's Calculation Of ECH For LTAR Subsidies Used An Improper
            Tier 1 Benchmark That Did Not Account For Regional Market Distortions
            Caused By The Chinese Government ....................................................17
            1.    Commerce cannot ignore substantial evidence regarding regional
                  market dynamics ..................................................................19
            2.    Petitioner's argument was timely, and Commerce unreasonably
                  refused to weigh record evidence ...........................................22
      D.    Commerce Failed to Investigate Other Chemical Inputs Provided For
            LTAR ..................................................................................................24
            1.    Petitioner alleged all elements of a countervailable subsidy and
                  supported those allegations with reasonably available information ..........25
            2.    Contrary to the statute, Commerce demanded information from
                  Petitioner that was not reasonably available to it.......................29
            3.    Commerce's refusal to investigate is contrary to its practice ..................30
      E.    Commerce Improperly Understated Kukdo's Subsidy Rate By Refusing
            To Find Cross-Ownership Among Kukdo And Four Of Its Affiliates .................33
            1.    The statute requires Commerce to examine the substance of
                  control ...............................................................................33
            2.    Commerce failed to follow its established practice .....................35
            3.    Commerce mischaracterized the significance of a plurality
                  shareholding in the presence of diversified ownership...............37
            4.    Commerce wrongly disregarded evidence of the Lee family
                  [                                        ]........................................39
                  a.    The Lees had [                              ] ....................39
                  b.    Commerce unreasonably disregarded evidence regarding
                        meetings of Kukdo's Board of Directors. ......................40
      F.    If Kumho's Or Kukdo's Subsidy Rate Is Amended On Remand,
            Commerce Also Should Recalculate The "All Others" Rate................42
VI.   CONCLUSION AND PRAYER FOR RELIEF .............................................................. 42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acciai Speciali Terni, S.p.A. v. United States,*
26 C.I.T. 892, 217 F. Supp. 2d 1345 (2002) ...........................................................................8

*Bowman Transp., Inc. v. Arkansas- Best Freight Sys., Inc.,*
419 U.S. 281 (1974) ...........................................................................8

*Burlington Truck Lines, Inc. v. United States,*
371 U.S. 156 (1962) ...........................................................................8

*Changzhou Wujin Fine Chemical Factory Co. v. United States,*
701 F.3d 1367 (Fed. Cir. 2012) ...........................................................................8

*CS Wind Viet. Co. v. United States,*
832 F.3d 1367 (Fed. Cir. 2016) ...........................................................................8

*Dongkuk Steel Mill Co., Ltd. v. United States,*
567 F. Supp. 3d 1359 (Ct. Int'l Trade 2022) ...........................................................................23

*Fabrique de Fer de Charleroi, SA v. United States,*
166 F. Supp. 2d 593 (Ct. Int'l Trade 2001) ...........................................................................33

*Fine Furniture (Shanghai) Ltd. v. United States,*
748 F.3d 1365 (Fed. Cir. 2014) ...........................................................................26

*Habaş Sinai Ve Tibbi Gazlar Istihsal Endüstrisi A.S. v. United States,*
459 F.Supp. 3d 1341 (Ct. Int'l Trade 2020) ...........................................................................22

*Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.S. v. United States,*
536 F. Supp. 3d 1333 (Ct. Int'l Trade 2021) ...........................................................................22

*Jiangsu Senmao Bamboo and Wood Indus. Co. v. United States,*
769 F. Supp. 3d 1344 (Ct. Int'l Trade 2025) ...........................................................................34

*Jiaxing Brother Fastener Co. v. United States,*
380 F. Supp. 3d 1343 (Ct. Int'l Trade 2019) ...........................................................................8

*Maverick Tube Corp. v. United States,*
273 F. Supp. 3d 1293 (Ct. Int'l Trade 2017) ...........................................................................11

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ...........................................................................8

*Nantong Uniphos Chemicals Co. v. United States,*
2018 Ct. Intl. Trade LEXIS 86 ...........................................................................38, 39

*NMB Sing. Ltd. v. United States,*
   557 F.3d 1316 (Fed. Cir. 2009)..............................................................................9, 37

*Nucor Corp. v. United States,*
   600 F. Supp. 3d 1225 (Ct. Int'l Trade 2022) ...............................................................26

*Nucor Corp. v. United States,*
   653 F. Supp. 3d 1295 (Ct. Int'l Trade 2023) ..................................................25, 26, 37

*Nucor Corp. v. United States,*
   698 F. Supp. 3d 1310 (Ct. Int'l Trade 2024) ...........................................11, 33, 34

*Nucor Corp. v. United States,*
   772 F. Supp. 3d 1340 (Ct. Int'l Trade 2025) ...............................................................11

*Nucor Corp. v. United States,*
   927 F.3d 1243 (Fed. Cir. 2019).................................................................11, 12, 14

*Posco v. United States,*
   557 F. Supp. 3d 1290 (Ct. Int'l Trade 2022) ...............................................................11

*Posco v. United States,*
   581 F. Supp. 3d 1272 (Ct. Int'l Trade 2022) ...............................................................11

*Posco v. United States,*
   977 F.3d 1369 (Fed. Cir. 2020)...................................................................................11

*Posco v. United States,*
   No. 17-00137, Slip Op. 22-3 (Ct. Int'l Trade Jan. 13, 2022) (Katzmann, J.),
   *aff'd* 2023 U.S. LEXIS 28035 (Fed. Cir. Oct. 23, 2023) .........................................11

*RHP Bearings Ltd. v. United States,*
   288 F.3d 1334 (Fed. Cir. 2002)....................................................................................8

*Rust v. Sullivan,*
   500 U.S. 173 (1991).....................................................................................................8

*RZBC Group Shareholding Co. v. United States,*
   100 F. Supp. 3d 1288 (Ct. Int'l Trade 2015).......................................26, 27, 30, 32

*Transactive Corp. v. United States,*
   91 F.3d 232 (D.C. Cir. 1996)........................................................................................8

*Universal Camera Corp. v. NLRB,*
   340 U.S. 474 (1951).......................................................................................................8

*Zenith Elecs. Corp. v. United States,*
   988 F.2d 1573 (Fed. Cir.1993)....................................................................................29

*Zhejiang DunAn Hetian Metal Co. v. United States*,
34 C.I.T. 408, 707 F. Supp. 2d 1355 (2010) .................................................. 9

**Statutes**

19 U.S.C. § 1516a(b)(1)(B) .................................................. 8

19 U.S.C. § 1671a(b)(1) .................................................. 25

19 U.S.C. § 1677-1(a) .................................................. 14

19 U.S.C. § 1677(5)(C) .................................................. 33

19 U.S.C. § 1677d(1) .................................................. 26

19 U.S.C. § 1677f(i)(3)(A) .................................................. 9

**Regulations**

19 C.F.R. § 351.301 .................................................. 23

19 C.F.R. § 351.301(c)(2)(iv) .................................................. 26

19 C.F.R. § 351.309 .................................................. 22, 23

19 C.F.R. § 351.309(c)(2) .................................................. 23

19 C.F.R. § 351.311(b) .................................................. 26

19 C.F.R. § 351.511(a)(2) .................................................. 6

19 C.F.R. § 351.511(a)(2)(i)-(ii) .................................................. 24

19 C.F.R. § 351.511(a)(2)(ii) .................................................. 22, 24

19 C.F.R. § 351.511(a)(2)(iii) .................................................. 9

19 C.F.R. § 351.511(c)(2) .................................................. 13

19 C.F.R. § 351.524 .................................................. 13

19 C.F.R. § 351.524(b)-(c) .................................................. 13

19 C.F.R. § 351.525 .................................................. 33

19 C.F.R. § 351.525(b)(6)(vi) .................................................. 34

19 C.F.R. § 351.525(b)(6) .................................................. 6

**Administrative Materials**

*Certain Chassis and Subassemblies Thereof From the Kingdom of Thailand: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 90 Fed. Reg. 36,132 (Dep't Commerce Aug. 1, 2025)..........................................................31

*Certain Epoxy Resins from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 90 Fed. Reg. 14,628 (Apr. 3, 2025).................................18

*Certain Epoxy Resins From the People's Republic of China, India, the Republic of Korea, and Taiwan: Initiation of Countervailing Duty Investigation*, 89 Fed. Reg. 33,319 (Dep't Commerce Apr. 29, 2024)..................................................4

*Certain Epoxy Resins from Taiwan: Amended Final Countervailing Duty Determination; Certain Epoxy Resins From the Republic of Korea and Taiwan: Countervailing Duty Orders*, 90 Fed. Reg. 22,235 (Dept. of Commerce, May 27, 2025) ....................................................................7, 37

*Certain Epoxy Resins From the Republic of Korea: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination,* 90 Fed. Reg. 14,605 (Dep't Commerce Apr. 3, 2025) ........................................................................... *passim*

*Certain Epoxy Resins from the Republic of Korea: Preliminary Negative Countervailing Duty Determination, Preliminary Negative Critical Circumstances Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 89 Fed. Reg. 74,912 (Dep't of Commerce, Sept. 13, 2024)..........................................................................5

*Certain Low-Speed Personal Transportation Vehicles from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 90 Fed. Reg. 26,536 (Dep't Commerce June 23, 2025)............................................................31

*Certain Passenger Vehicles and Light Truck Tires from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2014-2015*, 83 Fed. Reg. 11,694 (Dept. of Commerce Mar. 16, 2018)...........................................21

*Certain Passenger Vehicles and Light Truck Tires from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review and Rescission, in Part; 2014-2015*, 82 Fed. Reg. 42,287 (Dep't Commerce Sept. 7, 2017)..............................................................................20

*Certain Plastic Decorative Ribbon From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 83 Fed. Reg. 29,096 (Dep't Commerce June 22, 2018) .......................................................30

*Coated Free Sheet Paper from Indonesia.*
    72 Fed. Reg. 60,642 ...................................................................................34, 35

*Countervailing Duties: Final Rule,*
    63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998) .......................................9, 13

*Countervailing Duties: Notice of Proposed Rulemaking and Request for Public*
    *Comments*, 62 Fed. Reg. 8,818 (Dep't Commerce Feb. 26, 1997) .........................38

*Final Affirmative Countervailing Duty Determination,*
    83 Fed. Reg. 50,342 (Dep't Commerce Oct. 5, 2018) ...........................................20

*Final Affirmative Countervailing Duty Determination,*
    83 Fed Reg. 32,075 (Dep't Commerce July 11, 2018) ...........................................20

*Final Affirmative Countervailing Duty Determination,*
    75 Fed. Reg. 59,212 (Sept. 27, 2010) ...................................................................21

*Final Affirmative Countervailing Duty Determination,*
    84 Fed. Reg. 1,064 (Dep't Commerce Feb. 1, 2019) .............................................31

*Final Affirmative Countervailing Duty Determination and Final Negative Critical*
    *Circumstances Determination: Certain Lined Paper Products from Indonesia,*
    71 Fed. Reg. 47,174 (Dep't Commerce Aug. 16, 2006) ...................................15, 16

*Final Negative Countervailing Duty Determination,*
    70 Fed. Reg. 12,186 (Dep't Commerce Mar. 11, 2005) .........................................35

*Multilayered Wood Flooring from the People's Republic of China: Final Results*
    *and Partial Rescission of Countervailing Duty Administrative Review; 2019,*
    87 Fed. Red. 36,305 (Dep't Commerce June 16, 2022) .........................................32

*Regulations Enhancing the Administration of the Antidumping and*
    *Countervailing Duty Law Trade Remedy Laws: Proposed Rule,* 89 Fed. Reg.
    57,286 (Dep't Commerce July 12, 2024) ..............................................................34

*Regulations Enhancing the Administration of the Antidumping and*
    *Countervailing Duty Trade Remedy Laws*, 89 Fed. Reg. 101,694 (Dec. 16,
    2024) ....................................................................................................................34

*Wood Mouldings and Millwork Products from the People's Republic of China:*
    *Final Results and Partial Rescission of Countervailing Duty Administrative*
    *Review; 2022*, 89 Fed. Reg. 68,858 (Dep't Commerce Aug. 28, 2024) .................32

*Wood Mouldings and Millwork Products from the People's Republic of China:*
    *Preliminary Results and Partial Rescission of Countervailing Duty*
    *Administrative Review; 2022*, 89 Fed. Reg. 15,816 (Dep't Commerce Mar. 5,
    2024) ....................................................................................................................31

**Other Authorities**

*Statement of Administrative Action Accompanying the Uruguay Round*
    *Agreements Act*, H.R. Doc. No. 103-316 (1994) ...............................................................33, 34

The U.S. Epoxy Resin Producers *Ad Hoc* Coalition ("Petitioner") respectfully submits this memorandum in support of its Motion for Judgment on the Agency Record. For the reasons set forth below, Petitioner requests that the Court reverse the challenged aspects of the final determination of the U.S. Department of Commerce ("Commerce") under review and remand with instructions to recalculate the subsidy rates for the respondents, consistent with Petitioner's arguments.

