**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE**

|  |  |
|---|---|
| KUMHO P & B CHEMICALS INC.,<br>　　　　　　Plaintiff,<br><br>　　　and<br><br>KUKDO CHEMICAL CO., LTD., and U.S.<br>EPOXY RESIN PRODUCERS *AD HOC*<br>COALITION,<br>　　　　　　Consolidated Plaintiffs,<br><br>　　v.<br><br>UNITED STATES,<br>　　　　　　Defendant,<br>　　　and<br><br>U.S. EPOXY RESIN PRODUCERS *AD HOC*<br>COALITION,<br>　　　　　　Defendant-Intervenor,<br><br>　　　and<br><br>KUKDO CHEMICAL CO., LTD.<br>　　　　Consolidated Defendant-Intervenor. | **NON-CONFIDENTIAL VERSION**<br><br>**Consol. Court No. 25-cv-00143-gsk**<br><br>**Business Proprietary Information<br>Removed from Pages 10, 20, and 22.** |

**U.S. EPOXY RESIN PRODUCERS *AD HOC* COALITION'S<br>REPLY BRIEF IN SUPPORT OF RULE 56.2 MOTION FOR<br>JUDGMENT UPON THE AGENCY RECORD**

Stephen J. Orava<br>Patrick J. McLain<br>Worth S. Anderson<br>KING & SPALDING LLP<br>1700 Pennsylvania Avenue, NW<br>Washington, DC 20006–4706<br>(202) 737–0500<br><br>*Counsel for U.S. Epoxy Resin Producers*<br>Ad Hoc *Coalition*

July 27, 2026

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................... 1

II.   SUMMARY ............................................................................................ 1

III.  ARGUMENT .......................................................................................... 3

    A.    Commerce's Calculation Of Electricity For LTAR Subsidies Failed To Account Fully For Losses Incurred By KEPCO ........................................ 3

        1.    The Government conflates constructing a benchmark with allocating a benefit ................................................................................. 3

        2.    Federal Circuit precedent shows Commerce acted unlawfully .................... 4

    B.    Commerce's Calculation Of Electricity For LTAR Subsidies Failed To Account For Losses By KEPCO's Subsidiaries ........................................ 6

        1.    Petitioner properly raised this issue before the agency ........................... 6

        2.    The Government's upstream subsidy argument does not rebut Petitioner's benchmark claim ....................................................... 7

    C.    Commerce's Calculation Of ECH For LTAR Subsidies Used An Improper Tier 1 Benchmark That Did Not Account For Regional Market Distortions Caused By The Chinese Government ........................................ 9

        1.    The record shows the Asian ECH market is distorted by Chinese government subsidies ....................................................... 9

        2.    Commerce measured distortion arbitrarily ....................................... 10

        3.    The "novelty" of the transnational subsidy context does not excuse Commerce from complying with its own regulations ...................... 12

        4.    Petitioner's argument was timely ................................................... 13

    D.    Commerce Unreasonably And Unlawfully Refused To Investigate Other Chemical Inputs Provided For LTAR ................................................ 14

        1.    Commerce invoked a higher standard than the statute allows .................. 14

        2.    Commerce improperly demanded information that was not reasonably available to Petitioner ................................................ 17

        3.    The exhaustion doctrine does not apply; Commerce acted arbitrarily and capriciously ................................................................... 18

E.    Commerce's Cross-Ownership Determination Effectively Applied An Improper Majority Ownership Requirement ...........................................................19

    1.    Commerce's analysis was contrary to its established standard for determining cross-ownership ........................................................................19

    2.    Commerce's simultaneous Taiwan determination confirms that its cross-ownership determination is arbitrary................................................21

F.    The "All Others" Rate Must Be Recalculated ........................................................23

IV.    CONCLUSION...................................................................................................................23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*BlueScope Steel, Ltd. v. United States*,
719 F. Supp. 3d 1357 (Ct. Int'l Trade 2024) .........................................................................22

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962).............................................................................................................12

*Consol. Bearings Co. v. United States*,
358 F.3d 997 (Fed. Cir. 2003)...............................................................................................7

*Cornerstone Chemical Co. v. United States*,
Slip Op. 26–64 (Ct. Int'l Trade June 17, 2026) ...................................................................10

*In re Cysive, Inc., Shareholder Litigation*,
836 A.2d 531 (Del. Ch. 2003)...............................................................................................20

*DAK Americas LLC v. United States*,
456 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) .......................................................................16

*Dongkuk Steel Mill Co., Ltd. v. United States*,
567 F. Supp. 3d 1359 (Ct. Int'l Trade 2022) .......................................................................13

*Habaş Sinae Ve Tibbi Gazlar v. United States*,
459 F. Supp. 3d 1341 (Ct. Int'l Trade 2020) ..................................................................12, 13

*Habaş Sinae Ve Tibbi Gazlar v. United States*,
536 F. Supp. 1333 (Ct. Int'l Trade 2021) .......................................................................12, 13

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*,
463 U.S. 29 (1983).................................................................................................................14

*Nantong Uniphos Chemicals Co. v. United States*,
2018 Ct. Intl Trade LEXIS 86...........................................................................................19, 20

*Nucor Corp. v. United States*,
600 F. Supp. 3d 1225 (Ct. Int'l Trade 2022) .......................................................................17

*Nucor Corp. v. United States*,
653 F. Supp. 3d 1295 (Ct. Int'l Trade 2023) ...................................................................17, 21

*Nucor Corp. v. United States*,
698 F. Supp. 3d 1310 (Ct. Int'l Trade 2024) .......................................................................19

*Nucor Corp. v. United States*,
772 F. Supp. 3d 1340 (Ct. Int'l Trade 2025) .......................................................................17

*Nucor Corp. v. United States*,
    927 F.3d 1243 (Fed. Cir. 2019)......................................................................4, 5, 7

*RHP Bearings Ltd. v. United States*,
    288 F.3d 1334 (Fed. Cir. 2002)....................................................................10, 19, 23

*Royal Thai Gov't v. United States*,
    31 C.I.T. 1213, 502 F. Supp. 2d 1334 (2007)...........................................................23

*SolarWorld Americas, Inc. v. United States*,
    125 F. Supp. 3d 1318 (Ct. Int'l Trade 2015) ..........................................................14