## I.    STATEMENT PURSUANT TO RULE 56.2

### A.    Administrative Determination To Be Reviewed

1. Petitioner seeks review of certain aspects of Commerce's final determination in its countervailing duty ("CVD") investigation of Certain Epoxy Resins From the Republic of Korea. *Certain Epoxy Resins From the Republic of Korea: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination,* 90 Fed. Reg. 14,605 (Dep't Commerce Apr. 3, 2025) (the "*Contested Determination*") and accompanying Issues and Decisions Memorandum (Mar. 28, 2025) (the "*Contested Determination* IDM").

### B.    Issues Presented And Summary Of Argument

**1.    Regarding the Tier 3 benchmark used to analyze the provision of electricity for less than adequate remuneration ("LTAR"), is Commerce's decision not to use a rate of return sufficient to recoup massive historical and ongoing losses by the state-owned Korea Electric Power Corporation ("KEPCO") supported by substantial evidence and otherwise in accordance with law?**

2. No. Commerce unreasonably declined to adjust the overall benchmark rate of return to include the amounts that would be required if the Government of Korea were to achieve its stated goal of recovering past losses by 2026 – losses that KEPCO's own CEO called "difficult for a company to withstand." To recoup its cumulative losses, KEPCO would have had to charge customers a higher price for electricity. By failing to take account of the recoupment of cumulative losses, Commerce failed to measure the full benefit the respondents received.

**2.      Is Commerce's decision not to adjust its electricity for LTAR benchmark to account for all the costs that KEPCO would need to recover, including losses by KEPCO's wholly-owned subsidiaries supported by substantial evidence and otherwise in accordance with law?**

3.  No.  Commerce misconstrued Petitioner's arguments regarding the losses of KEPCO's subsidiaries as if they constituted an upstream subsidy allegation and, on that erroneous basis, declined to engage with the substance of those arguments.  Thus, Commerce failed to provide a legally sufficient explanation for its refusal to adjust the electricity for LTAR benchmark to account for the losses of KEPCO's subsidiaries.

**3.      Is Commerce's refusal to find a regional market distortion and consequent refusal to apply a world price benchmark to measure the benefit from the provision of epichlorohydrin ("ECH") for LTAR supported by substantial evidence and otherwise in accordance with law?**

4.  No.  Relying on the erroneous premise that Petitioner's arguments were untimely, Commerce unreasonably disregarded the evidence of distortions caused by the Government of China in the Asian regional market for ECH that rendered a Tier 1 "in-country" benchmark from South Korea unusable.  Thus, Commerce lacked substantial evidence for refusing to use a Tier 2 world market price benchmark with adjustments to remove distortions.

**4.      Is Commerce's refusal to investigate the provision of other chemical inputs used to produce subject merchandise supported by substantial evidence and otherwise in accordance with law?**

5.  No.  In refusing to investigate the provision of other chemical inputs for LTAR, Commerce unreasonably disregarded the lack of reasonably available information regarding the specific chemicals used by the mandatory respondents in their production processes.  Commerce also unreasonably demanded separate subsidy allegations with respect to each chemical input, despite the agency having previously investigated the provision of multiple inputs as part of a

single subsidy program.  In doing so, Commerce held Petitioner to a higher standard of proof

than the statute requires and acted contrary to its past practice without sufficient explanation.

> **5.    Is Commerce's decision not to find cross-ownership among Kukdo Chemical Co. Ltd. ("Kukdo") and four of its affiliates, and its consequent refusal to countervail subsidies received by those affiliates, supported by substantial evidence and otherwise in accordance with law?**

6.  No.  In refusing to find cross-ownership, Commerce effectively applied an unlawful

*per se* rule based solely on direct stock ownership among the entities at issue while improperly

disregarding extensive evidence showing common control across Kukdo and the four affiliates at

issue.  As a result, Commerce failed to countervail the subsidies received by those affiliates.

> **6.    Should Commerce revise the "all others" subsidy rate if the subsidy rates for Kumho and/or Kukdo are amended as a result of this appeal?**

7.  Yes.  Because the final "all others" subsidy rate was based on the final rates calculated

for mandatory respondents Kukdo and Kumho P & B Chemicals Inc. ("Kumho"), the "all others"

rate should be recalculated to account for any changes to those rates resulting from this appeal.

### C.  Request For Court Order And Relief Sought

8.  Petitioner requests that this case be remanded to Commerce with instructions to

reconsider the *Contested Determination* and recalculate the respondents' subsidy rates consistent

with the arguments presented in this brief.

## II.    PROCEDURAL HISTORY AND FACTUAL BACKGROUND

The issues in this appeal relate to the provision of electricity for LTAR, the provision of ECH for LTAR, the provision of other chemical inputs for LTAR, and whether one mandatory respondent was cross-owned with certain of its affiliates for purposes of attributing subsidies.

In response to the Petition filed by Petitioner on April 3, 2024, Commerce initiated this countervailing duty investigation on April 23, 2024.  *Certain Epoxy Resins From the People's Republic of China, India, the Republic of Korea, and Taiwan: Initiation of Countervailing Duty Investigation*, 89 Fed. Reg. 33,319 (Dep't Commerce Apr. 29, 2024).  The period of investigation was calendar year 2023.  *Certain Epoxy Resins From the Republic of Korea: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 90 Fed. Reg. 14605 (Dep't Commerce Apr. 3, 2025).

Commerce selected Kukdo and Kumho as mandatory respondents.  Commerce, "Countervailing Duty Investigation of Epoxy Resins from the Republic of Korea: Respondent Selection," C-580-920 (May 9, 2024) at 5 (P.R. 66).  Kukdo and Kumho are each multinational conglomerates, with affiliates that are part of the chemical industry in both Korea and the People's Republic of China ("China").  New Subsidy Allegations, dated Aug. 7, 2024 ("New Subsidy Allegations"), at 6 (P.R. 280); *see also* Letter from King & Spalding, Petitions for the Imposition of Antidumping Duties, Vol. IX, Korea Countervailing Duty, dated Apr. 3, 2024 ("Petition"), at 5 (P.R. 6).

At the outset of the underlying proceeding, Commerce decided to investigate a range of alleged subsidy programs, including KEPCO's provision of electricity for LTAR.  *Certain Epoxy Resins from the People's Republic of China, India, the Republic of Korea, and Taiwan: Initiation of Countervailing Duty Investigation*, 89 Fed. Reg. 33,319 (Dep't Commerce Apr. 29, 2024) (P.R. 58) and accompanying Initiation Checklist (P.R. 57).

During the pendency of the investigation, Petitioner filed new subsidy allegations regarding the provision of ECH, bisphenol A ("BPA"), and other key input and precursor chemicals from China for LTAR.  New Subsidy Allegations at 2-17 (P.R. 280).  In those allegations, Petitioner noted that each respondent's specific inputs are not public and provided such information as was reasonably available regarding the number and nature of the inputs, along with information regarding average unit values of imports from China to Korea for Harmonized Tariff Schedule headings that likely apply to the respondents' inputs.  *Id.* at 12-16 (P.R. 280).  On August 21, 2024, Commerce requested additional information from Petitioner. Among other things, Commerce asked Petitioner to "identify each input used in epoxy resin," and to "provide a separate allegation for each input allegedly provided to the Korean respondents for LTAR."  Commerce, "Supplemental Questions Regarding New Subsidy Allegations," dated Aug. 21, 2024, at 3 (P.R. 316).  In response, Petitioner reiterated that it "does not have access to actual usage information; it does not know the exact inputs each respondent uses and from which party it purchases these inputs, whether affiliated or not."  Petitioner also provided a list of inputs that it believed could have been used in the production process of epoxy resins by subject producers, based on public information submitted in a contemporaneous proceeding concerning Taiwan.  Letter from King & Spalding, "Petitioner's New Subsidy Allegations Supplemental Questionnaire Response," dated Sept. 3, 2024, ("Petitioner's NSASQR") at 8, 11-12 (P.R. 334).

On September 13, 2024, Commerce published a negative preliminary determination. *Certain Epoxy Resins from the Republic of Korea: Preliminary Negative Countervailing Duty Determination, Preliminary Negative Critical Circumstances Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 89 Fed. Reg. 74,912 (Dep't Commerce, Sept. 13, 2024) ("*Preliminary Determination*") (P.R. 350) and accompanying Preliminary Decision Memorandum ("PDM") (P.R. 351).  Regarding the issues on appeal:

- Because no "Tier 1" or "Tier 2" benchmarks were available under the agency's hierarchy for LTAR subsidy programs contained in 19 C.F.R. § 351.511(a)(2), Commerce determined that the benefit from KEPCO's provision of electricity under Tier 3 should be measured by analyzing whether the government price was consistent with market principles.  PDM at 25-26 (P.R. 351).

- Because Commerce had not yet decided whether to investigate the additional subsidies alleged by Petitioner, those programs were not addressed in the *Preliminary Determination*.  PDM at 4 (P.R. 351).

- Commerce preliminarily found cross-ownership among Kukdo, Kukdo Finechem, and Kukdo Precision, but not with other companies in the "Kukdo Group": Kukdo Corporation, Jung Do E&P Co., Ltd. ("Jung Do"), New Seoul Chemical Co., Ltd. ("New Seoul") or Ildo Chemical Co., Ltd. ("Ildo").  In this context, Commerce stated that it intended to continue to examine the totality of factors relevant to the cross-ownership analyses under 19 C.F.R. § 351.525(b)(6).  PDM at 9-10 (P.R. 351).

After the issuance of its preliminary determination, Commerce initiated investigations of the provision of ECH and BPA for LTAR, but it declined to investigate Petitioner's allegation of other chemical inputs from China provided for LTAR.  Commerce, "Initiation of Investigation of Additional New Subsidy Programs," dated Nov. 12, 2024 ("NSA Initiation Memorandum") (P.R. 387).  With regard to the other chemical inputs, Commerce stated that, "the petitioner has not provided a separate and distinct allegation with the necessary financial contribution, benefit and specificity information for each of the alleged chemical inputs."  *Id.* at 4 (P.R. 387).