*SolarWorld*, *RZBC Group Shareholding v. United States*,
    100 F. Supp. 3d 1288 (Ct. Int'l Trade 2015) ..........................................................15

*United States v. L.A. Tucker Truck Lines, Inc.*,
    344 U.S. 33 (1952)......................................................................................6

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1950).....................................................................................21

**Statutes**

19 U.S.C. § 1677–1(a) ...........................................................................................7

**Regulations**

19 C.F.R. § 351.301 .............................................................................................13

19 C.F.R. § 351.309 .............................................................................................13

19 C.F.R. § 351.309(c)(2).......................................................................................13

19 C.F.R. § 351.511(a)(2) .......................................................................................12

19 C.F.R. § 351.511(a)(2)(i)-(ii) ...............................................................................12

19 C.F.R. §351.511(a)(2)(ii).....................................................................................12

19 C.F.R. § 351.511(a)(2)(iii)....................................................................................3

19 C.F.R. § 351.511(c).............................................................................................3

**Administrative Materials**

*Certain Epoxy Resins from the People's Republic of China: Final Affirmative
    Countervailing Duty Determination and Final Affirmative Determination of
    Critical Circumstances*, 90 Fed. Reg. 14,628 (Dep't Commerce Apr. 3, 2025) ......................9

*Certain Epoxy Resins From the Republic of Korea: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination,* 90 Fed. Reg. 14,605 (Dep't Commerce Apr. 3, 2025) ....................................1

*Certain Epoxy Resins from Taiwan: Amended Final Countervailing Duty Determination*, 90 Fed. Reg. 22,235 (Dep't Commerce May 27, 2025) ................................21

*Countervailing Duties: Final Rule*, 63 Fed. Reg. 65,348, 65,377 65,378 (Dep't Commerce Nov. 25, 1998)........................................................................................3, 11

**Other Authorities**

*Statement of Administrative Action Accompanying the Uruguay Round Agreements Act*, H.R. Doc. No. 103–316 (1994) ...............................................................................20, 21

## I.     INTRODUCTION

The U.S. Epoxy Resin Producers *Ad Hoc* Coalition ("Petitioner") respectfully submits this reply brief in support of its Motion for Judgment on the Agency Record and in opposition to the response briefs filed by Defendant United States and by Consolidated Defendant-Intervenor Kukdo Chemical Co., Ltd. ("Kukdo").  For the reasons explained in Petitioner's opening brief, and as further detailed below, the Court should remand with instructions for the Department of Commerce ("Commerce") to reconsider certain aspects of the challenged final determination. *See Certain Epoxy Resins From the Republic of Korea: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination,* 90 Fed. Reg. 14,605 (Dep't Commerce Apr. 3, 2025) (the "*Contested Determination*") and accompanying Issues and Decisions Memorandum (Mar. 28, 2025) (the "*Contested Determination* IDM").

## II.     SUMMARY

This appeal presents five issues requiring remand.  First, Commerce unlawfully understated the electricity for less than adequate remuneration ("LTAR") benefit by constructing a benchmark that ignored accumulated losses and debt of the Korea Electric Power Corporation ("KEPCO").  The Government treats those losses as prior-period benefits, but Petitioner's argument concerns benchmark construction: a market-based electricity price during the POI would have reflected the need to recover accumulated losses and maintain a rate of return sufficient to ensure future operations.  Commerce unreasonably ignored sustained losses that no private seller could endure.

Second, Commerce failed to account for losses incurred by KEPCO's generation subsidiaries when constructing the electricity benchmark.  The point is not that the subsidiaries conferred a separate subsidy on KEPCO.  It is that their losses are part of the cost structure a market participant would have to recover to supply electricity sustainably.  Petitioner presented

1

that benchmark argument, thereby preserving it for judicial review.  Commerce and the Government wrongly recharacterized Petitioner's argument as an upstream subsidy claim. Commerce never addressed the issue Petitioner actually presented, rendering its determination unsupported by substantial evidence.

Third, Commerce improperly used a distorted Tier 1 benchmark for epichlorohydrin ("ECH").  The record showed that Chinese government subsidies and overcapacity depressed ECH prices throughout the integrated Asian market.  Rather than analyze that regional distortion, Commerce focused narrowly on the share of Chinese imports within Korea and ignored the mechanism through which regional overcapacity affects Korean prices.  Commerce dismissed that evidence as untimely and insufficient, but Petitioner timely submitted the relevant facts and properly raised the legal argument in its case brief.

Fourth, Commerce unlawfully refused to investigate other Chinese chemical inputs provided for LTAR.  Petitioner alleged a single program through which government-controlled Chinese producers supplied chemical inputs to Korean epoxy resin producers at subsidized prices.  Commerce accepted that theory for ECH and bisphenol A ("BPA") but demanded respondent-specific information for other inputs that was not reasonably available to Petitioner. That imposed an input-specific pleading burden not found in the statute.

Fifth, Commerce applied an unlawful rule in its cross-ownership analysis.  Although Commerce acknowledged that majority ownership is not required, it dismissed evidence of control because the Lee family could not "singlehandedly" control the relevant entities.  That standard is functionally indistinguishable from requiring majority ownership.  Commerce compounded that error by applying a different analytical framework in its same-day

2

determination under the same regulation regarding the same product from Taiwan, citing precedent there that it dismissed as irrelevant here.

Because each error affected subsidy calculations, the "all others" rate must be recalculated following remand.

## III.    ARGUMENT

### A.    Commerce's Calculation Of Electricity For LTAR Subsidies Failed To Account Fully For Losses Incurred By KEPCO

#### 1.    The Government conflates constructing a benchmark with allocating a benefit

The Government argues that incorporating losses KEPCO incurred prior to the period of investigation ("POI") would violate 19 C.F.R. § 351.511(c), which provides that Commerce "will normally allocate (expense) the benefit to the year in which the benefit is considered to have been received." Def. Br. at 47–48. However, that provision is not relevant to the issue at hand. Section 351.511(c) governs benefit allocation, meaning the assignment of a subsidy benefit to a particular period *after* the benefit has been measured. Petitioner did not ask Commerce to allocate a pre-POI benefit to the 2023 POI. Rather, Petitioner's claim concerns construction of the benchmark that is used to measure the benefit during the POI – specifically, what price would be "consistent with market principles" under § 351.511(a)(2)(iii)?