On March 11, 2025, Commerce issued its post-preliminary issues and decision memorandum concerning the new subsidy allegations.  Commerce found that respondents had received a countervailable subsidy in the form of ECH from China that was provided for LTAR.  Commerce measured the benefit by comparing the price that Kukdo Chemical paid to non-Chinese unaffiliated ECH suppliers with the price that Kukdo paid for ECH from Chinese suppliers.  Commerce, "Post-Preliminary Issues and Decisions Memo," dated Mar. 11, 2025 ("Post-Prelim. IDM") at 9-11 (P.R. 507).

6

On February 24, 2025, and March 5, 2025, Petitioner and other parties submitted case briefs.[1]  Petitioner's case briefs addressed each of the issues now raised by Petitioner in this appeal.

In the *Contested Determination*, Commerce determined that Kukdo and Kumho received countervailable subsidies, including with respect to the provision of electricity for LTAR and the provision of ECH from China for LTAR.  However, Commerce

- declined to adjust the benchmark used to determine the benefit from subsidized electricity to take account of the returns that would have been necessary to recover large losses by KEPCO and its subsidiaries, *Contested Determination* IDM at Comment 3;

- declined to adjust the benchmark used to determine the benefit from subsidized ECH to account for regional market distortions, *id.* at Comment 20;

- refused to reconsider its decision not to initiate an investigation of chemical inputs other than ECH and BPA, *id.* at Comment 21; and

- continued to find that Kukdo was cross-owned with Kukdo Finechem but was not cross-owned with its other affiliates in the Kukdo Group, *id.* at 1, n. 1 and Comment 13.

Following an affirmative material injury determination by the United States International Trade Commission, Commerce published countervailing duty orders on epoxy resins from Korea and Taiwan.  *Certain Epoxy Resins from Taiwan: Amended Final Countervailing Duty Determination; Certain Epoxy Resins from the Republic of Korea and Taiwan: Countervailing Duty Orders*, 90 Fed. Reg. 22,235 (Dept. of Commerce, May 27, 2025).  These consolidated appeals by Petitioner, Kukdo, and Kumho followed.

---

[1] The case briefs filed by the parties on February 24, 2025 addressed all issues other than those concerning Commerce's post-preliminary determination, and each is referred to herein as a party's respective "First Case Brief."  The case briefs filed by the parties on March 5, 2025 addressed issues relating to the post-preliminary determination, and each is referred to herein as a party's respective "Second Case Brief."

## III.    STANDARD OF REVIEW

The statute requires the Court to "hold unlawful any determination, finding, or conclusion found … to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Acciai Speciali Terni, S.p.A. v. United States*, 26 C.I.T. 892, 893, 217 F. Supp. 2d 1345, 1346-47 (2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)), taking into account "whatever in the record fairly detracts" from the weight of supportive evidence.  *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016).  The substantial evidence standard also requires the agency to "examine the relevant data and articulate a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*") (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

This standard of review also encompasses the "arbitrary and capricious" standard established under the Administrative Procedure Act.  *See Changzhou Wujin Fine Chemical Factory Co.* v. United States, 701 F.3d 1367, 1377 (Fed. Cir. 2012) (citing *Bowman Transp., Inc. v. Arkansas– Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974)).  "{A}n agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently."  *RHP Bearings Ltd. v. United States*, 288 F.3d 1334, 1347 (Fed. Cir. 2002) (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996)).  Thus, Commerce must treat like situations similarly and may not depart from a prior practice, unless "it provides a reasoned explanation for its change."  *Jiaxing Brother Fastener Co. v. United States*, 380 F. Supp. 3d 1343, 1365 (Ct. Int'l Trade 2019) (citing *Rust v. Sullivan*, 500 U.S. 173, 187 (1991)).

Failure to consider "an important aspect of the problem" similarly renders a determination by Commerce arbitrary. *State Farm*, 463 U.S. at 43. Agency determinations that ignore relevant statutory or regulatory language, or interpret that language contrary to its plain meaning, are also not in accordance with law. *See Zhejiang DunAn Hetian Metal Co. v. United States*, 34 C.I.T. 408, 437, 707 F. Supp. 2d 1355, 1381 (2010), *vacated on other grounds*, 652 F.3d 1333 (Fed. Cir. 2011).

Furthermore, Commerce is required by law to provide in its final determination "an explanation of the basis for its determination that addresses relevant arguments{} made by interested parties." 19 U.S.C. § 1677f(i)(3)(A). Failure to do so renders a CVD determination unlawful. *See NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319-20 (Fed. Cir. 2009).

## IV.    ARGUMENT

### A.    Commerce's Calculation of Electricity For LTAR Subsidies Failed To Account Fully For Losses Incurred by KEPCO

In analyzing electricity provided for LTAR, Commerce used a Tier 3 benchmark under its LTAR benefit hierarchy, measuring "the adequacy of remuneration by assessing whether the government price is consistent with market principles." 19 C.F.R. § 351.511(a)(2)(iii). The 1998 CVD Preamble explained that market principles include "analysis of such factors as the government's price-setting philosophy {and} costs (*including rates of return sufficient to ensure future operations*)." *Countervailing Duties: Final Rule*, 63 Fed. Reg. 65,348, 65,378 (Dep't Commerce Nov. 25, 1998) (emphasis added). Commerce correctly found that the Government of Korea provided electricity for LTAR, but it improperly understated the extent of the subsidies conferred through this program when it refused to adjust the Tier 3 benchmark to account for KEPCO's losses in prior years.

The Government of Korea acknowledged that any rational market actor – public or private – would seek "to recover past losses and ensure future operations," even as it disputed the

appropriate time period for such efforts.  Letter from Lee & Ko, "GOK's Rebuttal Brief," dated Mar. 5, 2025 ("GOK's First Rebuttal Brief"), at 5 (P.R. 498), *quoted in Contested Determination IDM* at Comment 3, p. 34.  The record shows that KEPCO and [     ] of its wholly-owned subsidiaries had significant losses in 2021, the year the Korean government imposed a new tariff structure.  Letter from Lee & Ko, "GOK's Initial Questionnaire Response," dated July 3, 2024 ("GOK IQR") at Exhibit E-1 (KEPCO Form 20-F reporting earnings as of Dec. 31, 2021 at page F-7) (P.R. 147); Letter from King & Spalding, "Rebuttal Factual Information Regarding the GOK's September 19, 2024, Supplemental Questionnaire Response," dated Oct. 7, 2024 ("Factual Information Submission"), at Attachments 1-5 (P.R. 371, C.R. 520 & 521).  Those losses grew to "whopping" record-setting levels in 2022.  Business Korea, *Kepco Posts Worst-ever Annual Operating Loss in 2022*," Feb. 27, 2023, provided in Petition at Exhibit IX-21 (P.R. 17).  Despite announced government plans to raise prices to recoup the losses by 2026, KEPCO's losses grew yet again in 2023.  GOK IQR at Exhibit E-2 (KEPCO Form 20-F reporting earnings as of Dec. 31, 2022 at pages 6-7 and F-7) (P.R. 147).  As of June 2023, KEPCO had reported nine consecutive quarterly operating losses.  Joyce Lee, *KEPCO to Hike Industrial Electricity Price, Sell Assets as Debt Hits $154 Billion*, Reuters (Nov. 8, 2023), provided as Exhibit IX-18 to the Petition (P.R. 16, 17).  KEPCO's CEO acknowledged publicly that "KEPCO's financial crisis, which began with soaring international energy prices, *has reached a limit financially that is difficult for a company to withstand*."  *Id.* (emphasis added).  Analysts noted that KEPCO was not taking adequate measures "to bring KEPCO's debts down to a sustainable level."  *Id.*

These losses accumulated partly because government policy explicitly prevented KEPCO from acting consistently with market principles.  *See* Business Economy, *Kepco's Operating Losses Snowball Beyond Control*, Aug. 12, 2022, provided in Petition at Exhibit IX-20 (P.R. 17)

("Kepco has been asking to raise electricity bills but a succession of governments have said

no."). A 2022 financial disclosure form stated, "{KEPCO's} ability to pass on fuel and other

cost increases to our customers may be limited due to the regulation of the Government on the

rates we charge for the electricity we sell to our customers." GOK IQR at Exhibit E-2 (KEPCO

Form 20-F reporting earnings as of Dec. 31, 2022 at pages 6-7) (P.R. 147). KEPCO also stated:

> The Government may adopt policy measures that affect the tariff
> rates in order to ease the burden on certain consumers, which may
> burden us financially. Previously, there have been several
> adjustments to the existing tariff rates for certain consumers in
> order to ease the burden of electricity tariff on them. But these
> adjustments may be independent from fuel price movements and
> our business, results of operations, financial condition and
> profitability may suffer as a result.

*Id*. (emphasis omitted). In sum, the evidence establishes that KEPCO had multiple consecutive

quarterly losses leading up to and continuing through the POI.[2]

In the *Contested Determination*, Commerce adjusted its benchmark to account for a

shortfall in recovery of the cost of fuel during the POI, but declined to adjust the overall rate of

return to include the amounts that would be required if the GOK were actually to make good on

its stated goal of recovering past losses by 2026 – losses that KEPCO's own CEO called

"difficult for a company to withstand." Commerce stated that the losses in 2021 and 2022 were

---

[2] These facts distinguish the present case from prior proceedings, concerning facts arising during 2013 to 2018, where reviewing courts upheld Commerce findings that KEPCO turned a profit and had an adequate rate of return. The factual basis underpinning those findings no longer exists. *See Maverick Tube Corp. v. United States*, 273 F. Supp. 3d 1293 (Ct. Int'l Trade 2017), *overruled in relevant part by Nucor Corp. v. United States,* 927 F.3d 1243 (Fed. Cir. 2019) (2013 POI); *Posco v. United States*, 581 F. Supp. 3d 1272 (Ct. Int'l Trade 2022); *Posco v. United States*, 977 F.3d 1369 (Fed. Cir. 2020) (2014 POI); *Posco v. United States*, 557 F. Supp. 3d 1290 (Ct. Int'l Trade 2022) (2014 POI); *Posco v. United States,* No. 17-00137, Slip Op. 22-3 (Ct. Int'l Trade Jan. 13, 2022) (Katzmann, J.), *aff'd* 2023 U.S. LEXIS 28035 (Fed. Cir. Oct. 23, 2023) (nonprecedential) (2015 POI); *Nucor Corp. v. United States*, 698 F. Supp. 3d 1310 (Ct. Int'l Trade 2024) (2018 POI); *Nucor Corp. v. United States*, 772 F. Supp. 3d 1340 (Ct. Int'l Trade 2025) (2018 POI). Moreover, KEPCO operated under a different tariff structure during the POIs in those cases. *See Contested Determination* IDM at Comment 1, p. 18.

"not contemporaneous to this investigation" and concluded that "{i}ncorporating costs from prior years that are *not otherwise present* in the 2023 electricity benchmark data would result in Commerce not {having} allocate{ed} the benefit received by the respondents in this investigation solely to the year in which the benefit was received as per 19 CFR 351.511(c)." *Contested Determination* IDM at Comment 3, p. 35 (emphasis added).

To the contrary, the deficit was "present" (and otherwise making its presence ever more felt) throughout the entire POI. That the Government had no serious and credible plan to recover the cumulative deficit was highly probative that, during the POI, KEPCO was not being run consistently with market principles. A company subject to market discipline cannot ignore a deficit that threatens the company with "collapse," in the words of KEPCO's own CEO, just because the debt was partially accrued in prior years or incurred by wholly-owned subsidiaries. *See Korea's Top Utility Wants Power Price Hikes to Avoid Crisis*, Bloomberg, Sept. 20, 2023, provided in Petition at Exhibit IX-22 (P.R. 17). As the Federal Circuit held in a case involving KEPCO,

> Under Commerce's broad theory, if the foreign government authority engaged in a uniform, non-discriminatory, tariffed practice of charging a price so low that the authority consistently lost large sums of money in a way no private seller could sustain, sales pursuant to that practice would *not* be properly viewed as 'for less than adequate remuneration.' *That position is beyond any reasonable interpretation of the statute, or of its implementing regulation.*

*Nucor Corp. v. United States*, 927 F.3d at 1249 (emphasis added). To recoup its cumulative losses, KEPCO would have had to charge customers a higher price for electricity. By failing to take account of that, Commerce failed to measure the full benefit respondents received.