In the preamble to its countervailing duty regulations, Commerce stated that to assess whether the government price was set in accordance with market principles, it would analyze such factors as "costs (including rates of return sufficient to ensure future operations). . . ." *Countervailing Duties: Final Rule*, 63 Fed. Reg. 65,348, 65,378 (Dep't Commerce Nov. 25, 1998). That inquiry requires assessing KEPCO's actual financial condition as it existed in 2023, including $154 billion in accumulated debt that KEPCO's own CEO called "difficult for a

3

company to withstand." Petition at Exhibit IX-18 (P.R. 16, 17). In other words, Commerce unreasonably treated the accumulated debt as irrelevant to its task of constructing a benchmark that would generate a rate of return sufficient to ensure future operations.

### 2.     Federal Circuit precedent shows Commerce acted unlawfully

*Nucor Corp. v. United States*, 927 F.3d 1243, 1249 (Fed. Cir. 2019), confirms the legal significance of KEPCO's sustained losses, but the record there differed in one critical respect: at that time "KEPCO more than fully covered its cost for the industry tariff applicable to {the Korean producer} respondents." *Id.* at 1247. In *Nucor*, Commerce determined that respondents had not received a preferential tariff rate relative to other users, and terminated its inquiry. The appellate panel unanimously rejected Commerce's broad legal theory. The majority stated:

> Under Commerce's broad theory, if the foreign government authority engaged in a uniform, non-discriminatory, tariffed practice of charging a price so low that the authority consistently lost large sums of money in a way no private seller could sustain, sales pursuant to that practice would not be properly viewed as 'for less than adequate remuneration.' That position is beyond any reasonable interpretation of the statute, or of its implementing regulation.

*Nucor Corp. v. United States*, 927 F.3d 1243, 1249 (Fed. Cir. 2019) (emphasis added).

The majority nevertheless sustained Commerce's ultimate determination because, unlike now, KEPCO was then recovering its costs and profitable. The dissent disagreed and would have remanded the entire case, concluding that Commerce had "taint{ed} the entirety of the underlying countervailing duty investigation." *Id.* at 1256 (Reyna, J., dissenting). Despite disagreeing on the ultimate result, the appellate panel *unanimously* agreed that Commerce could not ignore losses so large and sustained that no private seller could endure them. *Id.* at 1249.

4

The majority said their ruling was "significant but limited in constraining Commerce," *id.* at 1254, because Commerce retains "considerable prima facie leeway to make a reasonable choice within the permissible range, and properly justify its choice." *Id.* at 1255. The Government and Kukdo seize on this language while ignoring its import. *See* Def. Br. at 47-48; Kukdo Br. at 15. The Federal Circuit explicitly held that Commerce is *constrained* from ignoring losses that no private seller could sustain. Commerce retains leeway only so long as it makes a choice "within the permissible range," but ignoring consistent large losses is "beyond any reasonable interpretation of the statute," and therefore outside the permissible range. *Nucor*, 927 F.3d at 1249. Similarly, in this case, ignoring $154 billion in accumulated losses entirely was not a choice within the permissible range. Rather, it was a refusal to engage with the financial reality that, under *Nucor*, must be considered.

The Government also attempts to distinguish *Nucor* by noting that Commerce declined to apply the LTAR benchmark hierarchy in that case but applied it in the present case. *See* Def. Br. at 48. However, the statute's requirements, as interpreted by *Nucor*, apply regardless of the formalities of Commerce's analysis. A benchmark that excludes the accumulated losses necessary to determine whether prices are sustainable does not measure remuneration against market principles. Instead, it is the functional equivalent of not applying the LTAR hierarchy at all. Moreover, Commerce's approach creates a gap in the countervailing duty disciplines crafted by Congress: the benefit from pricing inadequate to recover accumulated losses can never be countervailed. In any given POI, Commerce will dismiss accumulated losses as "not contemporaneous."

5

**B.      Commerce's Calculation Of Electricity For LTAR Subsidies Failed To Account For Losses By KEPCO's Subsidiaries**

### 1.      Petitioner properly raised this issue before the agency

Commerce refused to adjust the electricity for LTAR benchmark to account for the losses of KEPCO's subsidiaries.  Pet. Br. at 13–17.  Petitioner raised this issue with specificity in its case brief before Commerce, which is the appropriate time under the agency's regulations.  Petitioner's First Case Brief at 10–11 (P.R. 487).  *See United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 36–37 (1952) (parties must raise issues "at the time appropriate under the agency's practice").

Nevertheless, the Government asserts that Petitioner failed to exhaust administrative remedies because "Petitioner failed to raise before Commerce its claim that electricity purchased by KEPCO did not fit into an upstream subsidy framework."  Def. Br. at 49.  Petitioner's case brief argued that Commerce should "revise KEPCO's reported electricity purchase costs to include additional costs that were not captured in the affiliated transfer prices."  Petitioner's First Case Brief at 11 (P.R. 487).  That was an argument about how to construct the benchmark, not a request to find a new subsidy.

It was Commerce, not Petitioner, that recharacterized the benchmark argument as an upstream subsidy allegation.  *See* IDM at Comment 3, p. 36.  Petitioner cannot reasonably be faulted for failing to preemptively rebut a mischaracterization Commerce had not yet made at the time Petitioner submitted its case brief.

Furthermore, even if Commerce's exhaustion argument were valid, the "pure question of law" exception would apply.  The Government argues that:

> This is not a pure question of law because it requires Commerce to analyze the relationship between KEPCO and its subsidiaries, the

> costs incurred by KEPCO's subsidiaries as compared to prices charged by the KPX, the nature of the upstream subsidy potentially provided to KEPCO, or how, if appropriate, to adjust the benchmark for electricity prices in light of any operating losses by the GENCOs.

The government's list of factual inquiries would be relevant only to an upstream subsidy allegation, a claim Petitioner has not made. They do not bear on the legal question that Petitioner actually presented: whether, as a matter of law, Commerce may refuse to consider subsidiary losses when constructing an electricity benchmark that is consistent with market principles. That question does not require the Court to resolve any disputed facts about an upstream subsidy. *See Consol. Bearings Co. v. United States*, 358 F.3d 997, 1003 (Fed. Cir. 2003).