Petitioner proposed that the benefit from not charging rates sufficient to recover KEPCO's accumulated deficit be allocated across the four-year span in which the Government of

Korea said that the losses should be recovered.  Such allocation across periods is a standard feature of Commerce's countervailing duty methodology.  *See, e.g.,* 19 C.F.R. § 351.524(b)-(c) (providing that coverage for operating losses over several years will normally be treated as a non-recurring subsidy allocated over the average useful life of renewable physical assets).  If Commerce were genuinely concerned that such allocation was not permitted by 19 C.F.R. § 351.511(c)(2), as suggested in the *Contested Determination*, then Commerce could have attributed the entire amount of the accrued deficit to the POI.[3]  What Commerce was *not* free to do, however, was disregard the accumulating losses entirely, such that the benefit from failure to charge rates adequate to recover the cumulative deficit could *never* be countervailed.  Accordingly, Commerce's decision to ignore KEPCO's cumulative deficit when constructing a benchmark is not supported by substantial evidence or otherwise in accordance with law.

### B.    Commerce's Calculation of Electricity For LTAR Subsidies Failed To Account For Losses By KEPCO's Subsidiaries

In addition to the error discussed in the preceding section, Commerce's electricity for LTAR benchmark failed to account for the losses incurred by KEPCO's subsidiaries.  Again, a key consideration in developing an appropriate benchmark to measure electricity for LTAR subsidies is whether the government provider charges prices that generate "rates of return sufficient to ensure future operations."  *Countervailing Duties*, 63 Fed. Reg. at 65,378.  Commerce did not engage with the substance of Petitioner's arguments regarding the losses of KEPCO's subsidiaries but instead rejected those arguments as untimely allegations of upstream subsidies.  *Contested Determination* IDM at Comment 3, p. 36.  To the contrary, Petitioner did

---

[3] Petitioner notes that 19 C.F.R. § 351.511 (c)(2) states that in the case of the provision of a good or service, Commerce "will normally allocate (expense) the benefit to the year in which the benefit is considered to have been received."  Accumulating losses are not "normal" for market participants.  Given that, and also given the recognition in 19 C.F.R. § 351.524 that coverage of operating losses is allocable, 19 C.F.R. § 351.511(c)(2) did not bar Commerce from choosing a methodology that would have resulted in fully countervailing the subsidy.

NON-CONFIDENTIAL VERSION; CONFIDENTIAL INFORMATION IN BRACKETS HAS BEEN DELETED

not claim that KEPCO's subsidiaries provided a subsidy to an input product, *see* 19 U.S.C. § 1677-1(a) (defining "upstream subsidy"), but rather that the losses incurred by those subsidies must be taken into account in measuring the benefit that the electricity for LTAR program confers on the subject merchandise.  This issue must therefore be remanded, as further explained below.

The financial statements of [     ] of KEPCO's wholly-owned subsidiaries showed significant losses on sales during the POI, representing approximately [     ] percent of the value of electricity purchased.  Factual Information Submission at Attachments 1-5 (P.R. 371, C.R. 520 & 521) (financial statements showing losses); Petitioner's First Case Brief at Exhibits 1 and 2 (P.R. 487, C.R 677) (calculation of percent of value).  The record also shows a cause of the losses: KEPCO's subsidiaries sold electricity at below-cost rates during the POI.  *See* Petitioner's First Case Brief at 10-11 (P.R. 487).  In raising this in its First Case Brief, Petitioner's point was not to allege that these transfers were themselves an upstream subsidy.  Rather, it was to show that the cost of the subsidiaries' sales was not being recovered by the revenue the sales generated.  Again, for any private market participant, avoiding or recovering losses – even if incurred by subsidiaries – is vital to staying in operation.  A reasonable rate of return sufficient to ensure future operations would have to include provision for these losses.  *Nucor Corp. v. United States*, 927 F.3d at 1250 (holding that the requirement to determine adequacy of remuneration in relation to market principles "does not endorse the charging of consistently low prices that no market participant could sustain….").  Accordingly, the benchmark rate of return should have been set at a level that would, *inter alia*, address these subsidiaries' losses.

In *Certain Lined Paper Products from Indonesia,* Commerce recognized that there are significant differences between the question of how subsidies should be attributed and the question of whether a case involves upstream subsidies.  *Certain Lined Paper Products from*

*Indonesia: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 71 Fed. Reg. 47,174 (Dep't Commerce Aug. 16, 2006), and accompanying Issues and Decision Memorandum at Comment 2, p. 25. By the same token, there is also a significant difference between constructing a benchmark to measure benefit and either attribution or upstream subsidies. In their case briefs, Respondents fundamentally misconstrued Petitioner's argument. The Government of Korea did not discuss a benchmark, but rather erroneously stated that "Petitioner's argument is that GENCOs sold electricity to KEPCO at below cost prices, thus subsidizing KEPCO, and that the remedy is to increase KEPCO's costs to offset this subsidy. This is equivalent to an upstream subsidy allegation." GOK's First Rebuttal Brief at 6 (P.R. 498). Kumho used nearly identical, and identically erroneous, language. Letter from Morris, Manning & Martin, "KPB's Rebuttal Brief," dated Mar. 5, 2025 ("Kumho's First Rebuttal Brief"), at 8 (P.R. 499). Respondents' arguments relate to *whether there is a financial contribution*, not how to *measure a benefit*. These are distinct inquiries.

Kukdo argued that the benefit of sales for less than adequate remuneration to the Korea Power Exchange did not pass through to KEPCO. Letter from Arnold & Porter, "Kukdo Chemical's Rebuttal Brief, dated Mar. 5, 2025 ("Kukdo's First Rebuttal Brief"), at 11-12 (P.R. 502). However, the pass-through of a financial contribution is beside the point. Rather, the issue is whether losses by subsidiaries needed to be accounted for in constructing a benchmark to measure the benefit conferred by the parent company to the subsidy recipient.

The respondents also implied that Commerce should blind itself to large and accumulating losses among KEPCO's subsidiaries because the losses related to the enterprise as a whole rather than being directly linked to specific tariff categories. GOK's First Rebuttal Brief at 5 (P.R. 498); Kumho's First Rebuttal Brief at 6-7 (P.R. 499); Kukdo's First Rebuttal Brief at 12 (P.R. 502). To the contrary, it is unreasonable to assert that an unsubsidized market

participant can stay in operation if it merely seeks to address smaller losses in a given line of business while ignoring larger losses in other areas.

Instead of engaging with the argument that Petitioner presented, Commerce stated in the *Contested Determination* that "{w}e agree with the GOK and Kumho that the petitioner's allegation and the proposed adjustment to KEPCO's electricity cost data constitute an untimely upstream subsidy." *Contested Determination* IDM at Comment 3, p. 36. Commerce then turned to a discussion of its regulatory deadlines. Commerce's analysis confused distinct aspects of its countervailing duty methodology. *Id.* The issue was not whether respondents indirectly received a subsidy from KEPCO's subsidiaries, but rather what rate of return would have been sufficient to ensure KEPCO's continued operation consistent with market principles, taking account of the subsidiaries' losses.

For completeness, Petitioner notes that even if Petitioner's argument had concerned *financial contribution* rather than the proper measurement of benefit, Commerce's regulations do not require an upstream subsidy allegation because the wholly-owned subsidiaries are cross-owned with KEPCO. In *Certain Lined Paper from Indonesia*, Commerce stated, "the upstream subsidy regulation expressly refers to 'subject merchandise,' whereas the attribution regulation speaks of a 'downstream product.' The term 'downstream product' is not synonymous to the term 'subject merchandise.'" *Certain Lined Paper Products from Indonesia*, 71 Fed. Reg. 47,174 (Dep't Commerce Aug. 16, 2006), IDM at Comment 2, p. 25. In the *Preamble*, Commerce stated "if the relationship between the input and downstream producers meets the affiliation standard but falls short of cross-ownership, even if the input product is primarily dedicated to the downstream product, we will only consider subsidies to the input producer in the context of an upstream subsidy allegation." *Countervailing Duties*, 63 Fed. Reg. at 65,401. Because the relationship between KEPCO and its wholly-owned subsidiaries did not fall short of

cross-ownership, Commerce was free to consider the subsidiaries' losses outside the context of an upstream subsidy allegation.

In misconstruing Petitioner's argument, Commerce failed to provide a reasoned explanation for its choice to disregard the losses of KEPCO's subsidiaries in constructing the market benchmark for the electricity for LTAR subsidy program. Thus, Commerce's choice is unsupported by substantial evidence and otherwise not in accordance with law.

### C. Commerce's Calculation Of ECH For LTAR Subsidies Used An Improper Tier 1 Benchmark That Did Not Account For Regional Market Distortions Caused By The Chinese Government

Commerce correctly found that Kukdo and Kumho benefited from ECH for LTAR provided by the Chinese government as part of its drive to dominate Asian chemical markets. *Contested Determination* IDM at 11-12; Petitioner's NSASQR at Exhibit 1 ("Why China is Starting a New Trade War," *Wall Street Journal*, Aug. 22, 2024) (P.R. 334). However, Commerce understated the benefit because it used a distorted Tier 1 benchmark from within South Korea when it should have used a Tier 2 world price benchmark, with adjustments to remove distorted data. *See Contested Determination* IDM at Comment 20, pp. 91-95. In refusing to use a Tier 2 benchmark, Commerce unreasonably criticized Petitioner's arguments on this issue as having been raised too late for the agency to adequately address them. This rationalization is unsupported, however, as demonstrated below.

The record shows that the Asian regional market for ECH is highly integrated. *See, e.g.*, Petition at 4 (P.R. 6) ("Notably, the South Korean epoxy resin industry and supply chain are also interconnected with Chinese companies and the Government of China ("GOC"), including through affiliations and close supplier relationships."); *see also* New Subsidy Allegations at Exhibit 2A, p. 6 (P.R. 281, C.R. 426) ([

].).  In addition to

being regional, the Asian market for ECH is highly distorted by Chinese government subsidies

and other non-market practices.  Petitioner's NSASQR at 10 (P.R. 334), citing Commerce, "Post-

Preliminary Analysis in the Countervailing Duty Investigation of Certain Epoxy Resins from the

People's Republic of China," dated Feb. 7, 2025, unchanged in *Certain Epoxy Resins from the*

*People's Republic of China: Final Affirmative Countervailing Duty Determination and Final*

*Affirmative Determination of Critical Circumstances*, 90 Fed. Reg. 14,628 (Apr. 3, 2025)

(determining Chinese epoxy resins producers enjoyed a 54.89% subsidy rate from ECH provided

for LTAR).  The whole region has been swamped by subsidized Chinese ECH.  Letter from King

& Spalding, "Petitioner's Case Brief on New Subsidy Allegations," dated Mar. 18, 2025

("Petitioner's Second Case Brief") at 8-9 (P.R. 522).  As a result, ECH prices in Asia are [

] than in other parts of the world.  *Id.* at Exhibit 1 (P.R.522; C.R. 691).  *See also*

Letter from Morris, Manning & Martin LLP, "KPB's New Subsidy Allegation Questionnaire

Response," dated Dec. 16, 2024, at Exhibit NSA-4 at 1 (P.R. 428; C.R. 552) (data from the

Independent Commodity Intelligence Services showing that [

].)  Thus,

ECH prices in South Korea or other portions of the Asian regional market are distorted and

therefore cannot serve as a market benchmark price to measure the extent of the subsidy at issue.