### 2.     The Government's upstream subsidy argument does not rebut Petitioner's benchmark claim

The Government cites Petitioner's statement that "KEPCO's subsidiaries did indeed sell electricity at below cost rates" and that the subsidiaries' prices failed to recover their costs, as evidence of an upstream subsidy argument. Def. Br. at 51. Petitioner's statements explained why KEPCO's reported costs understated the true cost of supplying electricity, thus demonstrating the factual predicate for a benchmark adjustment. Explaining why the record evidence required a benchmark adjustment is not the same as alleging that KEPCO's subsidiaries provided a separate countervailable subsidy to an "input product" within the meaning of 19 U.S.C. § 1677–1(a).

The Government also claims that "{t}he question Petitioner poses, phrased another way, is whether 'the government sets the price of the input product so as to guarantee that the benefit provided with respect to the input product is passed through to the subject merchandise.'" Def. Br. at 52. This alleged rephrasing fundamentally mischaracterizes the issue. The point is that

7

the costs of subsidiaries' sales are not being recovered by the revenue those sales generate.  For any private market participant, avoiding or recovering losses is vital to continuing in business, even when losses are generated by subsidiaries.  A benchmark rate of return sufficient to ensure future operations must account for those losses.  *Nucor Corp. v. United States*, 927 F.3d at 1250 (holding that the requirement to determine adequacy of remuneration in relation to market principles "does not endorse the charging of consistently low prices that no market participant could sustain").

Finally, the Government states that Commerce's "overarching benefit analysis for the Korean electricity system has been upheld by both the Federal Circuit and the Court of International Trade," adding "Petitioner fails to show why this Court should come to a different conclusion."  Def. Br. at 53.  The cases the Government cites arose between 2013 and 2018, when KEPCO turned a profit and had an adequate rate of return.  As the record plainly establishes, that factual situation no longer exists.  *See* Pet. Br. at 9–11.  As of June 2023, KEPCO had reported nine consecutive quarterly operating losses.  (P.R. 16, 17).  Notably, the Government's brief does not make a single reference to the snowballing debts of KEPCO and its subsidiaries, despite the centrality of those debts to this case.  Nor has the Government shown that any of the prior court cases reviewing Korean electricity programs involved the issue now before the Court: whether losses of subsidiaries need to be addressed to construct a benchmark rate of return sufficient to ensure future operations.

The Government's upstream-subsidy framing misses the reason that subsidiary losses matter.  Petitioner is not asking Commerce to countervail a separate input subsidy from KEPCO's subsidiaries to KEPCO; it is asking Commerce to construct a benchmark that reflects the costs a market participant would have to recover to continue supplying electricity.  Because Commerce never addressed that benchmark question, it failed to provide a reasoned explanation,

8

rendering its choice unsupported by substantial evidence and otherwise not in accordance with law.

### C. Commerce's Calculation Of ECH For LTAR Subsidies Used An Improper Tier 1 Benchmark That Did Not Account For Regional Market Distortions Caused By The Chinese Government

Commerce correctly found that Kukdo and Kumho benefited from ECH provided for LTAR by the Chinese government.  However, Commerce understated the benefit by using a distorted Tier 1 benchmark from within South Korea when it should have used a Tier 2 world price benchmark.  The Government and Kukdo offer three defenses of Commerce's choice: that Petitioner's argument was untimely, that the evidence of distortion was deficient, and that the "novelty" of the transnational subsidy context excuses Commerce from applying its own benchmark hierarchy.  None withstands scrutiny.

#### 1. The record shows that the Asian ECH market is distorted by Chinese government subsidies

The record establishes that the Korean ECH market is distorted, not because of the volume of Chinese imports into Korea standing alone, but because the massive, government-driven overcapacity in China has depressed ECH prices across the entire Asian region.  Notably, neither the Government nor Kukdo identify any record evidence suggesting that the Korean market had distinct pricing dynamics from the rest of the region.

In its parallel countervailing duty investigation of epoxy resins from China, Commerce found nearly 55 percent subsidization of ECH provided to Chinese epoxy resin producers. *Certain Epoxy Resins from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 90 Fed. Reg. 14,628 (Apr. 3, 2025).  As this Court recently confirmed when it remanded Commerce's refusal to find that Chinese imports created a particular market situation in the melamine market

9

NON-CONFIDENTIAL VERSION: PROPRIETARY INFORMATION IN BRACKETS HAS BEEN DELETED

in Turkey, subsidization in one country may cause far-reaching distortions. A countervailing duty "represents—subsidization of the manufacture, production, or export of merchandise," which "happens in the country of origin, not in the recipient nation." *Cornerstone Chemical Co. v. United States*, Slip Op. 26–64, at 16 (Ct. Int'l Trade June 17, 2026). A "subsidy is baked into the price" wherever subsidized products are sold. *Id.* (quoting *BYD (H.K.) Co. v. United States*, 785 F. Supp. 3d 1359, 1378 (Ct. Int'l Trade 2025)). Given the record evidence of Chinese ECH distorting prices throughout Asia, Commerce cannot reasonably find that Chinese ECH is subsidized at a rate of nearly 55 percent and simultaneously refuse to consider whether those subsidies distort ECH prices in Korea in this proceeding.

### 2. Commerce measured distortion arbitrarily

The Government and Kukdo attempt to justify Commerce's determination by citing the percentage of Korean ECH consumption accounted for by Chinese and Thai imports. Def. Br. at 56–57; Kukdo Br. at 20–21. However, Commerce failed to provide a reasoned explanation for its finding that the Chinese/Thai import market share was "minor." *See* IDM at Comment 20, pp. 94–95. The arbitrary nature of Commerce's decision is underscored by the fact that it found distortions [                                    ] import penetration in other cases. *See* Pet. Br. at 20–21 (citing *Forged Steel Fittings* (28 percent); *Cast Iron Soil Pipe Fittings* (36 percent); *Passenger Vehicle Tires* (31.61 percent); *Coated Paper* (33.1 and 36.68 percent)). Commerce did not explain why it deviated from its approach in those cases. *See* IDM at Comment 20, pp. 93–94. Instead, the Government states that even if Commerce had combined Korea's imports from China and Thailand, "such a combination would not have been *a majority share* of Korea's ECH consumption." Def. Br. at 56 (emphasis added). The Government does not attempt to explain how, in light of Commerce's other cases, requiring a majority share of consumption here

10

is "treating like situations" the same.  *RHP Bearings Ltd. v. United States*, 288 F.3d 1334, 1337 (Fed. Cir. 2002).