Nevertheless, in the *Contested Determination*, Commerce ignored the evidence of this

regional market distortion and wrongly declined to use a Tier 2 world-price benchmark in favor

of a Tier 1 "in-country" benchmark from South Korea.  Commerce attempted to justify this

choice on two purported grounds.  Commerce disregarded region-wide distortions of ECH prices

in Asia and instead stated that, even if it "were to cumulate Thai- and Chinese-origin imports of

ECH for purposes of a market distortion analysis, this combined share would still be a minor

share of Korea's overall ECH consumption during the POI." *Contested Determination* IDM at

Comment 20, pp. 94-95.  The agency also asserted that "{v}arious aspects of the petitioner's

argument in its case brief are novel within this investigation" and "due to the timing of

petitioner's argument, we were unable to adequately address it."  *Id.*  Neither claim is supported

by evidence on the record and otherwise in accordance with law.

### 1.    Commerce cannot ignore substantial evidence regarding regional market dynamics

The record plainly establishes that massive and increasing Chinese ECH overcapacity has

led to a surge of artificially cheap ECH throughout Asia, thereby depressing prices in all

countries in the region, including Korea.  *See* Petitioner's NSASQR at 5 (P.R. 334).  To

elaborate, the record showed that:

- Due to governmental industrial policies, as of 2021 China had enough heavily-subsidized ECH production capacity to fulfill – by itself -- virtually *the entire globe's* demand.  Petitioner's Second Case Brief at 10 (P.R. 522).  That production [
          ] what China needed domestically, resulting in an enormous surge of subsidized ECH into other Asian countries.  *See* New Subsidy Allegations at Exhibit 2A
  ([
          ], and Exhibit 4 ([                              ]) (P.R. 281, C.R. 426, 434).
  Between 2019 and 2023, Chinese exports of ECH increased by [      ] percent.
  Petitioner's Second Case Brief at Exhibit 1 (P.R. 522, C.R. 691).

- The Chinese surge [                                                  ], leaving exporters
  there and elsewhere with extra ECH to dispose of wherever they could at whatever
  price they could.  New Subsidy Allegations at Exhibit 2A, p. 33 (P.R. 281, C.R. 426).

- The inevitable result of too much supply chasing too little demand was [
          ] across the region, including in India, Taiwan, Thailand, and South
  Korea.  Petitioner's Second Case Brief at Exhibit 1 (P.R. 522, C.R. 691).  Given the
  evidence [                              ] across the region, Commerce was simply
  wrong when it claimed, "there is insufficient evidence to conclude that the ECH prices
  that private sellers in Thailand charged to customers in Korea were dictated or
  influenced by the ECH prices that sellers in China charged to customers in Thailand
  and/or Korea."  *Contested Determination* IDM at Comment 20, p. 94.

- As a trade publication reported, [

          ].  [

], submitted in Exhibit NSA-4 of Letter from Morris, Manning & Martin LLP, "KPB's New Subsidy Allegation Questionnaire Response," dated Dec. 16, 2024 (P.R. 428, C.R. 553) ([

])

Because the market for ECH was regionally-integrated, Commerce erred when it considered only the percentage of overall ECH consumption in South Korea accounted for by imports from China and Thailand. *Contested Determination* IDM at Comment 20, pp. 94-95; *see also* Commerce, "Final General Analysis Memorandum," dated Mar. 28, 2025, at 2, P.R. 537, C.R. 703.

But even in that inadequate analysis, [

]. S*ee, e.g., Forged Steel Fittings from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 50,342 (Dep't Commerce Oct. 5, 2018) and accompanying IDM at Comment 3 (finding the market distorted with 28 percent controlled by the Government of China); *Cast Iron Soil Pipe Fittings from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 83 Fed Reg. 32,075 (Dep't Commerce July 11, 2018), and accompanying IDM at Comment 1 ((finding the market distorted with 36 percent of consumption controlled by the Government of China); *Certain Passenger Vehicles and Light Truck Tires from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review and Rescission, in Part; 2014-2015*, 82 Fed. Reg. 42,287 (Dep't Commerce Sept. 7, 2017) and accompanying preliminary decision memorandum at 16 (finding the market distorted with 31.61 percent of consumption controlled by the Government of China) (unchanged in *Certain Passenger Vehicles and Light Truck Tires from the People's Republic of China: Final Results of Countervailing Duty*

*Administrative Review; 2014-2015*, 83 Fed. Reg. 11,694 (Dept. of Commerce Mar. 16, 2018));

and *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses*

*from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 75

Fed. Reg. 59,212 (Sept. 27, 2010), and accompanying IDM at 22 and Comment 14 (finding the

markets for two inputs distorted with 36.68 and 33.1 percent of production, respectively,

controlled by the Government of China).

Commerce did not explain why it deviated from its past practice or identify any standard

at all that guided its conclusion that imports accounting for [          ] of Korean

consumption were "minor." *Contested Determination* IDM at 93-94.

The regional effects of subsidized Chinese overcapacity were the key factor in setting

South Korean prices of ECH.  [

                              ].  Petitioner's Second Case Brief at 12-14 (P.R.

522, C.R. 691).  A trade publication submitted by Kumho stated:

- [

        ] (P.R. 428, C.R. 552).

- [

                                                    ] (P.R. 428, C.R.

    553) (emphasis added).

- [

                                        ] (P.R. 428, C.R. 554).

- [

        ] (P.R. 428, C.R. 556) (emphasis added).

In contrast, there is no record evidence suggesting that the Korean market had pricing dynamics

distinct from those in the interconnected Asian region.

In *Habaş Sinae Ve Tibbi Gazlar v. United States*, the Court sustained Commerce's

decision that a price that included Russian natural gas could not be used as a benchmark in

Turkey when the regional gas market was distorted by the Russian government for its own geopolitical purposes. *Habaş Sinai Ve Tibbi Gazlar Istihsal Endüstrisi A.S. v. United States*, 459 F.Supp. 3d 1341, 1349-51 (Ct. Int'l Trade 2020). *See also Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.S. v. United States*, 536 F. Supp. 3d 1333, 1343 (Ct. Int'l Trade 2021). Just as Russia distorted regional gas prices, including in Turkey, China's geopolitical drive to dominate Asian chemicals production has distorted regional ECH prices, including in South Korea. *See* Petitioner NSASQR at Exhibit 1 (describing China's "More Cars and Chemicals" geopolitical policy) (P.R. 334).

Commerce stated in promulgating its regulations that, "{w}hile we recognize that government involvement in a market may have some impact on the price of the good or service in that market, such distortion will normally be minimal unless the government provider constitutes a majority or, in certain circumstances, a substantial portion of the market." *Countervailing Duties; Final Rule*, 63 Fed. Reg. at 65,377. China's enormous and growing subsidized ECH production capacity made it [                    ] in the Asian region. *See* New Subsidy Allegations at Exhibit 2A at [  ] ([



                                                                         ]) (P.R. 281, C.R. 426). Given these facts in the record, Commerce was required by its regulation to use a non-distorted Tier 2 world price benchmark. 19 C.F.R. § 351.511(a)(2)(ii).

**2.      Petitioner's argument was timely, and Commerce unreasonably refused to weigh record evidence**

Petitioner timely submitted factual information throughout the investigation and then, in its case brief, explained the legal conclusions that flow from applying the statute and regulations to that information, exactly as provided in 19 C.F.R. § 351.309. Nevertheless, Commerce asserted in the *Contested Determination* that this *legal argument* was "untimely and deficient," claiming that "it was incumbent on the petitioner to raise their additional *arguments* regarding

potential ECH market distortion earlier in this investigation" and that information placed on the record by Petitioner earlier in the investigation did not constitute a "specific, formal or complete argument." *Contested Determination* IDM at Comment 20, p. 93.  Commerce's regulations contain no provision requiring that parties specifically allege market distortion at a point earlier than submission of their case briefs.  More fundamentally, Commerce has confused *argument* and *factual information*. *Compare* 19 C.F.R.  § 351.301 (deadline for submission of factual information) *and* § 351.309 (deadline for submission of written argument).  *See also Dongkuk Steel Mill Co., Ltd. v. United States*, 567 F. Supp. 3d 1359, 1362-64 (Ct. Int'l Trade 2022) (discussing the distinction between submission of "factual information" and "written argument.") Petitioner's Second Case Brief properly raised the legal issues flowing from regional market distortion at the time appropriate under Commerce's regulations.  *See* 19 C.F.R. § 351.309(c)(2) (providing that "{t}he case brief must present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination or final results, including any arguments presented before the date of publication of the preliminary determination or preliminary results.").

Contrary to Commerce's characterization, Petitioner made clear from the start of the investigation that Chinese overproduction distorted the regional market and from its initial allegation of transnational subsidies that using a world-price benchmark was appropriate.  In the Petition, for example, Petitioner discussed the distortion of the Asian regional market, explaining the relationship between China using its ECH overcapacity to become a major supplier in the other countries in Asia, as well as the resulting increase in the production of epoxy resins in Asia.  *See* Petition, Volume I at 3-4 (P.R. 2); Petition, Volume IX at 4 (P.R. 6) (explaining how epoxy resin producers in Asia used non-market based ECH to expand capacity and exports to the U.S. market.).  In its response to agency questions regarding its New Subsidies Allegations,

moreover, Petitioner stated that, "{b}y creating massive overcapacity supported by ongoing government subsidization, Chinese chemical producers utilize their overcapacity to provide low price chemicals not only throughout China, but in other countries such as Korea." Petitioner's NSASQR at 25; *see also id.*, Exhibit 1 (noting that, as result of Chinese state-backed overcapacity, India was investigating imports of Chinese chemicals) (P.R 334). Consistent with this evidence and argumentation, Petitioner's initial New Subsidy Allegation demonstrated the existence of a subsidy benefit using a "World Market Benchmark" for ECH. *See* New Subsidy Allegations at 15-16, P.R. 280 (providing world market benchmarks to show benefit). That is, Petitioner used a Tier 2 "world market price" benchmark under 19 C.F.R. § 351.511(a)(2)(ii), which is only applicable where a Tier 1 "actual market-determined price" from "transactions in the country in question" is unavailable. *See* 19 C.F.R. § 351.511(a)(2)(i)-(ii).

Given Petitioner's submissions on the record from the Petition to its initial New Subsidy Allegations filings, Commerce unreasonably claimed in the *Contested Determination* to have insufficient time to consider whether government distortions required the use of a Tier 2 world market price benchmark. Also, given the relevant facts in the record regarding those distortions, as well as the argumentation in Petitioner's Second Case Brief, Commerce could not reasonably conclude that ECH prices within South Korea were undistorted and thus constituted a useable Tier 1 benchmark.