The preamble to Commerce's countervailing duty regulations explains that "government involvement in a market may have some impact on the price of the good or service in that market" and that "such distortion will normally be minimal unless the government provider constitutes a majority or, in certain circumstances, a substantial portion of the market." 63 Fed. Reg. at 65,377 (emphasis added).  The "in certain circumstances" qualifier clarifies that a government-provided good may cause distortions while holding a market share of less than 50 percent, and Commerce has affirmed this proposition in the determinations cited above.

Moreover, the relevant inquiry is whether government involvement distorts *prices*, not merely whether import volume exceeds a particular percentage of domestic consumption.  The record shows that Chinese overcapacity depressed ECH prices region-wide, including prices charged by non-Chinese sellers in Korea, because prices in the highly integrated Asian ECH market move together.  Pet. Br. at 19–21; New Subsidy Allegations at Exhibit 2A (P.R. 281, C.R. 426).  The Government does not identify any contradictory evidence.  Nor does it identify any record evidence suggesting that the Korean market had pricing dynamics distinct from those in the interconnected Asian region.  Commerce's exclusive focus on the volume of Chinese imports *within Korea* ignored the mechanism by which the distortion actually operates: massive, subsidized overcapacity in China that sets the marginal price for the entire region and depresses prices for all sellers.  Commerce's failure to engage meaningfully on this issue means that its determination is unsupported by substantial evidence.

Kukdo asserts that Chinese exports of ECH are insufficient to have distortive effects and that European origin ECH sold for similar prices.  Kukdo Br. at 21-22.  The Contested Final

11

Determination makes no reference to either argument.  *See* Contested Determination IDM at 93-95.  Commerce's actions may be upheld only "on the same basis articulated in the order by the agency itself."  The court "may not accept counsel's *post hoc* rationalization for agency action." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962).

### 3.      The "novelty" of the transnational subsidy context does not excuse Commerce from complying with its own regulations

The Government argues that because this is the first case in which Commerce countervailed a transnational subsidy outside the international consortium or upstream subsidy provisions, prior determinations involving regional market distortion "provide little guidance." Def. Br. at 59–60.  Kukdo similarly asserts there are "no analogous cases."  Kukdo Br. at 23. This argument conflates the novelty of the transnational subsidy *finding* with the benchmark-selection *methodology*.  Commerce applied the benchmark hierarchy under 19 C.F.R. § 351.511(a)(2) in order to calculate the benefit from ECH for LTAR, the same regulatory provision it applies in every LTAR case.  Under that hierarchy, if an actual market-determined price in the country in question is unavailable at Tier 1 (*e.g.*, because domestic prices are distorted), then Commerce moves to a Tier 2 world price benchmark.  *See* 19 C.F.R. § 351.511(a)(2)(i)-(ii).  No reasonable basis exists to apply a higher standard for finding a distortion of prices at Tier 1 merely because the subsidy is transnational in nature.

Kukdo and the Government attempt to distinguish the *Habaş Sinae Ve Tibbi Gazlar v. United States* cases on the grounds that they "do not actually involve multiple countries."  Kukdo Br. at 22.  *See also* Def. Br. at 58–59.  In *Habaş*, the Court sustained Commerce's rejection of Russian prices as a "tier two" benchmark – which under 19 C.F.R. §351.511(a)(2)(ii) must be "available to purchasers in the country in question," *i.e.*, Turkey – because Russian government policy distorted the prices.  *See Habaş Sinae Ve Tibbi Gazlar v. United States*, 459 F. Supp. 3d

12

1341, 1346 (Ct. Int'l Trade 2020).  Commerce also declined to use European data because they were distorted by inclusion of Russia prices.  *See Habaş Sinae Ve Tibbi Gazlar v. United States*, 536 F. Supp. 1333, 1341 (Ct. Int'l Trade 2021).  In *Habaş*, Commerce did not ignore the broader effects of distortion by Russia, and the agency should not have ignored the effects of distortion by China in the present case.

### 4.    Petitioner's argument was timely

The Government and Kukdo repeat Commerce's claim that Petitioner did not raise a "specific, formal or complete argument" before the case briefs.  Def. Br. at 55–56; Kukdo Br. at 19–20.  Neither cites authority for the alleged requirement to make such an argument earlier in the proceeding, because none exists.  Commerce's regulations distinguish factual information (19 C.F.R. § 351.301) from written argument (19 C.F.R. § 351.309).  Petitioner timely submitted factual information throughout the investigation, including a world market (Tier 2) benchmark in its initial new subsidies allegation—which necessarily implies Tier 1 unavailability due to distortion—and raised the relevant arguments in its case brief, exactly as 19 C.F.R. § 351.309(c)(2) contemplates.  *See Dongkuk Steel Mill Co., Ltd. v. United States*, 567 F. Supp. 3d 1359, 1362–64 (Ct. Int'l Trade 2022) (distinguishing factual information from written argument).

Commerce acknowledged in the IDM that Petitioner's new subsidies allegation stated that countries "with massive overcapacity" through "direct Chinese investment in third country production" were "perpetuat{ing} global distortion."  IDM at Comment 20, p. 93, fn. 460. Commerce dismissed this as not "a formal allegation," *id.* at 93, but Commerce's regulations do not require that a party submit a "formal allegation" regarding a market distortion at Tier 1 of the LTAR benchmark hierarchy at any point prior to case briefs.

13

The Government further contends that Petitioner's distortion assertions were "not only untimely, but they were also deficient" because Petitioner supposedly provided insufficient evidence to justify combining Thai- and Chinese-origin ECH volumes.  Def. Br. at 55–56; IDM at Comment 20, p. 94.  The evidence Petitioner submitted—including data on Chinese overcapacity, export volumes to Thailand and Korea, and resulting price depression across the region—was more than sufficient to alert Commerce to the issue and require analysis.  Pet. Br. at 19–21; Petitioner's Second Case Brief at 8–12 (P.R. 522).