### D.     Commerce Failed to Investigate Other Chemical Inputs Provided For LTAR

Commerce unreasonably and unlawfully refused to investigate Petitioner's allegation that the Chinese government provided chemical inputs other than ECH and BPA to Korean producers of epoxy resins for LTAR. During the investigation, Petitioner alleged that (a) the Chinese government, through state-owned enterprises, other government entities, and entrusted or directed entities, provided ECH, BPA, and other key input and precursor chemicals to Korean

epoxy resin producers; (b) the provision of such inputs was *de jure* and *de facto* specific to the

chemical industry; and (c) such inputs were provided for LTAR and thereby conferred benefits

on Korean epoxy resin producers.  New Subsidy Allegations at 11-13 (P.R. 280); *see also* NSA

Initiation Memorandum, at 2-3 (P.R. 387).  Commerce initiated investigations of the provision of

ECH and BPA for LTAR, but it refused to investigate the provision of other chemical inputs for

LTAR.  The agency asserted that Petitioner's allegations with respect to the other chemical

inputs were "too deficient" because they did not consist of "a separate and distinct allegation

with the necessary financial contribution, benefit and specificity information for each of the

alleged chemical inputs."  *Contested Determination* IDM at Comment 21, p. 97.  As

demonstrated below, Commerce's refusal is unsupported by substantial evidence and is

otherwise not in accordance with law.

### 1. Petitioner alleged all elements of a countervailable subsidy and supported those allegations with reasonably available information

The statute sets out the requirements a petitioner must meet in alleging a subsidy.  It

states that "{a} countervailing duty proceeding shall be initiated whenever an interested party …

files a petition with the administering authority, on behalf of an industry, which alleges the

elements necessary for the imposition of the duty imposed by section 701(a), and which is

accompanied by information reasonably available to the petitioner supporting those allegations."

19 U.S.C. § 1671a(b)(1).  The Court has explained that Congress intentionally set this bar for

allegations "low."  *Nucor Corp. v. United States*, 653 F. Supp. 3d at 1304.  The statute also

directs Commerce to act with respect to "a practice which appears to be a countervailable

subsidy" that is discovered "in the course of a proceeding," including by providing that the

agency "shall include the practice, subsidy, or subsidy program in the proceeding if the practice,

subsidy, or subsidy program appears to be a countervailable subsidy with respect to the

merchandise which is the subject of the proceeding."  19 U.S.C. § 1677d(1); *see also* 19 C.F.R. § 351.311(b).  In other words, Congress set a low bar for subsidy allegations and has plainly instructed Commerce to investigate practices that "appear to be a countervailable subsidy" when such practices are discovered during the pendency of an investigation.  Consistent with these statutory directives, Commerce's regulations provide that a petitioner may submit a countervailable subsidy allegation up to 40 days before the scheduled date of the preliminary determination in a countervailing duty investigation.  19 C.F.R. § 351.301(c)(2)(iv).

Importantly, the statute does not require a petitioner to provide information about subsidy programs that is not available to it.  *See Fine Furniture (Shanghai) Ltd. v. United States,* 748 F.3d 1365, 1369-70 (Fed. Cir. 2014) (holding that normally respondents are in the best position to provide information concerning an alleged subsidy program); *see also Nucor Corp. v. United States*, 600 F. Supp. 3d 1225, 1233-1234 (Ct. Int'l Trade 2022) (remanding Commerce refusal to initiate investigation of alleged electricity subsidy program where the agency "faulted {the petitioner} for failing to provide better cost information without making the corresponding finding that such information was reasonably available to" the petitioner).

As this Court, informed by legislative history, has explained, "a petition or subsequent subsidy allegation functions 'like a civil complaint' and is intended 'to alert the agency to the possibility of a subsidy.'"  *Nucor Corp. v. United States*, 653 F. Supp. 3d 1295, 1300 (Ct. Int'l Trade 2023); *RZBC Group Shareholding Co. v. United States*, 100 F. Supp. 3d 1288, 1296 (Ct. Int'l Trade 2015) (citing S. Rep. No. 96-249, at 47 and H.R. Rep. No. 96-317, at 51).  The petitioner must only "allege the rough contours of the subsidy" based on "information reasonably available to the petitioner supporting those allegations. . . But Commerce *cannot refuse* to investigate unless it 'is convinced that the petition and supporting information fail to state a

claim upon which relief can be granted.'"  *See RZBC Group*, 100 F. Supp. 3d at 1292 (emphasis added).

Petitioner did all that was required with respect to the provision of other chemical inputs for LTAR.  In its new subsidy allegations, Petitioner noted that respondents used numerous precursor chemicals.  *See* New Subsidy Allegations at 2-4 (P.R. 280).  These inputs all had one thing in common: they were produced by the Chinese chemical industry.  The Petitioner showed that the Chinese chemical industry, which is dominated by government-controlled companies, provided a financial contribution to Korean epoxy resin producers, and the financial contributions were specific because they were limited on an industry or group basis.  New Subsidy Allegations at 13-15 (P.R. 280).  Commerce relied on this information in deciding to investigate provision of ECH and BPA.  NSA Initiation Memorandum at 2-3 (P.R. 387).  In relying on this information to initiate investigations of ECH and BPA, Commerce demonstrated that Petitioner had met the requirements to show that the overwhelmingly government-controlled chemical industry in China provided a financial contribution, which was specific.  If the financial contribution and specificity requirements were met with respect to ECH and BPA, they necessarily were also met with respect to other chemical inputs.

Moreover, in response to a supplemental Commerce questionnaire instructing Petitioner to "provide a separate allegation for each input allegedly provided to the Korean respondents for LTAR…," Commerce, "Supplemental Questionnaire Regarding New Subsidy Allegations," dated Aug. 21, 2024 at 3 (P.R. 316), Petitioner explained that subject merchandise is produced through complex processes that vary from manufacturer to manufacturer.  Petitioner's NSASQR at 8-12 (P.R. 334).  Apart from a few commonalities – all producers appear to use ECH and BPA, for example – the exact mix of chemical inputs a producer uses at different stages in the process is a closely guarded trade secret.  *Id.* at 19 (P.R. 334).  In other words, Petitioner

explained to Commerce that, aside from ECH and BPA, it does not have access to information regarding the specific chemical inputs used by the Korean respondents, but the Korean respondents do have that information.

Petitioner also alleged that ECH, BPA and the other inputs all originate in a single favored Chinese chemical industry. New Subsidy Allegations at 2-6 (P.R. 280). *See also* Petitioner's NSASQR at 15 (P.R. 334). The record contains no evidence suggesting that inputs other than ECH and BPA are produced by a separate and distinct industry.[4] Given the absence of any such evidence, Commerce's claim in the *Contested Determination* that "the petitioner did not provide … information supporting that the industries that produce {these additional chemicals} are favored by GOC," *Contested Determination* IDM at Comment 21, p. 97, is unsupported by the record.

As to benefit, Petitioner provided import statistics showing that eleven categories of chemical inputs used in subject merchandise were in fact exported from China to South Korea. New Subsidy Allegations at 15-16 (P.R. 280). Petitioner also compared these Korean import statistics to world export prices to establish a benefit for these eleven categories of chemical inputs. *Id.* (PR. 280). Furthermore, in its supplemental response, Petitioner provided Korean import statistics for another 26 categories of chemical inputs at the HS 4-digit level, and 64 categories at the HS 6-digit level, similarly comparing these Korean prices to world market benchmarks to establish a benefit. Petitioner's NSASQR at 14-15 and Exhibit 6 (P.R. 334).

Thus, the record disproves Commerce's claim that "petitioner did not provide information regarding the production of any of these chemicals in China." *Contested*

---

[4] The record does contain affirmative evidence of a single chemical industry, insofar as the Internal Revenue Service table that Commerce uses to determine average useful lives lists a single asset class for the "Manufacture of Chemicals and Allied Products". *See* Petition at Exhibit IX-14 (P.R. 6).

*Determination* IDM at 97.  To the contrary, the import statistics Petitioner provided showed that at least these eleven categories of chemical inputs used in subject merchandise were in fact exported from China to South Korea.  New Subsidy Allegations at 15-16 (P.R. 280).  Moreover, Petitioner noted that Kukdo and Kumho have multiple Chinese subsidiaries and are themselves part of the chemical industry in China and that their financial statements show significant purchases and sales among these affiliated parties.  *Id.; see also* Petition, Volume IX at 5-6 (P.R. 6).

### 2.    Contrary to the statute, Commerce demanded information from Petitioner that was not reasonably available to it

In this case, Commerce unlawfully added additional requirements not contained in the statute.  Commerce demanded that Petitioner "identify each input used in the production of epoxy resin that {petitioner alleges} was used in the production of epoxy resin," "{f}or each input … indicate whether the Korean mandatory respondents purchased the input during the POI," and "{p}rovide a separate allegation for each input allegedly provided to the Korean respondents for LTAR by their affiliated and/or cross-owned input providers."  Commerce, "Supplemental Questions Regarding New Subsidy Allegations," dated Aug. 21, 2024, at 3 (P.R. 316).  This amounted to a requirement that Petitioner prove at the outset actual usage of each chemical the respondents may have sourced from China.  Such information is not publicly available.  Petitioner's NSASQR at 8-9 (P.R. 334).  Rather, this is the sort of information that Commerce ordinarily develops through the investigative process.  *Cf. Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir.1993) ("The burden of production should belong to the party in possession of the necessary information.")

In the *Contested Determination*, Commerce stated "the petitioner's allegation was never clear on which chemicals were part of its allegations, other than ECH and BPA."  *Contested Determination* IDM at Comment 21, p. 97.  Commerce thus improperly faulted Petitioner for not

providing information that was not reasonably available to it.  Petitioner repeatedly informed Commerce that it did not have access to the proprietary information regarding respondents' specific production processes that would be necessary to develop individualized allegations for each chemical input.  Nevertheless, Petitioner made extraordinary efforts to identify specific chemicals that were likely implicated, including the overall number of chemical inputs Kukdo used, the number of chemicals Kumho used at each stage of the production process, and evidence that a significant amount of the chemicals used were imported to Korea from China. New Subsidy Allegations at 11-12 (raw materials used at each stage of Kumho's production), 13 (number of chemicals used by Kukdo) at 16 (exports to Korea) (P.R. 280).

Petitioner's submission omitted no important facts that were reasonably available to it, and it was sufficient to "alert the agency to the possibility of a subsidy." *RZBC Group*, 100 F. Supp. 3d at 1292.  In nevertheless requiring "separate and distinct" allegations, Commerce ignored the statute's "low" bar and instead imposed an impassable hurdle.  Accordingly, Commerce's determination not to investigate subsidized chemical inputs was not supported by evidence in the record and was not in accordance with law.

### 3.    Commerce's refusal to investigate is contrary to its practice

To be clear, Commerce does not have a practice of requiring separate allegations for each good or service provided for LTAR.  Although Commerce may request separate allegations, when subsidized inputs are numerous or information to distinguish them individually is unavailable, Commerce's practice is to consider them as a group.  Notably, both before and after this case, Commerce has investigated groups of petrochemical inputs from China as a single program.  *See Certain Plastic Decorative Ribbon From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 83 Fed. Reg. 29,096 (Dep't

Commerce June 22, 2018) and accompanying PDM at 9-10 and 23-26, unchanged in *Certain Plastic Decorative Ribbon From the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 84 Fed. Reg. 1,064 (Dep't Commerce Feb. 1, 2019) and accompanying IDM at 5 and 7. *See also Certain Low-Speed Personal Transportation Vehicles from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 90 Fed. Reg. 26,536 (Dep't Commerce June 23, 2025) and accompanying IDM at 10 and 49.