Thus, it was unreasonable for Commerce to refuse to consider Petitioner's regional distortion argument on the basis that it was "novel" and "untimely."  IDM at Comment 20, pp. 93–95.  Commerce failed to consider "an important aspect of the problem," leaving its determination unsupported by substantial evidence.  *See State Farm*, 463 U.S. at 43.  Accordingly, this issue must be remanded.

### D. Commerce Unreasonably And Unlawfully Refused To Investigate Other Chemical Inputs Provided For LTAR

#### 1. Commerce invoked a higher standard than the statute allows

The Government argues that Petitioner did not clearly indicate which specific additional chemicals were provided for LTAR and did not allege for each input the elements for the imposition of a duty.  Def. Br. at 61.  The Government states that "satisfying the burden for one type product does not satisfy it for any other, even if the products are similar or have shared characteristics."  Def. Br. at 63, *citing SolarWorld Americas, Inc. v. United States*, 125 F. Supp. 3d 1318, 1331 (Ct. Int'l Trade 2015).  The Government's reliance on *SolarWorld* is misplaced.  In that case, the petitioner stated that Commerce should have filled an evidentiary gap with pricing data from the International Trade Commission's "publicly available and easily accessible DataWeb service."  125 F. Supp. 3d at 1331.  The Court rejected this argument because the

necessary information was reasonably available to the petitioner.  This case is different.

Petitioner explained that it lacked access to respondents' proprietary production data, which was

necessary to identify relevant chemical inputs with greater specificity than had already been

accomplished in Petitioner's submissions.  *SolarWorld* therefore does not support Commerce's

refusal to investigate when Petitioner could not supply information that is uniquely within

respondents' possession.

Unlike *SolarWorld*, *RZBC Group Shareholding v. United States*, 100 F. Supp. 3d 1288

(Ct. Int'l Trade 2015), is directly on point, yet neither the Government nor Kukdo addresses it.

In *RZBC*, the Court held that, "{a}t the outset, when a petition is drafted, {the} domestic industry

may lack the data it needs to make firm factual allegations.  Hence, a degree of imprecision is

acceptable, so long as the parties back their claims with information reasonably available to

them."  100 F. Supp. 3d at 1295.  There, as here, the petitioner was not able to identify the

specific input used by respondents, yet the Court ruled that the statute's "easygoing standards"

required Commerce to "begin investigation, even if the precise contours of the subsidy were still

unknown."  *Id*. at 1295.

The Government states that "Petitioner provided *no information* to support its allegation

that the provision of any chemical – other than BPA and ECH – was specific. . . ."  Def. Br. at

63.  That is not accurate.  Petitioner did not allege unrelated subsidies for miscellaneous

chemicals.  Rather, Petitioner alleged a single program under which Chinese government-

controlled producers provided chemical inputs to Korean epoxy resin producers for LTAR, with

recipients limited to the chemical industry.  Petitioner's specificity showing regarding ECH and

BPA was not unique to those two inputs.  New Subsidy Allegations at 14-15 (P.R. 280, C.R.

425); Petitioner's Second Case Brief at 21 (P.R. 522).  The fact that a program may deliver

15

multiple inputs at subsidized prices does not necessarily transform it into multiple programs requiring separate specificity showings.

The reasonableness of treating chemical inputs as a group is demonstrated by Commerce's acceptance of that approach in other cases, including cases involving the chemicals sector. *See* Pet. Br. at 30–32; Def. Br. at 67 ("Petitioner is correct that Commerce does sometimes group inputs provided for LTAR as a single program.")  As this Court has recognized, "consistency has long been a core interest of administrative law, and inconsistent treatment is inherently significant. . . . . {N}early seventy years of Supreme Court and Federal Circuit precedent recognize an agency's duty to address departure from prior norms and policies." *DAK Americas LLC v. United States*, 456 F. Supp. 3d 1340, 1355–1356 (Ct. Int'l Trade 2020).

Petitioner alleged financial contribution (provision of goods by government-controlled entities), specificity (limited to the chemical industry), and benefit (below-market pricing demonstrated through import statistics).  New Subsidy Allegations at 11–16 (P.R. 280). Commerce relied on Petitioner's information to initiate on ECH and BPA.  New Subsidies Allegation ("NSA") Initiation Memorandum at 2–3 (P.R. 387).  Commerce never provided a reasonable explanation as to how the same allegation could be sufficient for ECH and BPA but insufficient for other chemical inputs supplied through the same mechanism.  The agency simply stated that ECH and BPA were the "primary direct inputs," although the statute makes no distinction between "primary direct inputs" and others in the context of LTAR subsidies.  *See* IDM at Comment 21, p. 95.  Despite lacking access to respondents' proprietary information regarding other chemical inputs, Petitioner presented sufficient information to "alert the agency to the possibility of a subsidy."  *RZBC*, 100 F. Supp. 3d at 1291.  Thus, Commerce's refusal to investigate rested on an input-specific pleading requirement that is contrary to the statute.

16

### 2.   Commerce improperly demanded information that was not reasonably available to Petitioner

Petitioner informed Commerce that it lacked access to respondents' proprietary production data regarding which specific chemicals each respondent purchases and from which suppliers. Petitioner's NSA Supplemental Questionnaire Response ("NSASQR") at 8–9 (P.R. 334). The Government asserts that, "{i}n this case, Petitioner showed that it was able to generally provide information regarding the usage of known chemicals for the purpose of supporting its allegation . . . because Petitioner submitted exactly such information regarding ECH and BPA." Def. Br. at 65. To the contrary, as Petitioner informed Commerce, all epoxy resin producers appear to use ECH and BPA, but which other chemicals any given producer uses is a trade secret. Petitioner's NSASQR at 19 (P.R. 334). That Petitioner was able to provide information for two universally used inputs therefore does not permit Commerce to reasonably infer that Petitioner had access to information concerning other respondent-specific inputs.