Commerce has also applied this practice in cases outside the chemical sector. In *Chassis from Thailand*, Commerce examined inputs of several different steel products provided for less than adequate remuneration (hot-rolled sheet, cut-to-length plate and sheet, and angles, beams, channels, and tubes) as a single group, with a single determination regarding a financial contribution from an authority and specificity. *See Certain Chassis and Subassemblies Thereof From the Kingdom of Thailand: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 90 Fed. Reg. 36,132 (Dep't Commerce Aug. 1, 2025) and accompanying preliminary decision memorandum at 7-12, 20-24. Similarly, in the 2022 annual review of *Wood Mouldings and Millwork Products from the People's Republic of China,* Commerce examined the Chinese government's provision of "coating and jointing" chemicals as a single program, even though the chemicals fell under seven separate Harmonized Tariff Schedule ("HTS") subheadings in three different HTS chapters. *Wood Mouldings and Millwork Products from the People's Republic of China: Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 15,816 (Dep't Commerce Mar. 5, 2024) and accompanying Preliminary Determination Memorandum at 22-29 and fn. 118, unchanged in *Wood Mouldings and Millwork Products from the People's Republic of China: Final Results and Partial Rescission of*

31

*Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 68,858 (Dep't Commerce Aug. 28, 2024).  *See also Multilayered Wood Flooring from the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 Fed. Red. 36,305 (Dep't Commerce June 16, 2022) and accompanying IDM at 9-10.

These cases show that even when inputs serve different functions in the production process, they can still be grouped together, and Commerce could have done likewise here.  In its initiation memorandum, Commerce attempted to distinguish *Wood Mouldings* by stating that "our approach … covered a limited number of chemicals that comprised one input into subject merchandise…."  NSA Initiation Memorandum at 3 (P.R. 38).  However, if grouping were justified to address a "limited number of chemicals," then the rationale for grouping is even stronger when dealing with a larger number of chemicals.

Moreover, this Court's jurisprudence provides that Commerce must investigate even when "the precise contours of the subsidy" remain unknown, such that it is not possible to delineate *a priori* with absolute precision which subsidized input a respondent used.  In *RZBC Group Shareholding Co. v. United States*, the petitioner alleged that respondents used subsidized calcium carbonate to make subject merchandise.  Calcium carbonate comes in two types, but the petitioner did not distinguish between them.  Commerce did not require a "separate and distinct allegation" for each type of possible input.  As the Court noted, "the petition directed its allegations at calcium carbonate generally," and despite "a degree of imprecision," the petition "accomplished … without question" its purpose of alerting Commerce to the likely existence of a subsidy.  *RZBC Group*, 100 F. Supp. 3d at 1295-96.

In sum, Commerce's refusal to investigate the provision of other chemical inputs for LTAR is contrary to its practice, and the agency failed to provide a reasoned explanation for deviating from this practice.  This constitutes another reason why this issue must be remanded.

**E.** **Commerce Improperly Understated Kukdo's Subsidy Rate By Refusing To Find Cross-Ownership Among Kukdo And Four Of Its Affiliates**

The record shows that four of Kukdo's affiliates in the Kukdo Group benefited from the same subsidy programs as Kukdo. *Contested Determination* IDM at Comment 13, pp. 68-72; Petitioner's First Case Brief at 12 (P.R. 487). The amount of those subsidies should have been incorporated into Kukdo's subsidy rate consistent with section 771(5)(C) of the Act, which provides that "{t}he determination of whether a subsidy exists shall be made . . . without regard to whether the subsidy is provided *directly or indirectly* on the manufacture, production, or export of merchandise." 19 U.S.C. § 1677(5)(C) (emphasis added). However, these subsidies were not subjected to the remedy of countervailing duties because Commerce erroneously determined that the companies in the Kukdo Group were not "cross-owned" within the meaning of 19 C.F.R. § 351.525.

### 1. The statute requires Commerce to examine the substance of control

In analyzing whether entities are cross-owned, Commerce's is not allowed to adopt a *per se* rule based solely on direct stock ownership. *See Nucor v. United States*, 698 F. Supp. 3d 1,310, 1,318 (Ct. Int'l Trade 2024) ("{C}ommon ownership is a fact-specific determination and calculating the percentage ownership of a company is not the end of the inquiry.") (internal quotation marks omitted). Direct stock ownership is merely one indicator of the real issue: control. The Court ruled in *Fabrique de Fer de Charleroi v. United States* that "{t}he primary consideration in attributing subsidies between two corporations is the *level of control*, or cross-ownership, existing between the companies." *Fabrique de Fer de Charleroi, SA v. United States*, 166 F. Supp. 2d 593, 600-601 (Ct. Int'l Trade 2001) (emphases added).

Regarding control, the Statement of Administrative Action to the Uruguay Round Agreements Act cautioned that "*{t}he traditional focus on control through stock ownership fails to address adequately modern business arrangements*, which often find one firm 'operationally

33

in a position to exercise restraint or direction' over another even in the absence of an equity relationship.  A company may be in a position to exercise restraint or direction, for example, *through corporate or family groupings. . . .*"  *Statement of Administrative Action Accompanying the Uruguay Round Agreements Act*, H.R. Doc. No. 103-316 (1994) at 838 (emphasis added).

Indeed, Commerce has recognized repeatedly the reality that control can be exercised without majority direct stock ownership.  For example, Commerce stated in the preamble to its 2024 regulatory amendments that, "Commerce's experience since 1998 has shown that other factors, such as certain familial relationships, may, in particular circumstances, warrant a finding of cross-ownership, with or without a majority voting ownership interest."  *Regulations Enhancing the Administration of the Antidumping and Countervailing Duty Law Trade Remedy Laws: Proposed Rule,* 89 Fed. Reg. 57,286, 57,316 n. 175 (Dep't Commerce July 12, 2024) (citing *Coated Free Sheet Paper from Indonesia: Final Affirmative Countervailing Duty Determination*, 72 Fed. Reg. 60,642 (Dep't Commerce Oct. 25, 2007) ("*Coated Free Sheet Paper from Indonesia*") and accompanying Issues and Decision Memorandum), *unchanged in Regulations Enhancing the Administration of the Antidumping and Countervailing Duty Trade Remedy Laws*, 89 Fed. Reg. 101,694 (Dept' Commerce Dec. 16, 2024) (promulgating final rule).

Commerce's regulations state that "{c}ross-ownership exists between two or more corporations where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets.  *Normally*, this standard will be met where there is a majority voting ownership interest between two corporations or through common ownership of two (or more) corporations."  19 C.F.R. § 351.525(b)(6)(vi) (emphasis added).  "Normally" does not mean "always," or that cross-ownership can only be found when majority ownership exists.  *See Jiangsu Senmao Bamboo and Wood Indus. Co. v. United States*, 769 F. Supp. 3d 1344, 1367 (Ct. Int'l Trade 2025).  *See also Nucor*, 698 F. Supp. 3d at 1319.

Commerce must apply its regulation in a manner that is consistent with the statute, giving due consideration to the reality of how "modern business arrangements" in practice may afford control in a given country and industry.

### 2.    Commerce failed to follow its established practice

Commerce acknowledged in the *Preliminary Determination* that the regulation's definition of cross-ownership "establishes a test that involves an evaluation of the totality of the circumstances, which can include board membership composition and family relationships." PDM at 9-10 (P.R. 351).  In *Live Swine from Canada*, Commerce identified as particularly relevant circumstances whether a group of companies are organized into one production system dedicated primarily to the production and sale of a product; whether one company owns a plurality interest in another company; whether companies within the group are contractually bound through long-term purchase and/or supply contracts; whether managerial services are provided by one of the companies to the others; whether the companies market products through each other; and whether companies provide accounting and management services to other companies within the group.  *Live Swine from Canada: Final Negative Countervailing Duty Determination*, 70 Fed. Reg. 12,186 (Dep't Commerce Mar. 11, 2005) ("*Live Swine*") and accompanying IDM at 2-7.  Commerce applied the *Live Swine from Canada* framework in *Coated Free Sheet Paper from Indonesia.* 72 Fed. Reg. 60,642, IDM at p. 8 and Comment 3, pp. 54-55.

All of the *Live Swine* factors were present in this case, and each pointed to the group being under common control by Kukdo's largest beneficial shareholders, the Lee family:

- o  *Organization into one production system*: Kukdo is highly dependent on its affiliates for its operations.  Kukdo Corporation provides joint management of the group of affiliates, provides a common headquarters, purchases and sells the products of the group, and wholly owns two subsidiaries (Jung Do and New Seoul) that are highly dependent on sales of chemicals to Kukdo.  Kukdo accounted for approximately [    ] percent of Jung Do's and [    ] percent of New Seoul's sales

during the POI.  *See* Letter from Arnold & Porter, "Affiliated Companies Questionnaire Response," dated May 31, 2024 ("Kukdo ACQR") at 4-5 (P.R. 88, C.R. 47).

o *Ownership by one company of a plurality of another*: The Lee Family [

] percent of the voting shares in Kukdo.  This makes the Lee Family alone the single largest (*i.e.*, plurality) shareholder of Kukdo.  *See* Petitioner's First Case Brief at Exhibit 3 and sources cited therein (P.R. 487, C.R. 677).  Moreover, Kukdo's 2022 income tax return (filed in 2023) lists [

].  Letter from Arnold & Porter, "Kukdo Chemical's Section III Questionnaire Response," dated July 3, 2024 ("Kukdo Section III QR"), at Exhibit GEN-3 (Kukdo's 2022 Tax Return), [                    ] (P.R. 194, C.R. 271).

o *Long-term purchase and/or supply contracts*: Ildo manufactures the "raw materials used in the production of subject products such as bisphenol F and phenol novolac (both of which are raw materials in the production of epoxy resin)," under a [                    ] toll processing agreement between Nittetsu Chemical & Materials, Co., Ltd. ("NSCM") and Kukdo.  *See* Kukdo ACQR at 5 (P.R. 88, C.R. 47); *see also* Letter from Arnold & Porter, Kukdo ACSQR at 9-10 and Exhibit 6-D (P.R. 231-232, C.R. 316 & 320).  The joint venture's [

].  *See* Letter from Arnold & Porter, "Kukdo Chemical's Affiliated Companies Supplemental Questionnaire Response," dated July 16, 2024 ("Kukdo ACSQR") at Exhibit 6-D (Article 2) (P.R. 232, C.R. 320).  The JV Agreement [

].  *Id*. (Articles 2(1) and 10) (P.R. 232, C.R. 320).  Ildo and Kukdo share the Iksan production facility, including electricity, in Jeollabuk-do, Korea.  *See* Kukdo Section III QR at I-27 (P.R. 193).  Ildo toll processes [

].  *See* Letter from Arnold & Porter, "Kukdo Chemical's Affiliated Companies Supplemental Response," dated Aug. 2, 2024, in Volume II at Exhibit FX-3 (Ildo 2023 financial statements at Income Statement and Note 20.2 (P.R. 271, C.R. 381**).

o *Shared managerial/accounting and management services*: Kukdo stated that Kukdo Corporation's business activities include "affiliates management."  *See* Kukdo ACQR at Exhibit 3 (P.R. 89).  [

].  *See* Kukdo ACSQR at Exhibit 3 (P.R. 232, C.R. 320) and Kukdo Section III QR at 1 (P.R. 193).

o *Shared marketing*: The product brochure of Kukdo's wholly owned affiliate and subject merchandise producer, Kukdo Finechem Co., Ltd., notes that it has been a member of the "Kukdo Group" since 2008 and has received a global sales network and technology support from the Kukdo Group.  *See* Kukdo Section III QR in Vol. II, Exhibit GEN-1 at 2 (P.R 205).

Commerce reaffirmed the significance of the *Live Swine* factors in a determination regarding Taiwan, issued *on the same day* and concerning *the same subject merchandise* as the *Contested Determination* in this case. *Certain Epoxy Resins from Taiwan: Amended Final Countervailing Duty Determination*, 90 Fed. Reg. 22,235 (Dep't Commerce May 27, 2025) and accompanying IDM at Comment 7 (citing *Live Swine from Canada* and *Coated Paper from Indonesia* in explaining that Commerce's analysis of cross-ownership would "look beyond ownership to the totality of evidence on the record").