In *Nucor Corp. v. United States*, 600 F. Supp. 3d 1225 (Ct. Int'l Trade 2022) ("*Nucor I*"), the court remanded with instructions that Commerce reconsider its decision not to investigate a subsidy because "Commerce faulted Nucor for failing to provide better cost information without making the corresponding finding that such information was reasonably available to Nucor." *Id.* at 1232. The Government notes that, after three remands, the Court ultimately upheld Commerce's decision. *Nucor Corp. v. United States*, 772 F. Supp. 3d 1340, 1348–50 (Ct. Int'l Trade 2025) ("*Nucor IV*"). The Government omits that, in the first remand results, Commerce found that requested information *was* publicly available on the record of the agency's prior investigations. *Nucor Corp. v. United States,* 653 F. Supp. 3d 1295, 1302 (Ct. Int'l Trade 2023) (*"Nucor II"*). Commerce made no comparable finding here. The ultimate result in *Nucor IV* does not limit the core holding of *Nucor I*: Commerce cannot refuse to investigate by demanding

17

information to which a petitioner lacks access.  Here, Commerce improperly demanded that

Petitioner prove at the outset actual usage of each chemical the respondents may have sourced

from China while ignoring Petitioner's explanation that such information was not reasonably

available to it.

### 3.    The exhaustion doctrine does not apply; Commerce acted arbitrarily and capriciously

The Government states that Petitioner failed to raise before the agency that Commerce

does *not* have a practice of requiring separate allegations for each good or service provided for

LTAR.  Def. Br. at 66.  To the contrary, Petitioner's NSASQR explicitly cited cases in which

Commerce had not required separate allegations but, instead, treated inputs as a group.

NSASQR at 8–9 (P.R. 334).  Moreover, the exhaustion doctrine required Petitioner to present the

agency with the substance of its objection, not to predict and refute every *post hoc*

characterization Commerce might later invoke to defend its decision.

In any event, the Government fails to cite any case indicating a practice of requiring

separate allegations for each input.  To the contrary, the Government acknowledges prior cases

in which Commerce grouped inputs provided for LTAR as a single program.  Def. Br. at 67.  The

Government responds that those cases do not establish a binding practice and that each case

stands on its own.  Case-by-case discretion may allow Commerce to account for different

records, but it does not permit the agency to act arbitrarily.  Here, Commerce does not have the

discretion to apply a heightened initiation standard without addressing comparable situations in

other proceedings where it treated multi-input LTAR allegations as a single program.  Even if

those cases were not numerous enough to establish a practice, they show that nothing in the

statute or regulations compelled Commerce to require a separate allegation for each input.

Because the input-specific pleading requirement Commerce imposed was untethered to the

18

statute and unexplained in relation to contrary examples, Commerce treated similar situations differently, without providing a reasoned explanation.  That is arbitrary and capricious agency action.  *See RHP Bearings Ltd. v. United States*, 288 F.3d 1334, 1347 (Fed. Cir. 2002).

### E.    Commerce's Cross-Ownership Determination Effectively Applied An Improper Majority Ownership Requirement

#### 1.    Commerce's analysis was contrary to its established standard for determining cross-ownership

The Government concedes that "cross-ownership is not always based solely on majority direct stock ownership."  Def. Br. at 70.  Nevertheless, its defense of Commerce's decision shows that Commerce applied exactly that impermissible rule in practice.  The Government and Kukdo would like the Court to believe this case merely presents a disagreement about how the evidence should be weighed.  To that end, for example, Kukdo argues that "Commerce based its determination on a myriad of record evidence."  Kukdo Br. at 31.  *See also* Def. Br. at 73–74.  In fact, Commerce wrongly disregarded evidence regarding the Lee family and meetings of Kukdo's Board of Directors, see Pet. Br. at 39–42, and most importantly, it applied an unlawful standard to the evidence that it did consider.  Specifically, Commerce dismissed each piece of evidence of Lee family control by requiring "singlehanded" or exclusive control.  IDM at Comment 13, p. 72 (finding Lee family "could not singlehandedly control the board of directors").  Neither brief even attempts to explain how Commerce's requirement of "singlehanded" control could be anything other than a rule requiring majority ownership, even though this court has held that "calculating the percentage ownership of a company is not the end of the inquiry."  *Nucor Corp. v. United States*, 698 F. Supp. 3d 1310, 1318 (Ct. Int'l Trade 2024), *citing Nantong Uniphos Chemicals Co. v. United States*, 2018 Ct. Intl Trade LEXIS 86.

Neither brief addresses Commerce's misreading of *Nantong Uniphos Chemicals Co. v. United States*, 2018 Ct. Intl Trade LEXIS 86 at *9, cited in the *Contested Determination IDM* at

NON-CONFIDENTIAL VERSION: PROPRIETARY INFORMATION IN BRACKETS HAS BEEN DELETED

Comment 13, p. 72.  Petitioner showed that *Nantong* stands for the proposition that a plurality voting interest is sufficient for cross ownership where shares are widely held.  Pet. Br. at 38–39. Neither the Government nor Kukdo mention the case, let alone attempt to rehabilitate Commerce's mistaken reliance on it.

Kukdo argues that equal ownership of Ildo Chemical's shares by Kukdo Chemical and a Japanese corporation precludes a finding of control.  Kukdo Br. at 29–30.  However, Kukdo does not address the evidence that [

].  *See* Pet. Br. at 36.

Commerce not only equated corporate control with "singlehanded" control, but also dismissed record evidence showing how control was actually exercised within the Kukdo Group. Commerce claimed [

], *see* Kukdo BPI Analysis Memorandum at 2, and [

]

the Lee family.  *See* Def. Br. at 74–75.  Commerce ignored [

] "modern business arrangements."  *Statement of Administrative Action Accompanying the Uruguay Round Agreements Acts*, H.R. Doc. No. 103-316 (1994) at 838.   It would require [

].  As *Nantong* recognized, differences in the concentrations of shareholdings can matter greatly in the control analysis.  2018 Ct. Intl Trade LEXIS 86, *7-*9; *see also In re Cysive, Inc., Shareholder Litigation*, 836 A.2d 531, 552 n. 30 (Del. Ch. 2003) (stating that "a 100% turn-out is unlikely even in a contested election {of directors}" and "{a} 40% bloc is very potent in view of that reality.").  Relying on [

] to dismiss record evidence showing how control is actually exercised falls far short of the required analysis of "modern business arrangements" that can afford control "even in

20

the absence of an equity relationship." *Statement of Administrative Action Accompanying the Uruguay Round Agreements Act*, H.R. Doc. No. 103–316 (1994) at 838.  Commerce's approach also falls short of taking into account "whatever in the record fairly detracts" from a conclusion. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 486 (1950) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. . . . Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function.").