Here, however, Commerce denied that *Live Swine from Canada* and *Coated Paper from Indonesia* reflected an "established framework." Commerce stated that, "{s}ince every case's fact pattern is unique, Commerce is not beholden to the analysis criteria chosen in *Live Swine from Canada* or {*Coated Free Sheet Paper*} *from Indonesia* in determining the totality of factors…." *Contested Determination* IDM at Comment 13, p. 70. This is not a reasonable explanation of Commerce's choice. The Federal Circuit has held that, "{i}f Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom." *NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1328 (Fed. Cir. 2009). Here, in two cases about the same products, addressing the same issue, published on the same day, Commerce made diametrically opposed statements regarding its methodology. Thus, Commerce failed to satisfy its duty to "be consistent in its statement of the applicable standard and its application of that standard." *Nucor Corp. v. United States*, 653 F. Supp. 3d at 1303 (Ct. Int'l Trade 2023).

### 3. Commerce mischaracterized the significance of a plurality shareholding in the presence of diversified ownership

Petitioner noted the pronounced role the Lee family plays in Kukdo's operations, stating "{t}here is no evidence on the record of any other natural person, or group of natural persons, who have levels of shareholding, seats on the Board of Directors of Kukdo, and management

responsibility comparable to the Lee family."  Petitioner's First Case Brief at 22 (P.R. 487).  In

the *Contested Determination* IDM, Commerce responded that, "record evidence indicates that

Kukdo Chemical is not controlled by any entity, is a publicly-traded company, and does not have

a single shareholder with a majority or large minority ownership interest.  The petitioner's claim

rests on an assumption that another other entity must control Kukdo, however Kukdo has

diversified ownership where no single entity may exert control to the extent that it meets

Commerce's cross-ownership threshold."  *Contested Determination* IDM at Comment 13, p. 72.

This explanation fails to account for key facts in the record regarding ownership and

control over Kukdo.  [



].  *See* Petitioner's First Case Brief at

Exhibit 1 (P.R. 487, C.R. 677) ([

]).  [                                ] Commerce described in proposing its CVD regulations

when it stated that, "if the remaining shares are widely held, then a large minority voting interest

would be sufficient to find cross ownership."  *Countervailing Duties: Notice of Proposed*

*Rulemaking and Request for Public Comments*, 62 Fed. Reg. 8,818, 8,845 (Dep't Commerce

Feb. 26, 1997).

In the *Contested Determination*, Commerce cited *Nantong Uniphos Chemicals Co. v.*

*United States*, 2018 Ct. Intl. Trade LEXIS 86.  However, that case confirms that, when most of

the remaining shares are widely held, a plurality voting interest is [            ] sufficient for

cross ownership.  In *Nantong*, Nantong contended that Commerce should have found that it was

cross-owned with respondent Wujin, which would have resulted in *de minimis* subsidy rates for

both companies.  Wujin was Nantong's *second*-largest shareholder and had three seats on

Nantong's eight-person board.  The *largest* shareholder also had three seats.  The Court noted

that a balance of power among just a few large shareholders with roughly equal ownership

interests was different from a case with diversified ownership.  The Court stated that,

"{a}lthough, for example, a forty percent minority shareholder might wield *de facto* control over

the use or disposition of corporate assets where all other shareholders hold a two percent stake,

such power is not clearly found where there are only three minority shareholders, and all hold

significant percentage stakes."  *Nantong Uniphos Chemicals Co. v. United States*, 2018 Ct. Intl.

Trade LEXIS at *9.  [



].  Kukdo

ACSQR at Exhibit 3-C-3 (minutes [                                ]). (P.R. 232, C.R. 318).

### 4.    Commerce wrongly disregarded evidence of the Lee family [                    ]

#### a.    The Lees had [                                    ]

The record establishes that Lee family members, [



] at Kukdo's annual

shareholder meetings, [



].  *See* Kukdo ACQR at Exhibits 1, 2, and

4(1) (P.R. 89, C.R. 48) and Kukdo ACSQR at 5 and Exhibit 3-C-3 (P.R. 231-232, C.R. 318); *see*

*also* SAA at 838.  Kukdo's Shareholder Meeting Minutes show that at meetings on Mar. [    ],

2023, and on Mar. [    ], 2024, [



].  *See* ACSQR at Exhibit 3-C-3 (P.R. 232, C.R.

NON-CONFIDENTIAL VERSION;
CONFIDENTIAL INFORMATION IN
BRACKETS HAS BEEN DELETED

318).[5]  Consequently, the Lee family [                                    ] at

these meetings, [

                              ].  *Id*. at [                    ].  (P.R. 232, C.R. 318).

In an analysis memorandum cited in the *Contested Determination* IDM, Commerce

dismissed this evidence [


                      ] does not indicate that the Lee family [                              ]

during the POI.  We note that Kukdo's [


                              ]"  Commerce, "Final Determination Analysis

Memorandum for Kukdo Chemical Co., Ltd. and Kukdo Finechem Co., Ltd.," dated Mar. 28,

2025 ("Kukdo Final Analysis"), at 2 (P.R. 538, C.R. 704).  In taking this position, Commerce

impermissibly reverted to a *per se* majority stock ownership requirement, essentially stating that

it will disregard evidence that [

                                                      ].

**b.    Commerce unreasonably disregarded evidence regarding meetings of Kukdo's Board of Directors.**

Kukdo provided minutes from four quarterly meetings of Kukdo's Board of Directors in

2023.  [

---

[5] The minutes of the shareholder meeting state that [

                              ].  At the shareholder

meeting [

                              ].  [

                      ].  *See* Kukdo ACQR Exhibits 1 and 2 (P.R. 89, C.R. 48).

]  *See* Kukdo's Letter, "Kukdo Affiliated Companies Supplemental

Questionnaire Response {to Question 3.d}" dated July 17, 2024, at Exhibit 3-D-1 ([      ]), 3-D-2

([                    ]) and 3-D-3 ([                         ]) (P.R. 233, C.R.

322).  Of particular note, on [             ], the Board [

]  *Id.* at Exhibit 3-D-3

(emphasis added) (P.R. 233, C.R. 322).  [



].

Commerce dismissed the evidence from the Board minutes, stating there was no record

evidence indicating that [

]  "Kukdo Final Analysis" at 2 (P.R. 538, C.R. 704).

Commerce essentially stated that [

].  Such an approach

misconceives the nature of control, which, in "modern business arrangements," can be [



] is unsurprising: Kukdo's

Board of Directors is dominated by inside directors (six of nine), with four of the nine directors

holding executive positions within the company, and two other directors [

].  *See* Kukdo ACQR at Exhibit 2 (showing that Sichang Lee,

Yeonjin Heo, Jinbae Jeong, and Kyungup Won serve as either Kukdo's CEOs or CFOs; Yongho

Kim is [                                        ]; and Kajiwara

Yozo is [                         ]).  (P.R. 89, C.R. 48).

Rather than addressing the substantial record evidence of [                    ], Commerce again impermissibly invoked a *per se* rule.  Commerce found "that the Lee family similarly could not *singlehandedly* control the board of directors because Sichang Lee was one out of nine Kukdo Chemical board members during the POI and Kukdo Corporation could not, either directly through its shares or indirectly through a "golden share" or special voting right, *singlehandedly* select the Kukdo Chemical board of directors."  *Contested Determination* IDM at Comment 13, p. 72 (emphasis added).  Requiring that a shareholder have the power to act "singlehandedly" is functionally indistinguishable from requiring that a shareholder own a majority of the stock, a prohibited *per se* rule.

Commerce failed to follow its established practice, impermissibly applied a *per se* rule regarding shareholding amounts, ignored evidence that Kukdo's self-identified [

                        ], and otherwise failed to address the reality of control in modern business arrangements.  Consequently, its determination regarding cross-ownership is not supported by substantial evidence and is otherwise not in accordance with law.

### F.    If Kumho's Or Kukdo's Subsidy Rate Is Amended On Remand, Commerce Also Should Recalculate The "All Others" Rate

In the *Contested Determination*, the "all others" rate assigned to exporters other than Kumho and Kukdo was understated, because the rate was based on the final rates calculated for Kumho and Kukdo.  If this litigation results in revisions to Kumho's and/or Kukdo's subsidy rate consistent with Petitioner's arguments, the "all others" rate should be recalculated in accordance with law.

## VI.    CONCLUSION AND PRAYER FOR RELIEF

For the reasons set forth above, the Petitioner requests that the Court enter judgment on the administrative record in its favor and remand the *Contested Determination* with instructions for Commerce to: (i) adjust the benchmark used to measure the benefit from provision of

electricity for LTAR to include a rate of return sufficient to recoup KEPCO's losses; (ii) adjust the benchmark similarly for losses of KEPCO's wholly-owned subsidiaries; (iii) adjust for regional market distortion the benchmark used to determine the benefit from provision of ECH for LTAR; (iv) initiate an investigation of provision for LTAR of chemical inputs from China other than ECH and BPA; (v) re-examine whether Kukdo and its affiliates are cross-owned and attribute subsidies accordingly; and (vi) recalculate the "All Others" subsidy rate to the extent necessary based on changes relating to the other issues raised in this action.

Respectfully submitted,

December 2, 2025
Date

/s/ Stephen J. Orava
Stephen J. Orava
Patrick J. McLain
Worth S. Anderson

KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006-4706
(202) 737-0500
sorava@kslaw.com

Counsel for U.S. Epoxy Resin Producers
Ad Hoc Coalition

**CERTIFICATE OF COMPLIANCE**
**WITH WORD COUNT LIMITATIONS**

Pursuant to paragraph 2(B)(2) of the U.S. Court of International Trade's *Standard*

*Chambers Procedures*, the undersigned certifies that this brief complies with the word count

limitations set forth in the Court's scheduling order.  Exclusive of the exempted portions, as

provided in paragraph 2(B)(1), this brief contains 13,917 words.  In preparing this certificate, the

undersigned has relied upon the word count feature of the word-processing system used to

prepare the submission.

/s/ *Stephen J. Orava*
Stephen J. Orava

KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC  20006-4706
(202) 737-0500
sorava@kslaw.com

*Counsel for U.S. Epoxy Resin Producers*
Ad Hoc *Coalition*

December 2, 2025

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| KUMHO P & B CHEMICALS INC., ) | |
| Plaintiff, ) | |
| ) | |
| and ) | |
| ) | |
| KUKDO CHEMICAL CO., LTD., and U.S. ) | |
| EPOXY RESIN PRODUCERS *AD HOC* ) | |
| COALITION, ) | |
| Consolidated Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | **NON-CONFIDENTIAL VERSION** |
| Defendant, ) | |
| and ) | **Consol. Court No. 25-cv-00143-gsk** |
| ) | |
| U.S. EPOXY RESIN PRODUCERS *AD HOC* ) | |
| COALITION, ) | |
| Defendant-Intervenor, ) | |
| ) | |
| and ) | |
| ) | |
| KUMHO P & B CHEMICALS INC., and KUKDO ) | |
| CHEMICAL CO., LTD. ) | |
| Consolidated Defendant-Intervenors. ) | |

## <u>ORDER</u>

Upon consideration of the Rule 56.2 Motion for Judgment on the Agency Record of the

U.S. Epoxy Producers *Ad Hoc* Coalition, it is hereby:

ORDERED that the motion is granted; and it is further

ORDERED that this case is remanded to the U.S. Department of Commerce with

instructions to reconsider its final determination and recalculate respondents' subsidy rates

1

consistent with the Court's opinion.


Dated: _____                          _____

                                            Gary S. Katzmann, Judge