Despite the Government's claim that Commerce examined the totality of the circumstances, what it actually *did* was to require "singlehanded" control, which is functionally indistinguishable from requiring majority ownership.  Recognizing that proposition does not entail the court reweighing the evidence, as Kukdo asserts.  Kukdo Br. at 2, 10.  Rather, "{t}he court considers what Commerce said and what it did." *Nucor Corp. v. United States,* 653 F. Supp. 3d 1295, 1302 (Ct. Int'l Trade 2023).  Remand is required "where there is inconsistency between" the relevant standard and the conclusion that the agency reached, because then the agency fails to meet the requirement to "be consistent in its statement of the applicable standard and its application of the standard." *Id.* at 1302.

### 2.    Commerce's simultaneous Taiwan determination confirms that its cross-ownership determination is arbitrary

Commerce issued a determination regarding Taiwan, which involved the same product and the same cross-ownership regulatory provision, on the same day as the Korea determination at issue here.  Pet. Br. at 35–37.  In the Taiwan case, Commerce found that Nan Ya Plastics was cross-owned with three affiliated input suppliers based on "a combination of high levels of minority ownership, interlocking board members, and a high degree of intertwined operations." *Certain Epoxy Resins from Taiwan: Amended Final Countervailing Duty Determination*, 90 Fed.

21

NON-CONFIDENTIAL VERSION: PROPRIETARY INFORMATION IN BRACKETS HAS BEEN DELETED

Reg. 22,235 (Dep't Commerce May 27, 2025), IDM at Comment 7, pp. 54–55.  The companies' collective ownership ranged from 23 to 28 percent, remaining shares were widely held, and the founding Wang family held executive director positions across the group.  *Id.* at 55–58.  [

].

In the Taiwan case, Commerce affirmatively cited *Live Swine from Canada* and *Coated Paper from Indonesia* as relevant precedent, stating they showed "it was appropriate to analyze both a respondent's equity positions in other entities that were part of its production system and the degree to which the respondent provided operations and/or financial management services to these other entities."  *Certain Epoxy Resins from Taiwan* IDM at Comment 7, p. 55.  In the Korea IDM, issued the same day, Commerce dismissed those same authorities, stating it was "not beholden to the analysis criteria chosen in *Live Swine from Canada* or *CFS from Indonesia*."  IDM at Comment 13, p. 70.  Commerce may not rely on those cases as useful guidance in one same-day determination while disclaiming them in another involving the same product and the same regulation.

In Taiwan, Commerce found that Wang family members holding executive director positions "adds additional weight" to the cross-ownership finding, and Commerce did not insist upon "singlehanded" control.  *Certain Epoxy Resins from Taiwan* IDM at Comment 7, pp. 58–59.  In Korea, Commerce dismissed Lee family board presence because the Lee family could not "singlehandedly control."  IDM at Comment 13, p. 72.  In other words, Commerce credited family board service as substantial evidence of control in Taiwan, while dismissing comparable evidence in Korea.

The Government argues that cases citing *Live Swine from Canada* do not establish a "practice" under the three-part test in *BlueScope*.  Def. Br. at 71–73, *citing BlueScope Steel, Ltd.*

22

*v. United States*, 719 F. Supp. 3d 1357 (Ct. Int'l Trade 2024). That response misses the point. Commerce applied inconsistent analytical methods to the same regulatory provision in two determinations about the same product decided on the same day. Commerce may reach different conclusions when different facts warrant them. However, as this Court has held, "Commerce may not treat two like situations differently without explanation." *Royal Thai Gov't v. United States*, 31 C.I.T. 1213, 1219, 502 F. Supp. 2d 1334, 1341 (2007). Commerce cited *Live Swine* as relevant precedent in Taiwan and on the same day disclaimed it in Korea. In these circumstances, the invocation of "case-by-case discretion" cannot justify plainly arbitrary action. *See RHP Bearings*, 288 F.3d at 1347.

### F.  The "All Others" Rate Must Be Recalculated

The "all others" rate was based on the final rates for Kumho and Kukdo and should be recalculated consistent with any amendments. Pet. Br. at 42. The Government and Kukdo do not separately dispute this point.

### IV.  CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that the Court enter judgment in its favor and remand the *Contested Determination* with instructions for Commerce to:

(i)  adjust the benchmark used to measure the benefit from the provision of electricity for LTAR to include a rate of return sufficient to recoup KEPCO's cumulative losses;

(ii)  adjust the benchmark similarly for losses of KEPCO's subsidiaries;

(iii)  adjust for regional market distortion the benchmark used to determine the benefit from provision of ECH for LTAR, using a Tier 2 world price benchmark with adjustments to remove distorted data;

(iv)  initiate an investigation of provision for LTAR of chemical inputs from China other than ECH and BPA;

(v)  re-examine whether Kukdo and its affiliates are cross-owned and attribute subsidies accordingly; and

23

(vi)   recalculate the "All Others" subsidy rate to the extent necessary based on changes relating to the other issues raised in this action.

Respectfully submitted,


*/s/ Stephen J. Orava*
Stephen J. Orava
Patrick J. McLain
Worth S. Anderson

KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006–4706
(202) 737–0500
sorava@kslaw.com

July 27, 2026

*Counsel for U.S. Epoxy Resin Producers*
Ad Hoc *Coalition*

24

**CERTIFICATE OF COMPLIANCE**
**WITH WORD COUNT LIMITATIONS**


Pursuant to paragraph 2(B)(2) of the U.S. Court of International Trade's *Standard Chambers Procedures*, the undersigned certifies that this brief complies with the word count limitations set forth in the Court's scheduling order.  Exclusive of the exempted portions, as provided in paragraph 2(B)(1), this brief contains 6,896 words.  In preparing this certificate, the undersigned has relied upon the word count feature of the word-processing system used to prepare the submission.


/s/ *Stephen J. Orava*
Stephen J. Orava

KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC  20006–4706
(202) 737–0500
sorava@kslaw.com

*Counsel for U.S. Epoxy Resin Producers*
Ad Hoc *Coalition*


July 27, 2026